IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BRIDGEVILLE RIFLE & PISTOL CLUB, LTD.; MARK HESTER; JOHN R. SYLVESTER; MARSHALL KENNETH WATKINS; BARBARA BOYCE, DHSc RDN; ROGER T. BOYCE, SR.; and the DELAWARE STATE SPORTSMEN'S ASSOCIATION, | § § § § § § § § § | No. 15, 2017 <br><br> Court Below: Superior Court of the State of Delaware |
| Plaintiffs Below, Appellants, | § § § § | C.A. No. S16C-06-018 (S) |
| v. | § § § | |
| DAVID SMALL, SECRETARY OF THE DELAWARE DEPARTMENT OF NATURAL RESOURCES AND ENVIRONMENTAL CONTROL; DEPARTMENT OF NATURAL RESOURCES AND ENVIRONMENTAL CONTROL; ED KEE, SECRETARY OF DELAWARE DEPARTMENT OF AGRICULTURE; and DELAWARE DEPARTMENT OF AGRICULTURE, | § § § § § § § § § § § § § § | |
| Defendants Below, Appellees. | § § § § | |

Submitted: September 13, 2017
Decided: December 7, 2017

Before **STRINE**, Chief Justice; **VALIHURA**, **VAUGHN**, **SEITZ** and **TRAYNOR**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **REVERSED**.

Francis G.X. Pileggi, Esquire (*argued*), and Alexandra D. Rogin, Esquire, Eckert Seamans Cherin & Mellott, LLC, Wilmington, Delaware, for Appellants.

Ralph K. Durstein, III, Esquire (*argued*), and Devera B. Scott, Esquire, State of Delaware Department of Justice, Dover, Delaware, for Appellees.

Myron T. Steele, Esquire and Jesse L. Noa, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware, for Amicus Curiae, *Members of the Delaware General Assembly.*

Thomas D. Shellenberger, Esquire, Law Office of Thomas D. Shellenberger LLC, Wilmington, Delaware, for Amicus Curiae, *Pink Pistols*.

Brian Gottesman, Esquire, Berger Harris LLP, Wilmington, Delaware. Of Counsel: Dan M. Peterson, Esquire, Dan M. Peterson PLLC, Fairfax, Virginia, for Amici Curiae, *Law Enforcement Legal Defense Fund, Law Enforcement Action Network,* and *Retired Delaware Police Officers Hosfelt, Smith, Deputy, Egolf, Monaghan, Briggs, Roe, Brode, Capitan, Konnick,* and *Guittari*.

Jeffrey S. Goddess, Esquire, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware. Of Counsel: Paul B. Carberry, Esquire, White & Case LLP, New York, New York, for Amicus Curiae, *The Law Center to Prevent Gun Violence*.

Stephen E. Jenkins, Esquire and Marie M. Degnan, Esquire, Ashby & Geddes, Wilmington, Delaware. Of Counsel: David H. Thompson, Esquire, Peter A. Patterson, Esquire and Haley N. Proctor, Esquire, Cooper & Kirk, PLLC, Washington, D.C., for Amicus Curiae, *National Rifle Association of America, Inc.*

**VALIHURA**, Justice, for the Majority:

This appeal concerns guns and, as such, has attracted numerous amici curiae raising politically fraught questions concerning gun rights.[1] However, at its core, this case raises straightforward questions of Delaware constitutional and administrative law. We are asked whether unelected officials from the State's parks and forest departments, whose power is expressly limited, can ban (except for a narrow exception for hunting) the possession of guns in state parks and forests in contravention of Delawareans' rights under the State's constitution. Clearly they cannot. They lack such authority because they may not pass unconstitutional laws, and the regulations completely eviscerate a core right to keep and bear arms for defense of self and family outside the home -- a right this Court has already recognized. As such, the regulations are unconstitutional on their face. Thus, we REVERSE for these reasons and those that follow.

\* \* \*

Appellants challenge two regulations adopted by two different State agencies that result in a near total ban of firearms in Delaware's state parks and forests. Appellants are two organizations, namely the Delaware State Sportsmen Association and the Bridgeville Rifle & Pistol Club, Ltd., along with several of their individual members who wish to carry firearms on these State properties. They seek a declaratory judgment that the regulations

---

[1] These amici also assert evidence-based arguments which this Court cannot consider given that there is no evidentiary record in the proceeding below. *See* Briefs for Law Enforcement Action Network; Law Enforcement Legal Defense Fund; Members of the Delaware General Assembly; Retired Delaware Police Officers Hosfelt, Smith, Deputy, Egolf, Monaghan, Briggs, Roe, Brode, Capitan, Konnick and Guittari; The National Rifle Association of America, Inc.; and The Pink Pistols as Amici Curiae Supporting Appellants. *See also* Brief for The Law Center to Prevent Gun Violence as Amicus Curiae Supporting Appellees.

are unconstitutional: they contend that these regulations compromise their fundamental rights under Article I, Section 20 of the Delaware Constitution, which provides: "A person has the right to keep and bear arms for the defense of self, family, home and State, and for hunting and recreational use."[2]

Although federal courts are still grappling with whether there exists a Second Amendment right to carry a firearm outside the home, our Court settled the issue under our own constitution in our unanimous, en banc opinion in *Doe v. Wilmington Housing Authority*, by holding that, "[o]n its face, the Delaware provision is intentionally broader than the Second Amendment and protects the right to bear arms *outside the home*, including for hunting and recreation."[3] We stated that, though not unlimited, Section 20 protects a core right of "defense of self and family *in addition to* the home" (as all parties here concede).[4]

But despite this constitutional requirement, the first of the challenged regulations, Delaware's Department of Natural Resources and Environmental Control ("DNREC") Regulation 9201-21.1, provides:

> It shall be unlawful to display, possess or discharge firearms of any description, air rifles, B.B. guns, sling shots, or archery equipment upon lands or waters administered by the Division, except with prior written approval of the Director.[5]

---

[2] DEL. CONST. art. I, § 20.

[3] *Doe v. Wilm. Hous. Auth.*, 88 A.3d 654, 665 (Del. 2014). (emphasis added). Thus, "our interpretation of Section 20 is not constrained by . . . federal precedent . . . ." *Id.*

[4] *Id.* (emphasis in original).

[5] 7 *Del. Admin. C.* § 9201-21.1.

2

"Division" is defined as DNREC's Division of Parks and Recreation ("Parks Division"), responsible for more than 23,000 acres of Delaware property ("State Parks").[6] Section 21.3 provides that, "[n]otwithstanding subsection[] 21.1 [above] . . . hunting may be permitted in certain areas at times authorized by the Division . . . [and] shall be in accordance with State and Federal laws, rules and regulations."[7] Breach of Section 21.1 is classified as a class D environmental violation, punishable by a fine "not less than $50 nor more than $100, plus the costs of prosecution and court costs"; repeat violations within five years are punishable by fines ranging from $100 to $500 plus costs.[8] The practical implication of this regulatory scheme is the prohibition of all firearms within State Parks, except with the written permission of the Director or for hunting purposes at certain times in compliance with additional regulations.

Similarly, Section 8.8 of Delaware's Department of Agriculture ("DOA") Hunting Rules and Regulations provides:

> Target shooting is prohibited.  Firearms are allowed for legal hunting only and are otherwise prohibited on State Forest lands.[9]

---

[6] 7 *Del. Admin. C.* § 9201-1.0; *see Public Protected Lands*, STATE OF DELAWARE, https://data.delaware.gov/Recreation/Public-Protected-Lands/whe2-8n4h/data (last visited Nov. 27, 2017) [hereinafter Public Protected Lands Data].

[7] 7 *Del. Admin. C.* § 9201-21.3.

[8] 7 *Del. C.* § 4702(a); 7 *Del. Admin. C.* §§ 9201-21 (classification as an Environmental D Violation), -25.1.

[9] 3 *Del. Admin. C.* § 402-8.8.

3

In effect, the DOA, whose Forest Service oversees the approximately 18,000 acres of Delaware's three state forests ("State Forests"),[10] also completely bans firearms with a limited exception for legal hunting, which may be pursued only if licensed and selected by lottery to use one of the specifically designated stands.[11] Violations of the DOA's State Forest Regulations, including the Hunting Rules and Regulations, are unclassified misdemeanors punishable by fines ranging from $25 to $500.[12] And, as under the DNREC regulation, because possession of firearms is banned, the DOA regulation acts as a total ban on carrying firearms for self-defense.[13]

The Superior Court upheld the DNREC and DOA regulations (collectively, the "Regulations") as it believed that they were substantially related to achieving the "important governmental objective of keeping the public safe from the potential harm of firearms in State Parks and Forests" and that the Regulations did not impose an undue burden on Appellants' Section 20 constitutional rights.[14] But this Court rejected precisely that sort of "general safety concern" justification as insufficient to uphold such regulations

---

[10] *See* Public Protected Lands Data, *supra* note 6.

[11] *See* 3 *Del. Admin. C.* §§ 402-8.2, -11.

[12] *Id.* § 402-10.2.

[13] Section 8.8 does not even allow possession with the written permission of the DOA's Agriculture Secretary. *Id.* § 402-8.8.

[14] *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 2016 WL 7428412, at *5 (Del. Super. Ct. Dec. 23, 2016). As the parties cross-moved for judgment on the pleadings, the Superior Court decided the case based on the motions and the accompanying appendices. *Id.* at *1 (citing Super. Ct. Civ. R. 56(h)).

in *Doe*.[15]   And the Superior Court's determination that the Regulations do not unduly infringe on Appellants' Section 20 constitutional rights because they "remain free to hunt on State lands in accordance with the reasonable restrictions in place"[16] wrongly presumes that the ability to exercise just part of one's Section 20 rights (connected to hunting, at limited times) is an adequate substitute for eliminating the core Section 20 right of self-defense entirely in State Parks and Forests.   The Superior Court's decision fails to appreciate that the ability to exercise Section 20's fundamental rights must be meaningful and that the State must preserve an avenue for carrying out Section 20's core purposes,[17] which includes the right of possession of lawful firearms for self-defense, including outside the home.[18]

The Superior Court's opinion does not address the express Section 20 right to bear arms for self-defense except to observe that, "the need to respond to a threat with a firearm is diminished when firearms are prohibited in the area,"[19] and that Appellants' "right to bear arms to protect themselves if the need for self-defense arises is not hindered but, rather, aided in effect by the presence of the Regulations."[20]   But that conclusion is premised on the questionable notion -- unsupported by reference to any evidence -- that

---

[15] *Doe*, 88 A.3d at 667.

[16] *Bridgeville*, 2016 WL 7428412, at *5.

[17] *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) (striking down a firearms regulation that constituted a "serious encroachment on . . . the meaningful exercise of the core right to possess firearms for self-defense.").

[18] *Doe*, 88 A.3d at 665.

[19] *Id.*

[20] *Id.*

5

outlawing possession of firearms in an area makes law-abiding citizens safer because criminals will, for some reason, obey the Regulations.

The limited ability to have a hunting rifle or shotgun while engaged in a controlled hunt on state park or forest land does not fulfill -- and cannot substitute for -- the people's right to have a firearm for defense of self and family while camping overnight in a State Park or hiking in the more remote acres of State Forests (assuming compliance with all other laws governing guns). The Regulations not only unduly burden that constitutional right, but eviscerate it altogether.

We acknowledged in *Doe* that the right to carry a firearm for self-defense is not absolute and may be restricted.[21] For example, the State validly prohibits felons from possessing deadly weapons[22] and limits possession of concealed deadly weapons outside the home to people who hold permits.[23] The issue here is not whether the government may regulate firearms, but whether DNREC and DOA (the "Agencies") can justify a near total ban on the right to possess a lawful gun to defend one's self and family with a firearm in Delaware's State Parks and Forests. The Agencies not only fail to justify such sweeping regulations, but fail to show that they had the authority to enact such unconstitutional regulations in the first place.[24]

---

[21] *Doe*, 88 A.3d at 667.

[22] *Id.* at 664 (citing *Short v. State*, 586 A.2d 1203, 1991 WL 12101, at *1 (Del. Jan. 14, 1991)).

[23] *Id.* (citing *Smith v. State,* 882 A.2d 762, 2005 WL 2149410, *3 (Del. Aug. 17, 2005)).

[24] At oral argument, the State agreed that Agency power is limited by the Constitution -- and in particular that the Regulations are subject to Section 20. *See* Oral Argument at 40:10, https://livestream.com/accounts/5969852/events/7714841/videos/162711371/player    ("[T]he

6

# I.  ANALYSIS

It is important to understand what is -- and is not -- at issue in this appeal.  Appellants do not seek "unfettered" or "unregulated" use of firearms in Delaware's State Parks and Forests.  The comprehensive and nuanced restrictions imposed by our General Assembly on the right to keep and bear arms are not challenged and are not at issue.[25]  Rather, Appellants seek to exercise their Section 20 rights, subject to the existing statutory scheme limiting the use of firearms.  Accordingly, invalidating the Regulations would merely

---

Regulations are clearly subject to examination as to whether they satisfy and do not violate that constitutional provision [Article I, Section 20].").

[25] *See, e.g.*, 11 *Del. C.* § 602 (prohibiting display of a firearm with the intent to place another in fear of imminent physical injury); *id.* § 603 (prohibiting guardians from allowing possession or purchase of a firearm by a juvenile); *id.* § 1441(allowing retired police officers to be specially licensed to carry a concealed weapon following retirement); *id.* §§ 1441A, 1441B (extending federal law regarding retired law enforcement officers' ability to carry concealed firearms); *id.* § 1442 (prohibiting a non-law enforcement officer to conceal any firearm without a license); *id.* § 1444 (prohibiting the possession of a firearm silencer, sawed-off shotgun, machine gun, or any other firearm or weapon adaptable for use as a machine gun); *id.* § 1445 (prohibiting the sale or transfer of a firearm to a minor); *id.* §§ 1447, 1447A (criminalizing possession of a firearm during the commission of a felony); *id.* § 1448 (prohibiting certain persons from owning, using or purchasing firearms); *id.* § 1448A (requiring a criminal background check prior to the purchase or sale of a firearm); *id.* §§ 1454, 1455 (criminalizing the act of giving a firearm to a prohibited person or engaging in a sale or purchase of a firearm on behalf of a person not legally allowed to sell or purchase firearms); *id.* § 1456 (criminalizing unlawfully permitting a minor access to a firearm); *id.* § 1459 (prohibiting the possession of a firearm with an obliterated serial number); *id.* § 1460 (prohibiting possession of a firearm in a public place while under the influence); *see also* 7 *Del. C.* § 1707 (prohibiting the training of hunting dogs while carrying a firearm); 9 *Del. C.* § 330 (prohibiting counties from regulating firearms); 10 *Del. C.* §§ 2703, 2806 (regulating the possession of firearms by constables); *id.* § 9224 (requiring drug testing for Justice of the Peace employees permitted to carry firearms); *id.* § 1045 (allowing court to order temporary relinquishment/ban on possession of firearms in connection with a protective order); 24 *Del. C.* §§ 901, 902, 903, 904, 905 (regulating the sale of firearms); *id.* § 1321 (prohibiting security guards from carrying firearms without proper licensing); 29 *Del. C.* § 9005(13) (requiring training for officers of Department of Services for Children, Youth and Their Families who carry firearms at work).

subject possession and carry of firearms to the same requirements and limitations that already apply throughout the State. Rather, the issue presented here is twofold: can a fundamental constitutional right be eliminated entirely, or virtually entirely, in State Parks and Forests -- not even by our elected General Assembly, but by unelected state administrators? Further, did the Agencies even have the authority to enact the Regulations?

### A.    Standard of Review

"Questions of law and constitutional claims are decided *de novo*."[26]

### B.    The Evolution of the Regulations at Issue

It is useful to start with an explanation of the regulations at issue.

### 1. Regulating Firearms in State Parks

The parties agree that the first version of a firearms restriction in State Parks appears in the minutes of a meeting of the State Park Commission of Delaware on April 10, 1962, when the Commission unanimously adopted Rules and Regulations for Use of State Parks.[27] Then-Section 10 provided: "No firearms or fireworks shall be possessed,

---

[26] *Doe*, 88 A.3d at 661 (citing *Sheehan v. Oblates of St. Francis de Sales*, 15 A.3d 1247, 1258 (Del. 2011)).

[27] App. to Appellants' Opening Br. at A368 (State Park Commission of Delaware Apr. 10, 1962, Meeting Minutes); *id.* at A194 (letter dated Aug. 19, 2016, Agencies' Response to Superior Court's request that "counsel provide the language of the Regulations governing firearms through the years, and the dates of any changes"); *id.* at A448-49 (letter dated Sept. 2, 2016, concerning Defendants' Response to the Court's request). The dissent notes that DNREC was created in 1937, *see* Dissent at 26, but it cites no statewide ban on possession of firearms in State Parks until 1962. The dissenters therefore must concede that: (i) there was no continuous ban on possession of firearms in State Parks until 1977; and (ii) there was no continuous ban on possession in State Forests until 2003 -- after Section 20's passage.

8

displayed or discharged on any park area at any time."[28]  In 1968, the Rules were amended and the provision, which moved to Section 9.01, included an exception for those with "prior written permission,"[29] without explaining how to obtain such permission and what qualified as valid permission.

In 1969, the Rules were revised again, and the provisions concerning fireworks and firearms split into two subsections, (a) and (b).[30]  Section 9.01(b) governing firearms provided: "The display or discharging of firearms upon the lands and waters administered by the Commission is prohibited without prior written permission, except in those areas designated for hunting and trapping by the State Park Commission."[31]  The provision now only forbade "display or discharge[]," but not possession.  Notably, the provision in Section 9.01(a), relating to fireworks, did ban possession of fireworks.[32]

In 1977, the firearms provision moved to Section 8.04 and once again addressed possession as well as the display and discharge of firearms:

> It shall be unlawful to display, possess or discharge firearms of any description, air rifles, B.B. guns or sling shots upon any lands or waters administered by the Division, except those persons lawfully hunting in those

---

[28] *Id.* at A368 (State Park Commission of Delaware Apr. 10, 1962, Meeting Minutes).

[29] *Id.* at A352 (State Park Commission of Delaware Rules and Regulations, Effective June 18, 1968, § 9.01).

[30] *Id.* at A345 (State Park Commission of Delaware Rules and Regulations, Effective Apr. 26, 1969, § 9.01).

[31] *Id.* § 9.01(b).

[32] *Id.* § 9.01(a).

9

areas specifically designated for hunting by the Division, or except with prior written approval of the Director or his authorized agent.[33]

By restoring the ban on "possess[ion]" outside hunting areas, there was now a total ban on firearms in those areas without prior written approval of the Director or his authorized agent.[34] The provision also added the requirement of *lawful* hunting in order to possess a firearm in the designated hunting areas. For example, Section 10.01(f) established that "[n]o firearms, other than a shotgun, may be used for hunting on areas designated for hunting within State Park lands."[35] Section 10.01(f) also prohibited all possession of "rifled firearm[s]" in State Parks.[36]

The firearms provision did not change until 2004, when it was moved from the section governing "Conduct" to Section 24.0 regarding "Hunting, Fishing and Wildlife Management."[37] The language of the provision remained substantively unchanged other than adding "archery equipment" to the list of banned objects.[38]

---

[33] *Id.* at A325 (State of Delaware Park Rules and Regulations, DNREC Division of Parks & Recreation, Effective May 26, 1977, § 8.04).

[34] No version of the Regulations outlines standards or criteria regarding such approval or the process for obtaining it. There is no evidence that the Director or his authorized agent has ever granted such approval. Nor is there any evidence or reason to believe that this exception is a remedy available to the ordinary park visitor.

[35] *Id.* at A332 (State of Delaware Park Rules and Regulations, DNREC Division of Parks & Recreation, Effective May 26, 1977, § 10.01(f)).

[36] *Id.*

[37] 7 Del. Reg. 1768, 1780 (June 2004), *available at* App. to Appellants' Opening Br. at A238, A250.

[38] *Id.* The revision also added the word "by" to the clause "except those persons lawfully," so the provision reads "except by those persons lawfully." *Id.*

The current provision -- which is substantively the same as the 2004 version, though split in two subsections -- was finalized in March 2016.[39]

## 2. Regulating Firearms in State Forests

In contrast, DOA's Forest Service did not begin barring the possession of firearms except for hunting until 2003 -- after the addition of Section 20 to the State Constitution. The earliest Forest Service regulation concerning firearms, from approximately 1979 through 1981 (according to the Agencies), provided: "[t]he discharge or use of a firearm of any sort is prohibited, except by licensed hunters for game in season. No target shooting is permitted at anytime [*sic*]."[40] On its face, the regulation did not prohibit possession -- only use and discharge. Regulations from 2003 prohibited target shooting and provided: "[f]irearms are allowed for legal hunting only, and are prohibited on State Forest lands from March 1 through August 31."[41] In 2006, the seasonal date restriction was eliminated such that firearms are "allowed for legal hunting only and are otherwise prohibited on State Forest lands."[42]

---

[39] 7 *Del. Admin. C.* § 9201-21, *available at* App. to Appellants' Opening Br. at A235.

[40] App. to Appellants' Opening Br. at A428, A439 (State of Delaware Department of Agriculture State Forest Rules at ¶ 8); *see id.* at A198 (table of contents for Appendix B to letter dated Aug. 19, 2016, Agencies' response to Superior Court's request that "counsel provide the language of the Regulations governing firearms through the years, and the dates of any changes") (providing dates for the Department of Agriculture State Forest Regulations and listing 1979 as the earliest such regulation).

[41] 6 Del. Reg. 1201, 1204, § 7.9 (Mar. 1, 2003), *available at* App. to Appellants' Opening Br. at A399.

[42] 9 Del. Reg. 1425, 1429 at § 8.8 (Apr. 1, 2006), *available at* App. to Appellants' Opening Br. at A392; *see* 10 Del. Reg. 88, 89 (July 1, 2006) (adopting proposed regulation), *available at* App. to Appellants' Opening Br. at A387.

C. *Article I, Section 20 of the Delaware Constitution*

When it comes to interpreting provisions of our Delaware Constitution, we have previously highlighted "the significance of knowing the original text, context and evolution of any phrase that appears in the present Delaware Constitution."[43] Accordingly, we first analyze the text of Section 20 and the context that surrounds its adoption. We then explain the history of the evolution of the right to bear arms in Delaware. This historical explanation refutes any notion that the rights codified in Section 20 were not pre-existing rights or that they sprang into existence for the first time in 1987 with Section 20's passage.

1. *Section 20 – Its Text and Evolution*

We begin with the text of the Constitution. We have previously observed that "[o]n its face, the Delaware provision is intentionally broader than the Second Amendment."[44] Comparing the language of the two provisions makes this clear:

| Text of Second Amendment: | Text of Section 20: |
|---|---|
| "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." | "A person has the right to keep and bear arms for the defense of self, family, home and State, and for hunting and recreational use." |

---

[43] *In re Request of Governor for an Advisory Opinion*, 905 A.2d 106, 108 (Del. 2006). In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the United States Supreme Court emphasized the importance of surveying the relevant history in addition to the text when analyzing the Second Amendment to the United States Constitution, the federal analogue to our Section 20. *See also Wrenn v. District of Columbia*, 864 F.3d 650, 658 (D.C. Cir. 2017) (noting that historical analysis is "essential for tracing the '*pre-existing* right' embodied by the [Second] Amendment" (quoting *Heller*, 554 U.S. at 592) (emphasis in *Heller*)). In *Wrenn*, the D.C. Circuit criticized courts that have "dispensed with the historical digging" that *Heller* "makes essential to locating the Amendment's edge, or at least its core." 864 F.3d at 661.

[44] *Doe*, 88 A.3d at 665.

12

We held in *Doe* that, given that "Section 20 specifically provides for the defense of self and family *in addition to* the home," Section 20 "protects the right to bear arms outside the home."[45] In contrast, the United States Supreme Court recently denied a writ of *certiorari* in a case that directly raised the issue of whether the Second Amendment protects the right to carry outside the home.[46] However, we need not decide whether the Regulations violate the Second Amendment as Appellants only allege that they violate Section 20. And our Delaware Constitution may provide "broader or additional rights" than the federal constitution, which provides a "floor" or baseline rights.[47]

Thus, the text of Section 20 allows us to begin with the proposition, articulated in *Doe* and conceded by the State,[48] that Section 20 protects the right to bear arms outside the home. Importantly, just as we found in *Doe* that the specific enumeration of "self and family" *in addition to* the home provides an independent right to bear arms outside the home (and not just in it), the separation of "defense of self and family" in the text of Section

---

[45] *Doe*, 88 A.3d at 665 (emphasis in original).

[46] *Peruta v. California*, 2017 WL 176580, at *1 (U.S. June 26, 2017) (denying writ of certiorari), discussed *infra* at note 100.

[47] Randy J. Holland, *State Jury Trials and Federalism: Constitutionalizing Common Law Concepts*, 38 VAL. U. L. REV. 373, 375 (2004). In *Dorsey v. State*, this Court held that "Delaware judges cannot faithfully discharge the responsibilities of their office by simply holding that the Declaration of Rights in Article I of the Delaware Constitution is necessarily in 'lock step' with the United States Supreme Court's construction of the federal Bill of Rights." 761 A.2d 807, 814 (Del. 2000); *see also* Randy J. Holland, *The Delaware State Constitution* 36 (2d ed. 2017) ("The provisions in the federal Bill of Rights set only a minimum level of protection.").

[48] *See, e.g.*, App. to Appellants' Opening Br. at A91 (Defs.' Reply Br. in Support of Defs.' Mot. for Summary Judgment on the Pleadings and Answering Br. on Pls.' Mot. for Judgment on the Pleadings) ("[T]he right extends beyond the home to a lesser degree.").

20 creates a different right from the right to bear arms "for hunting and recreational use," which is a separate clause of the provision and permitted under the Regulations in limited circumstances.

As part of the Declaration of Rights, Section 20 is covered by the Delaware Constitution's "Reserve Clause," which declares in bold capitalized letters: "**EVERYTHING IN THIS ARTICLE [THE DECLARATION OF RIGHTS] IS RESERVED OUT OF THE GENERAL POWERS OF GOVERNMENT HEREINAFTER MENTIONED**"[49] The Reserve Clause has been in our Constitution in substantially its present form since 1792.[50] A prior version of it appeared in Article 30 of

---

[49] DEL. CONST. art. I (Reserve Clause). Our dissenting colleagues accuse us of giving Section 20 a "federal coat of paint." Dissent at 5. Yet they refuse to follow the recent unanimous, en banc decision of this Court in *Doe*: they say they "disagree" with it and find the case "problematic." Dissent at 68. It is troubling that the dissenters advocate ignoring the principles of *stare decisis* and, instead, would base decisions on their own views of which of our fundamental rights are worth protecting. Such an approach, were it to be followed, would undermine the stability of our law. In addition, the dissenters ignore the Reserve Clause altogether.

[50] The 1792 convention delegates unanimously approved the Declaratory Clause subjoined to the first Article, which provided: "WE declare that every Thing in this Article is reserved out of the general Powers of Government herein after mentioned." *Minutes of the Convention of the Delaware State* 65 (Dover, Del., 1792 printed by Brynberg & Andrews), *available at* RG 1115.000 House of Assembly Minutes and Proceedings, 1776-1791 Box # 6 (Dover, Del. Public Archives).

14

the Constitution of 1776.[51]  In *State v. Bender*,[52]  we held that the exercise by our General Assembly to amend the Constitution is not the exercise of "a general power of government,"[53] and thus constitutional under the Reserve Clause.  We found that the General Assembly's ability to amend the Constitution is a "very 'special' power" given that it requires the "indirect submission to the people of a proposed amendment to the Constitution passed by the General Assembly."[54]  Because constitutional amendments only become effective if two successive General Assemblies vote in favor of them, the electorate has an opportunity to reject a proposed amendment that has been approved by the first General Assembly by engaging with their legislators and, if needed, replacing them with legislators who will vote in accordance with their views.[55]  Although we also observed in *Bender* that the precise meaning of the Reserve Clause may have been "lost in the mists of time,"[56] at a minimum, it must suggest that *unelected* officials cannot enact regulations which totally ban fundamental rights set forth in Article I.

---

[51] Article 30 of the 1776 Constitution provided:

> No article of the declaration of rights and fundamental rules of this state, agreed to by this convention, nor the first, second, fifth (except that part thereof that relates to the right of suffrage) twenty-sixth and twenty-ninth articles of this constitution, *ought ever to be violated on any pretence whatever*.  No other part of this constitution shall be altered, changed or diminished, without the consent of five parts in seven of the Assembly, and seven Members of the Legislative Council.

DEL. CONST. OF 1776, art. 30 (emphasis added).

[52] 293 A.2d 551 (Del. 1972).

[53] *Id.* at 554.

[54] *Id.* at 553.

[55] *See* DEL. CONST. art. XVI, § 1.

[56] 293 A.2d at 554.

*2. The Historical Underpinnings of Delaware's Right to Bear Arms for Self-Defense*

The right to bear arms, including the right of self-defense, has existed since our State's founding and has always been regarded as an inalienable right. We reject the notion that the Regulations were "grandfathered" because various versions of them predate the addition of Section 20: they were unconstitutional before the passage of Section 20, and they are unconstitutional now.

This Court recognized in *Doe v. Wilmington Housing Authority* that "Delaware has a long history, dating back to the Revolution, of allowing responsible citizens to lawfully carry and use firearms in our state."[57] Delaware is -- and always has been -- an "open carry" state.[58]

---

[57] *Doe*, 88 A.3d at 663.

[58] *Id.* In addition to historically being an open carry state, Delaware is one of the overwhelming majority of states that permits concealed carry with a license. *See* 11 *Del. C.* § 1441. By pointing to a thirty-year period in the 1800s when concealed carry was prohibited in Delaware, our dissenting colleagues suggest that regulations effecting a total ban are thus permissible. *See* Dissent at 28. The dissenters almost entirely ignore that Delaware has permitted open carry since its inception. They miss that Delaware has always permitted some meaningful avenue to exercise the right to bear arms, whether that avenue be through open carry or concealed. The crucial fact here is that the Regulations allow for neither. Further, the better reading of the historical precedents shows that states have had flexibility to favor either mode (open or concealed carry) or both, and have run afoul of constitutionally protected rights to bear arms when they have banned both -- as the Regulations do here. *See, e.g., Nunn v. State*, 1 Ga. 243 (Ga. 1846), for example, where the Georgia Supreme Court upheld a concealed carry ban, that court also stated that a statute that banned both open and concealed carry "is in conflict with the Constitution, and void." *Id.* at 251; *see also State v. Reid,* 1 Ala. 612, 616-617 (1840) ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional."); *Bliss v. Com.*, 12 Ky. 90, 91 (1822) (suggesting that a regulation that "import[s] an entire destruction of the right of the citizens to bear arms in defense of themselves and the state" would be plainly unconstitutional). Moreover, the dissent's references to the Northampton statute (originating in 1328), *see* Dissent at 19, 21, are "neutralized" by *Heller*, as the *Wrenn* court concludes: "[e]arly commentators seem to confirm that whatever Northampton banned on the shores of England or

16

Since even before the founding, Delawareans valued their right of self-defense. As this Court has observed, "Like citizens of our sister states at the founding, Delaware citizens understood that the 'right of self-preservation' permitted a citizen to 'repe[l] force by force' when 'the intervention of society in his behalf, may be too late to prevent an injury.'"[59] Various militia acts enacted in Delaware's colonial period described the right of self-defense as "the first Principle and Law of Nature," and emphasized the importance of raising a "well regulated Militia" so that "the Inhabitants may be *armed*, trained and disciplined in the Art of War, whereby they may be enabled not only to assert the just Rights of his Majesty's Crown, *but also to defend themselves, their Lives and Properties, and preserve the many invaluable Privileges they enjoy under their present happy Constitution.*"[60] As we noted in *Doe*, "An individual's right to bear arms was 'understood

colonial America, the right to bear arms by the time of the Founding was thought to protect carrying for self-defense generally." 864 F.3d at 660.

[59] *Doe,* 88 A.3d at 663 (citing *Heller*, 554 U.S. at 595 (quoting 1 *Blackstone's Commentaries* 145-46 n.42 (1803) (alteration in original))).

[60] *An Act for Establishing a Militia in this Government* (passed Nov. 5, 1757) (italics supplied), *microformed on* RG 1111.000 Legislative Papers, 1731-1775 (Dover, Del. Public Archives); *see also An Act for Establishing a Militia in this State* (passed Feb. 22, 1777) (Wilm., Del., James Adams 1777) (emphasis added), *available at* IMP F161.31.A21 R28 M64 (Wilm., Del., Del. Historical Soc'y Archives):

> WHEREAS Self-Preservation is the first Principle and Law of Nature, and a Duty that every Man indispensably owes not only to himself but to the Supreme Director and Governor of the Universe who gave him a Being:
>
> AND WHEREAS in a State of Political Society and Government all Men by their original Compact and Agreement are obliged to unite in defending themselves, and those of the same Community, against such as shall attempt unlawfully to deprive them of their just Rights and Liberties; and it is apparent that without Defence no Government can possibly subsist:

to be an individual right protecting against both public and private violence.'"[61]

Further, Article 25 of Delaware's first constitution (enacted on September 20, 1776) provided that, unless otherwise altered by the State's legislature, the common law of England "shall remain in force."[62] By definition, this included Article VII of the 1689

. . .

> FOR PREVENTION whereof, and that the Inhabitants of this State may be armed, trained and disciplined in the Art of War, whereby they may be enabled not only to assert their just Rights but also to defend themselves, their Lives and Properties, and preserve inviolate that Freedom they derived from their Ancestors and the Constitution, and transmit the fair Inheritance to their Posterity;

(emphasis in original and added).

The Second Amendment's reference to "[a] well regulated Militia" in its prefatory clause -- and the root of the written right to keep and bear arms in various *militia* acts -- has led some to believe that the right's apparent tie to the militia somehow limits the scope of the right to bear arms to the "right to possess and carry a firearm *in connection with militia service*." *Heller*, 554 U.S. at 577 (emphasis added). However, the close textual, contextual, and historical exegesis in *Heller* confirms that the prefatory clause "announces the purpose for which the right was codified: to prevent the elimination of the militia," but not to limit the scope of the operative clause stating the right itself. *Id.* at 599. "[T]he threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right -- unlike some other English rights -- was codified in a written Constitution." *Id.* And, as *Heller* noted, though "self-defense had little to do with the right's *codification*; it was the *central component* of the right itself." *Id.* (emphasis in original).

[61] *Doe*, 88 A.3d at 663 (quoting *Heller*, 554 U.S. at 594); *see also,* Samuel Adams, *The Rights of the Colonists as Men* (Nov. 20, 1772), *reprinted in The Constitution of the United States of America and Selected Writings of the Founding Fathers* (2012) at 19. ("Among the natural rights of the colonists are these: First, a right to life. Second, to liberty. Thirdly, to property; together with the right to support and defend them in the best manner they can. These are evident branches of, rather than deductions from, the duty of self-preservation, commonly called the first law of nature.").

[62] DEL. CONST. OF 1776 art. 25 ("The common law of England, as well as much of the statute law as have been heretofore adopted in practice in this state, shall remain in force, unless they shall be altered by a future law of the Legislature; such parts only excepted as are repugnant to the rights and privileges contained in this constitution and the declaration of rights, agreed to by this convention."). This Court has repeatedly held that Delaware law includes the English common law as it existed in 1776, except where it has been clearly modified by our statutory law. *See* DEL.

18

English Bill of Rights -- described by the United States Supreme Court as "the predecessor to our Second Amendment"[63] -- which provided: "That the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law."[64] As noted by the United States Supreme Court in *Heller*, this "was clearly an *individual* right, having nothing whatever to do with service in a militia."[65] *Heller* made clear that the Second Amendment protects an inherent right of self-defense.[66]

Delaware's ratification of the Bill of Rights in the United States Constitution reinforces that Delaware's delegates to the constitutional convention viewed the right to

---

CONST. OF 1897, Schedule § 18; *Quillen v. State*, 110 A.2d 445, 450 (Del. 1955) ("Apart from statute[,] our law is in general the common law of England as it existed in 1776 . . . ."); *Steele v. State*, 151 A.2d 127, 130 (Del. 1959) ("Except as insofar as it has been found to be inconsistent with our statutory law, the common law of England is part of the law of this state. It was first adopted in the Constitution of 1776, Article 25. The same section was reenacted in each of the three succeeding constitutions: Constitution of 1792, Article VIII, Section 10; Constitution of 1831, Article VII, Section 9; and in our present Constitution of 1897, Schedule, § 18."). In contrast to *Doe* and *Heller*, the dissent ignores the English common law heritage at the time of our state's early history that was expressly incorporated into our laws and, puzzlingly, focuses on "the state of firearm regulation in England as of 1977." Dissent at 32. That discussion is irrelevant.

[63] *Heller*, 554 U.S. at 593 (citing Edward Dumbauld, *The Bill of Rights and What It Means Today* 51 (1957); William Rawle, *A View of the Constitution of the United States of America* 122 (1825)).

[64] *Heller*, 554 U.S. at 593 (quoting 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441).

[65] *Id.* (emphasis added).

[66] *Id.* at 599, 628. Further, Chancellor James Kent wrote in his 1826 *Commentaries on American Law*:

> The municipal law of our own . . . country[] has likewise left with individuals the exercise of the natural right of self[-]defence, in all those cases in which the law is either too slow or too feeble to stay the hand of violence. [. . .] The right of self-defence in these cases is founded on the law of nature, and is not, and cannot be superseded by the law of society.

James Kent, 2 *Commentaries on American Law, Part IV: Of the Law Concerning the Rights of Persons* 15 (2d ed. O. Halsted 1832).

19

keep and bear arms as an inalienable and fundamental right. On January 22, 1790, the Delaware House of Assembly ratified the federal Bill of Rights, including the language of what became the Second Amendment.[67] Then, after the Bill of Rights became effective, Delaware convened its own constitutional convention to amend its own Declaration of Rights "to enumerate, and more precisely define, the Rights reserved out of the general Powers of Government[.]"[68]

In *Doe*, we noted that, "[i]n 1791, Delaware delegates to the state constitutional convention were unable to agree on the specific language that would codify in our Declaration of Rights the right to keep and bear arms in Delaware," despite several attempts.[69] For two decades, Delaware's citizens had been divided on the question of independence from England: the Whigs, who favored independence, and the Tories, who did not, fought for political control.[70] "Concerns over groups of armed men stood in the

---

[67] *Votes and Proceedings of the House of Assembly of the Delaware State* 21, 39 (Wilm., Del., 1790 printed by James Adams), *microformed on* RG 1115.000 House of Assembly Minutes and Proceedings, 1776-1791 (Dover, Del. Public Archives).

[68] *See Minutes of the Grand Committee of the Whole Convention of the Delaware State* (Wilm., Del., 1792 printed by James Adams), *reprinted in Proceedings of the House of Assembly of the Delaware State 1781-1792 and of the Constitutional Convention of 1792*, at 777; Claudia L. Bushman, Harold B. Hancock, & Elizabeth Moyne Homsey, *Introduction* to *Proceedings of the House of Assembly of the Delaware State 1781-1792 and of the Constitutional Convention of 1792*, at 35.

[69] *Doe*, 88 A.3d at 663.

[70] *See* 3 *Documentary History of the Ratification of the Constitution*, 56 (Merrill Jensen, ed. State Historical Society of Wisconsin 1978). The first state elections under the 1776 Constitution "were characterized by violence, especially in Sussex County." *Id.* at 39. The Tories prevailed in Sussex County, possibly because "[a]rmed Tories had driven Whigs from the polls . . . ." *Id.* Whig leaders Caesar Rodney and Thomas McKean (two of three of Delaware's delegates to the Continental Congress who voted in favor of independence) lost their campaigns, "but the next year the Whigs retaliated in kind and won control" of the General Assembly, which then elected Rodney president,

way of an agreement [on language codifying the right to bear arms]."[71] Mobs of men armed with pistols and other weapons had incited violence in Sussex County as Whigs and Tories sought to prevent each other from voting as they fought for control of Delaware's legislature.[72] A petition seeking to set aside the results of an October 1787 election in Sussex County alleged that "numbers of persons were beat, wounded and maimed, and the lives of many others threatened by a mob furnished with clubs, pistols, cutlasses, etc."[73] According to the testimony of the Lewes sheriff, the armed men determined that certain groups of Tories should not vote.[74] However, despite their obvious animosity, as this Court observed in *Doe*, "there was an apparent consensus among the delegates on an individual's right to bear arms in self-defense."[75]

---

a role comparable to that of governor. *Id.* In 1778 "the Whig-controlled legislature adopted an act denying political rights to those who refused to take oaths of allegiance to the state, and an act confiscating Tory property." *Id.* By 1786 the Tories had regained control. *Id.*

[71] *Doe*, 88 A.3d at 663.

[72] *See Documentary History of the Ratification of the Constitution*, *supra* note 70, at 56; John A. Munroe, *Delaware and the Constitution: An Overview of Events Leading to Ratification*, 22 Del. Hist. 219-38 (1987-88), *reprinted in The Philadelawareans and Other Essays Relating to Delaware* 250, 261-64 (2004).

[73] *Petition* (Oct. 20, 1787), *reprinted in Documentary History of the Ratification of the Constitution*, *supra* note at 70, at 64-65.

[74] The legislature resolved the issue when it voided the election results and scheduled a new Sussex County election for November 26, 1787. The statewide election of delegates to the ratification convention (for the United States Constitution) was to occur the same day. The result was a "Tory victory" in Sussex County. The Whigs unsuccessfully petitioned the legislature to challenge the election results. *Documentary History of the Ratification of the Constitution, supra* note 70, at 41; *see also id.* at 92-93.

[75] *Doe*, 88 A.3d at 663. The U.S. Supreme Court similarly explained that, during that time, rival parties agreed on at least one thing: "Antifederalists and Federalists alike agreed that the right to bear arms was fundamental to the newly formed system of government." *McDonald v. City of Chicago*, 561 U.S. 742, 769 (2010); *see also Documentary History of the Ratification of the*

The 1792 Convention delegates adopted a Preamble that refers to a natural right of defending life and liberty: "Through Divine Goodness, all men have by nature, the right of worshipping and serving their Creator according to the dictates of their consciences, of enjoying and defending life and liberty . . . ."[76] All subsequent versions of the Delaware Constitution, including the 1831 and 1897 versions, retained the proclamation that "all men have by nature, the right of . . . defending life and liberty" in the first sentence of the preamble.[77]

We noted in *Doe* that, despite consensus on the existence of the right to bear arms, "[n]ot until almost 200 years [after the ratification of the Delaware's first constitution] did the Delaware General Assembly agree on the language to be used" in explicitly codifying Delaware's right to bear arms.[78] Section 20's legislative history suggests that it was introduced in response to various state and federal court decisions that had recently challenged the view that the Second Amendment protected an *individual* right to bear arms

---

*Constitution, supra* note 70, at 39 ("The animosity among political leaders and the violence on election days were probably unmatched in any other state, but at the same time Delawareans seemed remarkably united in their attitude toward other states and the government of the United States.").

[76] DEL. CONST. OF 1792 pmbl.; *Minutes of the Convention* (Wilm. Del., 1792 printed by Peter Brynberg & Samuel Andrews), *supra* note 50, at 918.

[77] DEL. CONST. OF 1831 pmbl.; DEL. CONST. OF 1897 pmbl. (current constitution). The dissenters' reference to a few laws from the 1800s prohibiting the *discharge* of firearms within town limits, *see* Dissent at 21-22, does not demonstrate a longstanding tradition of banning the *possession* of firearms. Commenting on similar laws, the majority in *Heller* noted such laws "provide no support for the severe restriction in the present case." 554 U.S. at 632.

[78] *Doe*, 88 A.3d at 663.

for self-defense and that it applied to the states.[79]  The legislative history underscores that the General Assembly intended to codify the *pre-existing* right of the people to keep and bear arms, including for self-defense -- not create a brand new right.

On May 8, 1986, the House of Representatives began the process of amending the Constitution by introducing House Bill 554 ("H.B. 554") as the "first leg of a constitutional amendment that *explicitly* protects the *traditional* lawful right to keep and bear arms."[80]  Aside from three absent representatives, the House unanimously voted in favor of H.B. 554 following debate.[81]  In June of 1986, the Senate passed the bill.[82]

---

[79] *See* House Debate on H.B. 554 at 1:26, 3:56, 133d Gen. Assem. (May 22, 1986); Sen. Debate on H.B. 30 at 35:30, 38:00, 41:15, 134th Gen. Assem. (Apr. 16, 1987).  For example, in *Hetherton v. Sears, Roebuck & Co.* -- a 1981 opinion alluded to in the Section 20 legislative debates -- the Third Circuit suggested as dicta that the right to own a gun is not a "fundamental right" and that "Delaware could ban the sale of all deadly weapons" and that the State had the "power to effect a total ban" if it so chose. 652 F.2d 1152, 1157-58 (3d Cir. 1981).  Further, several decisions had held that the Second Amendment did not apply to the states. *See, e.g., Quilici v. Morton Grove*, 695 F.2d 261, 270 (7th Cir. 1982).  At oral argument, the State agreed that this uncertainty prompted the enactment of Section 20:

> STATE: [C]learly the Second Amendment was in existence, but there was some question -- even in 1987 -- as to whether it conferred an individual right, and whether it could be applied to the states.
>
> COURT: And wasn't that the impetus for Section 20?
>
> STATE: That's right.

Oral Argument at 35:59, https://livestream.com/accounts/5969852/events/7714841/videos/162711371/player.

[80] Del. H.B. 554 syn., 133d Gen. Assem. (1986) (emphases added).

[81] Del. H.J., 133d Gen. Assem. 269 (1986).

[82] Del. S.J., 133d Gen. Assem. 342 (1986) (recording eighteen yeas, one nay; one abstention; one absence).

On January 28, 1987, after a new General Assembly convened, the amendment was reintroduced as House Bill 30 ("H.B. 30") -- "the second leg of a constitutional amendment that *explicitly* protects the *traditional* lawful right to keep and bear arms," according to the synopsis.[83]  The House Administration Committee, which considered H.B. 30 that April, "found that this piece of legislation reinforces the provisions *currently found in the Delaware Statutes and Constitution*."[84]  The bill passed the House and Senate that month with just two nays (in the Senate),[85] establishing Section 20 as part of the Declaration of Rights in the Delaware Constitution and indisputably recognizing the right to bear arms as a fundamental right.[86]

---

[83] Del. H.J., 134th Gen. Assem. 15 (1987); Del. H.B. 30 syn., 134th Gen. Assem. (1987) (emphases added).

[84] House Administration Committee Meeting Minutes at 2 (Apr. 1, 1987).

[85] *See* House Debate on H.B. 30 at 1:00, 134th Gen. Assem. (Apr. 2, 1987); Del. H.J., 134th Gen. Assem. 44 (1987) (recording that, with the exception of one absent member, the House unanimously voted in favor of H.B. 30); Sen. Debate on H.B. 30 beginning at 1:00, 134th Gen. Assem. (Apr. 16, 1987) (indicating that the Senate debated H.B. 30 for nearly an hour); Del. S.J., 134th Gen. Assem. 56 (1987) (recording seventeen yeas, one nay; one abstention; and two absences).  The dissenters' citations to cherry-picked quotations of a few individual legislators do not undermine the clear text of Section 20 or detract from its stated purpose of *explicitly* protecting the *traditional* right to keep and bear arms.  The dissent boldly purports to know the intentions of the members of the General Assembly, our governors, and representatives in Congress in asserting that a "bipartisan consensus" supports classifying parks as "sensitive places" where guns should be banned.  *See* Dissent at 3-4, 6-7, 9-10, 82, 92.  But, in addition to being contradicted by the actual legislative history from the time of Section 20's passage and Section 20's text, that assertion is belied by -- among other things -- the amicus brief filed on behalf of numerous members of the General Assembly who contend that the Agencies have "overstepped their mandate by issuing and enforcing regulations that state law preempts and that are outside the scope of the authority the General Assembly delegated to them."  Amicus Br. at 2.

[86] *Doe*, 88 A.3d at 664 n.37 ("A fundamental right has been defined as a right that is guaranteed either explicitly or implicitly by the constitution." (citing *San Antonio Ind. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33-34 (1973))).

24

More than two decades later, the United States Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), finally settled the questions that had served as an impetus for Section 20. *Heller* confirmed that the Second Amendment codified an *individual* right to keep and bear arms separate and apart from the provision's other purpose of maintaining a well-regulated militia.[87] Given that, "[w]hatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home," the Court held in *Heller* that "complete prohibition of their use [as under the District of Columbia's statute] is invalid."[88]

*McDonald* found that the Due Process Clause of the Fourteenth Amendment incorporated the Second Amendment and therefore applies to the states.[89] The *McDonald* Court further emphasized the importance of protecting the right of self-defense given that it is "deeply rooted in this Nation's history and tradition,"[90] and "a basic right, recognized by many legal systems from ancient times to the present day" -- "'the *central component*'

---

[87] 554 U.S. at 581, 583-84 (finding that the phrase "right of the people" as used in the Second Amendment meant that the right "is exercised individually," as opposed to being a collective right belonging to a militia; "'[k]eep arms' was simply a common way of referring to possessing arms, for militiamen *and everyone else*"; and "bear" meant "carry") (emphasis in original) (citations omitted).

[88] *Id.* at 629. *Heller* addressed a challenge to a District of Columbia statute that banned entirely the possession of handguns in the home and required that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable. *Id.* at 574.

[89] *See* 561 U.S. 742, 791 (2010) (In his majority opinion, at 758-59, Justice Alito observed that the Supreme Court had "never previously addressed the question whether the right to keep and bear arms applies to the States under [the Due Process Clause] theory").

[90] *Id.* at 768 (citation omitted) (internal quotation marks omitted).

of the Second Amendment right," as recognized in *Heller*.[91] Both cases confirmed that the core right to bear arms for self-defense is a traditional or pre-existing right -- *i.e.*, a right that existed even before being codified.[92]

The *Heller* Court found "[t]he very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed,'"[93] as the Second Amendment "was not intended to lay down a 'novel principle' but rather codified a right 'inherited from our English ancestors.'"[94] Indeed, as explained in *Heller*, "[b]y the time of the founding, the right to have arms had become fundamental for English subjects."[95] Blackstone, the prominent authority on English law of the time, "cited the

---

[91] *Id.* at 767 (quoting *Heller*, 554 U.S. at 599) (footnote omitted).

[92] *Heller*, 554 U.S. at 592 ("[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right" and observing that "[t]he very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.'") (emphasis in original); *McDonald*, 561 U.S. at 757 ("[T]he right of bearing arms for a lawful purpose 'is not a right granted by the Constitution' and is not 'in any manner dependent upon that instrument for its existence.'" (quoting *United States v. Cruishank*, 92 U.S. 542, 553 (1875))). The Third Circuit now adheres to the post-*Heller* view that the "Second Amendment protects an individual's right to possess a firearm 'unconnected with militia service.'" *Binderup v. Attorney Gen. United States of Am.*, 836 F.3d 336, 343, 357 (3d Cir. 2016) (quoting *Heller*, 544 U.S. at 582) (view expressed in two plurality opinions accounting for majority of the en banc Third Circuit), *cert. denied sub nom. Sessions v. Binderup*, 137 S. Ct. 2323 (2017), *and cert. denied sub nom. Binderup v. Sessions*, 137 S. Ct. 2323 (2017)). The Third Circuit also noted that *McDonald* confirms that the Second Amendment applies to the states through the Fourteenth Amendment "because the right is 'fundamental' to 'our system of ordered liberty.'" *Id.* at 346 (quoting *McDonald*, 561 U.S. at 778, 791).

[93] *Heller*, 554 U.S. at 592 ("This is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed." (quoting *United States v. Cruikshank*, 92 U.S. 542, 553 (1875))) (internal quotation marks omitted).

[94] *Id.* at 599-600 (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)).

[95] *Id.* at 593 (citation omitted). As with *Doe*, our dissenting colleagues refuse to accept *Heller* and *McDonald* as valid and binding law. Although they acknowledge that this Court in *Doe* embraced

26

arms provision of the Bill of Rights as one of the fundamental rights of Englishmen."[96]

Justice Scalia observed that "[Blackstone's] description of [the right] cannot possibly be thought to tie it to militia or military service. It was, [Blackstone] said, 'the natural right of resistance and self-preservation,' and 'the right of having and using arms for self-preservation and defence.'"[97]

It is not a historical accident that Delaware's 1757 Militia Act uses similar language in proclaiming that "[s]elf-preservation is the first Principle and Law of Nature, and a Duty that every Man indispensably owes not only to himself but to the Supreme Director and Governor of the Universe, who gave him a Being."[98] The use of such language not only

---

both *Heller* and *McDonald* and read them into the Delaware Constitution, *see* Dissent at 12, the dissenters dispense with the "bare *Heller* majority" as "odd" in recognizing the pre-existing right to keep and bear arms. Dissent at 59 n.195. The dissenters argue that, "in the name of originalism," the *Heller* majority "has denuded the text of the Second Amendment of any meaning as to its most evident meaning . . . ." *Id.* The dissenters thus refuse to recognize the holdings in either *Doe* or *Heller* as having any real force and denigrate these decisions as the product of "novel principles of federal constitutional law favored by gun rights advocates . . . ." *Id.* at 93.

[96] *Heller*, 554 U.S. at 593-94.

[97] *Id.* at 594 (quoting 1 Blackstone's Commentaries 145, 145-46 n.42 (1803)). In *The Second Amendment in the Nineteenth Century*, David Kopel notes that "[t]he first scholarly analysis of the Second Amendment is found in St. George Tucker's American edition of Blackstone's *Commentaries*, published in 1803." David B. Kopel, *The Second Amendment in the Nineteenth Century*, 1998 B.Y.U. L. REV. 1359, 1370 (1998) (citing William Blackstone, *Commentaries* (St. George Tucker ed., Lawbook Exchange, Ltd. 1996) (1803)). Tucker wrote of the Second Amendment that: "This may be considered as the true palladium of liberty . . . . The right of self defence is the first law of nature . . . ." *Id.* at 1377 (footnote omitted).

[98] *An Act for Establishing a Militia in this Government* (passed November 5, 1757), *microformed on* RG 1111.000 Legislative Papers, 1731-1775 (Dover, Del. Public Archives).

reflects the influence of our English common law heritage, but underscores the pre-existing nature of this natural right.[99]

Although the United States Supreme Court has not expressly decided whether the Second Amendment protects public carry (i.e., carrying arms outside the home), the conclusion that self-defense is the Second Amendment's "core purpose" suggests that it must allow citizens to be armed outside the home given that "in some circumstances a person may be more vulnerable in a public place than in his own house,"[100] among other

---

[99] As the Court observed in *Dorsey v. State*, "[p]rior to the American Revolution, many aspiring colonial attorneys traveled to London to study law at the Middle Temple or one of the other English Inns of Court." 761 A.2d 807, 816 (Del. 2000). Following their legal studies, they returned to practice law in colonial America. *Id.* Further, "[t]he President of the 1792 Delaware Constitutional Convention was John Dickinson, who had studied the common law of England at the Middle Temple in London with Thomas McKean and, thus, was also a contemporary of William Blackstone." *Id.* at 817.

[100] *Peruta v. California*, 2017 WL 176580, at *3 (U.S. June 26, 2017) (denying writ of certiorari) (Thomas, J., dissenting); *see also Wrenn*, 864 F.3d at 657 ("[T]he [Second] Amendment's 'core lawful purpose' is self-defense, and the need for that might arise beyond as well as within the home." (quoting *Heller*, 554 U.S. at 630)). *Heller* suggests that the Second Amendment protects the right to bear arms outside the home. First, *Heller* determined that "keep arms" and "bear arms" have distinct meanings. To "bear arms" means to "wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person," suggesting that the right is exercised in transit so one may be ready at all times, and not merely at home. *Drake v. Filko*, 724 F.3d 426, 444 (3d Cir. 2013) (Hardiman, J., dissenting) (quoting *Heller*, 554 U.S. at 584) (alterations omitted) (internal quotation marks and citation omitted). Second, *Heller* determined that the Second Amendment protects an inherent right to self-defense. *Id.* (citing *Heller*, 554 U.S. at 599, 628); *see also supra* note 60. Conflicts obviously can arise outside of the home, and in some circumstances, a person may be more vulnerable in a public place than at home. Third, the *Heller* Court's statement that "the need for defense of self, family, and property" is "*most* acute" in the home, 554 U.S. at 628 (emphasis added), suggests that the need must be *less* acute elsewhere -- but nonetheless present. *Drake*, 724 F.3d at 444. Fourth, the *Heller* Court acknowledged that "[i]t was understood across the political spectrum that the right helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down." 554 U.S. at 599. Finally, "[t]he prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting." *Id.* Hunting and serving in a militia both involve activities outside the

28

reasons. However, regardless of what the United States Supreme Court decides regarding the Second Amendment, in this State, the text of our Delaware Constitution is clear: the right to keep and bear arms exists outside of the home.[101]

### D. The Regulations Violate Section 20 of Our Constitution

Our conclusion that Section 20 affords a right of public carry for self-defense does not resolve entirely the question of whether the Regulations are valid. Like the Second Amendment, Delaware's right to public carry for self-defense is fundamental but not absolute.[102] We have recognized the validity of several restrictions on gun possession, such as statutes prohibiting the possession of a firearm silencer, sawed-off shotgun, machine gun, or any other firearm or weapon adaptable for use as a machine gun;[103] allowing courts to order people subject to protective orders to relinquish their firearms and ban them from possessing guns;[104] and outlawing possession of a firearm in a public place while under the influence.[105] However, a total ban of possession of firearms for self-defense in Delaware's State Parks and Forests is not the sort of restriction that passes constitutional muster.

---

home. Accordingly, *Heller* suggests that the Second Amendment right extends beyond the confines of one's home and is thus part of the "baseline" protection afforded to the citizens of Delaware; *see also Wrenn*, 864 F.3d at 659 ("[T]he [Second] Amendment's core generally covers carrying in public for self-defense.").

[101] *See Doe*, 88 A.3d at 665.

[102] *Griffin v. State*, 47 A.3d 487, 488 (Del. 2012).

[103] 11 *Del. C.* § 1444.

[104] 10 *Del. C.* § 1045(a)(8).

[105] 11 *Del. C.* § 1460.

29

As demonstrated above, Section 20 protects a bundle of rights -- including hunting, recreation, and the defense of self, family, and State. That one of these rights (i.e., hunting) may be exercised during some parts of the year by some citizens does not result in a "wide class of cases" in which the Regulations can be applied constitutionally so as to enable it to survive a facial challenge.[106] Rather, the total ban on possession for defense of self and family completely eviscerates those rights for the vast majority of ordinary, law-abiding Delawareans at all times in State Parks and State Forests. The Regulations permit only a very limited class of visitors to Delaware Parks and Forests to exercise a narrow sliver of their Section 20 rights (permitted hunting by licensed hunters during designated days as long as they also win the lottery for a stand).

---

[106] *See Hazout v. Tsang Mun Ting*, 134 A.3d 274, 287 (Del. 2016) ("[B]lanket judicial invalidation of a statute's words should not ensue if the statute can be applied constitutionally in a wide class of cases, but might operate overbroadly in some more limited class of cases.").

It is axiomatic that the State cannot ignore our Constitution, even when acting as proprietor of State-owned property.[107]  As in other areas concerning fundamental rights, statutes and regulations impacting Section 20 rights must comply with our Constitution.[108]

*Heller* suggests that "complete prohibition[s]" of Second Amendment rights are automatically invalid and need not be subjected to any tiers of scrutiny.[109]  In *Wrenn v.*

---

[107] *See Doe*, 88 A.3d at 668 ("We recognize that where the government is a proprietor or employer, it has a legitimate interest in controlling unsafe or disruptive behavior on its property.  But [the State] has conceded that after *McDonald*, as a landlord it may not adopt a total ban of firearms."); *Bailey v. Philadelphia, W. & B.R. Co.*, 4 Del. 389, 389 (1846) ("The State has the right of a proprietor over navigable streams entirely within its borders; and may obstruct, or (*unless where restricted by the Constitution of the United States*,) may close up, such streams at pleasure.") (emphasis added); *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 687 (1992) ("The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints.") (internal citations and quotation marks omitted); *id.* at 696 (Kennedy, J., concurring) (joined by Blackmun, Stevens, and Souter, JJ.) ("A fundamental tenet of our Constitution is that the government is subject to constraints which private persons are not.").

[108] Case law does not support the dissenters' novel position, not even argued by the State, that the government may "regulate firearm possession and use on its own property, *like any other proprietor* may."  Dissent at 11 (emphasis added).  We do not disagree that the government may regulate firearms.  But the distinction missed throughout the dissent is that, unlike private proprietors who are given more flexibility in certain circumstances, the State must comply with the Constitution when enacting laws and regulations that interfere with the exercise of fundamental rights on its property.  *See supra* note 107; *Marsh v. Alabama*, 326 U.S. 501, 506 (1946) ("Ownership does not always mean absolute dominion.  The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it.").  Further, *Light v. United States*, 22 U.S. 523 (1911), cited in the dissent, *see* Dissent at 22, stands for the unremarkable proposition that the government may forbid cattle from grazing on its land without a permit; no fundamental constitutional rights were at issue.  *See id.* at 537.  *Davis v. Massachusetts*, 167 U.S. 43 (1897), another case relied on by the dissenters for their novel theory, has been expressly rejected by the United States Supreme Court and, thus, is no longer good law.  *See Jamison v. State of Tex.*, 318 U.S. 413, 415-16 (1943) (noting that the argument based on *Davis* that the state "has the power absolutely to prohibit the use of the streets for the communication of ideas" has been "directly rejected by this Court").  In its briefs and at oral argument, the State's counsel agreed that the Regulations must comply with Section 20 and should be subject to intermediate scrutiny.

[109] *See Heller*, 554 U.S. at 629.

*District of Columbia*, the D.C. Circuit concluded, "[i]t's appropriate to strike down such 'total ban[s]' without bothering to apply tiers of scrutiny because no such analysis could ever sanction obliterations of an enumerated constitutional right."[110]  The D.C. Circuit persuasively explained that, "[b]y declining to apply tiers of scrutiny to a total ban on ownership, *Heller*[] closed off the possibility that courts would erroneously find some benefits weighty enough to justify other effective bans on the right to keep common arms."[111]  In *Wrenn*, the statutory scheme at issue banned possession of handguns in the District of Columbia for all citizens other than those who demonstrated a "special need for self-protection" by satisfying the police chief that they had "'good reason to fear to [their] person or property' or 'any other proper reason for carrying a pistol,'" and included a few limited exceptions.[112]  The Court said that the District of Columbia's scheme operated as a "total ban" because "at a minimum the Amendment's core must protect carrying given the risks and needs typical of law-abiding citizens" -- a right "most D.C. residents can never exercise, by the law's very design."[113]  As the Seventh Circuit aptly stated, "[b]oth *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right . . . are categorically unconstitutional."[114]

---

[110] 864 F.3d 650, 665 (D.C. Cir. 2017) (quoting *Heller*, 554 U.S. at 629).

[111] *Id.*

[112] *Id.* at 655 (quoting D.C. Code § 22-4506(a)-(b)) (citing D.C. Code § 22-4504.01)).

[113] *Id.* at 665.

[114] *See Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011); *Peruta v. Cty. of San Diego*, 742 F.3d 1144, 1170 (9th Cir. 2014) ("[T]he rare law that 'destroys' the [core Second Amendment]

We applied intermediate scrutiny in *Doe*[115] because it *did not* involve a total ban: although the regulation at issue largely restricted the fundamental right to bear arms in the common areas of housing properties managed by the Wilmington Housing Authority ("WHA"), it allowed possession while traveling to and from a resident's unit and purported to allow firearms for self-defense.[116]

In contrast, here, the Regulations do not allow *any* possession of firearms, such as the exception for traveling to and from a resident's unit in *Doe*. Moreover, this ban is not even limited to as confined a place as the common areas of properties managed by the WHA, or to as narrow a subset of the population as those properties' residents or visitors as in *Doe*. Nor is it limited to what might legitimately be characterized as a "sensitive" place supported by evidence buttressing the designation of certain areas as such places. Rather, this ban applies to *all* 23,000 acres of Parks and 18,000 acres of Forests -- spanning an area almost the size of the entire District of Columbia at issue in *Heller*[117] and four times the size of the City of Wilmington[118] -- and to every segment of the population.

---

right" necessitates "*Heller*-style per se invalidation."), *rev'd on reh'g en banc*, 824 F.3d 919 (9th Cir. 2016).

[115] *See Doe*, 88 A.3d at 666-67 ("The General Assembly's careful and nuanced approach [of leaving in place a series of statutes affecting the right to keep and bear arms in Delaware] supports an intermediate-scrutiny analysis that allows a court to consider public safety and other important governmental interests.").

[116] *Id.* at 657-58.

[117] U.S. Census Bureau, *District of Columbia: 2010 - Population and Housing Unit Counts*, U.S. DEP'T OF COMMERCE 13 (June 2012), https://www.census.gov/prod/cen2010/cph-2-10.pdf (listing the District of Columbia's total area as 68.34 square miles, which is 43,737.6 acres).

[118] *See* U.S. Census Bureau, *2017 Gazetteer Files*, U.S. DEP'T OF COMMERCE, https://www2. census.gov/geo/docs/maps-data/data/gazetteer/2017_Gazetteer/2017_gaz_place_10.txt (listing

Our adoption of intermediate scrutiny in *Doe* was consistent with the approach that federal circuits have employed when confronting facial challenges to statutes alleged to impinge on Second Amendment rights, yet do not qualify as total bans.[119] Under a "two-pronged" framework forged by the Third Circuit in *United States v. Marzarella*,[120] they first ask "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee."[121] If yes, they "evaluate the law under some form of means-end scrutiny," such as intermediate scrutiny, to determine whether the statute or regulation can survive a facial challenge.[122]

In determining which standard of review or sort of means-end scrutiny should apply, the Seventh Circuit reasonably summarized, "the rigor of this judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right."[123] Federal courts understandably vary in their application

Wilmington's total land area as 10.90 square miles, which is 6,976 acres, and total water area as 6.04 square miles, which is 3,866 acres) [hereinafter Gazetteer].

[119] *See Binderup v. Attorney Gen. United States of Am.*, 836 F.3d 336, 346 (3d Cir. 2016) (collecting cases).

[120] 614 F.3d 85 (3d Cir. 2010).

[121] *Id.* at 89.

[122] *Id.* For example, in *Marzarella*, the Third Circuit was evaluating the prohibition of possession of a firearm with a destroyed serial number under 18 U.S.C. § 922(k). *Id.* at 92. Given that "[t]he burden imposed by the law does not severely limit the possession of firearms," the court applied intermediate scrutiny and found the law survived because, "even if it burden[ed] protected conduct," § 922(k) reasonably served an important "law enforcement interest in enabling the tracing of weapons via their serial numbers." *Id.* at 95, 97-98.

[123] *Ezell*, 651 F.3d at 703; *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 690 (6th Cir. 2016) ("Given *Heller*'s focus on 'core' Second Amendment activity, our choice of scrutiny level should be informed by (1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on the right." (quoting *United States v. Chovan*, 735 F.3d 1127,

of this broad framework, but a few principles have emerged.  For example, courts are more likely to apply stricter scrutiny to statutes that infringe on the core right of self-defense as opposed to some other right embedded within the Second Amendment.[124]  Further, courts are more likely to apply stricter scrutiny to regulations that limit the rights of all citizens, instead of merely a "narrow class of individuals who are not at the core of the Second Amendment," such as convicted felons or the mentally ill.[125]  Given that the Regulations not just infringe -- but destroy -- the core Section 20 right of self-defense for ordinary citizens, one might legitimately argue that we need not apply any level of scrutiny.

---

1138 (9th Cir. 2013)) (internal quotation marks and citation omitted); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 195 (5th Cir. 2012) ("A less severe regulation -- a regulation that does not encroach on the core of the Second Amendment -- requires a less demanding means-ends showing.").

[124] *Heller v. District of Columbia*, 670 F.3d 1244, 1257 (D.C. Cir. 2011) ("[A] regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong justification, whereas a regulation that imposes a less substantial burden should be proportionately easier to justify.").

[125] *United States v. Chester*, 628 F.3d 673, 682-83 (4th Cir. 2010) (applying intermediate scrutiny to 18 U.S.C. § 922(g)(9), barring convicted felons from possessing firearms, because the Second Amendment's core protects "the right of a *law-abiding, responsible* citizen to possess and carry a weapon for self-defense") (emphasis in original); *United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010) (observing that "[b]oth logic and data establish a substantial relation between § 922(g)(9)" and its important governmental objective of "preventing armed mayhem," so the court "need not get more deeply into the 'levels of scrutiny' quagmire"); *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010) (applying intermediate scrutiny to 18 U.S.C. § 922(g)(8), which bans possession of firearms by those who "based on their past behavior, are more likely to engage in domestic violence"); *United States v. Mahin*, 668 F.3d 119, 124 (4th Cir. 2012) (same); *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 691 (6th Cir. 2016) (applying intermediate scrutiny to 18 U.S.C. § 922(g)(4) because it "does not burden the public at large; it burdens only a narrow class of individuals who are not at the core of the Second Amendment -- those previously adjudicated mentally defective or previously involuntarily committed"); *Nat'l Rifle Ass'n, Inc.*, 700 F.3d at 205 (applying intermediate scrutiny to ban on firearm sales under 18 U.S.C. § 922(b)(1) and (c)(1) because the statutes "do[] not disarm an entire community, but instead prohibits commercial handgun sales to 18-to-20-year-olds -- a discrete category").

But even assuming intermediate scrutiny applies, the Regulations still fail. Under intermediate scrutiny, the Agencies have the burden to: *first*, articulate their important governmental objectives in enacting the Regulations; *second*, demonstrate that the Regulations are substantially related to achieving those objectives; and, *third*, show that the Agencies have not burdened the fundamental right to bear arms in self-defense more than is reasonably necessary to ensure that the asserted governmental objectives are met.[126] The Agencies are required to show more than a "general safety concern."[127]

In the proceedings below, the parties submitted cross-motions for judgment on the pleadings and agreed that the matter raises purely legal issues. Thus, no evidentiary record was created. The Agencies nonetheless attempted to justify their Regulations by pointing to their general "interest in law enforcement, keeping the peace, and public safety."[128] The Agencies argued that this interest "in public safety substantially outweighs any individual selfish interest in possession of a firearm," and that "[i]n fact, private possession of firearms is inconsistent with, and contrary to, preserving public safety."[129] The Agencies then urged the court to exclude any facts bearing on public safety "in that such considerations are reserved to the legislature in enacting laws, and the executive branch in promulgating

---

[126] *See Doe*, 88 A.3d at 666-67.

[127] *Id.* at 667.

[128] App. to Appellants' Opening Br. at A45 (Defs.' Opening Brief in Support of Mot. for Judgment on the Pleadings); *see also id.* at A40, A42 ("The Defendants have undertaken an obligation, pursuant to authority delegated by the legislature, to provide security and to punish any violators. A critical component of that public safety obligation has been the regulation of firearms, with the explicit authority and implicit blessing of the General Assembly.").

[129] *Id.* at A47.

36

regulations, and should have no bearing on the judicial determinations as to Constitutionality."[130] Thus, the Agencies presented no record support for what can only be characterized as the type of "general safety concern" that we found inadequate in *Doe*. On this basis alone, the Agencies fail the intermediate-scrutiny test.

Moreover, the State proffers no basis upon which to conclude that public safety concerns justify a total ban in all acres of Delaware's parkland and forests -- especially given that we observe that open carry and licensed concealed carry is permitted in Delaware's crowded urban areas such as Wilmington's Rodney Square under the State's current regulatory scheme.

Further, the Regulations fail as they "burden the right to bear arms more than is reasonably necessary."[131] Indeed, the Regulations adopted by DNREC and DOA are grossly out of step with the types of "place"-based restrictions adopted by our General Assembly. Our State statutes allowing for "place" restrictions are purposefully narrow and few in number. Aside from prohibiting guns in detention facilities as contraband,[132] the only "place-focused" firearms regulation statute enacted on a statewide basis is 11 *Del. C.* § 1457, which creates the crime of "possession of a weapon in a Safe School and Recreation Zone." The statute imposes criminal liability for possessing a firearm or deadly weapon

---

[130] *Id.* at A76.

[131] *Doe*, 88 A.3d at 668. The dissent repeatedly and mistakenly assigns the burden of proof to Appellants. *See, e.g.*, Dissent at 10, 73-74, 79-80. This is yet another example of the dissenters' refusal to follow this Court's precedent.

[132] 11 *Del. C.* § 1256; *see id.* § 1258(1) (defining "[c]ontraband").

37

on or near school property, in a school vehicle, or at a recreation center, athletic field, or sports stadium as long as *another* independent offense is also committed in that place.[133] Section 1457 does not even prohibit concealed carry by licensed persons or open carry by non-prohibited persons of adult age as long as such persons do not commit other crimes.

Moreover, the General Assembly has restricted political subdivisions (i.e., counties and municipalities) from regulating the ownership, transfer, possession, or transportation of firearms in areas such as parking lots and parks.[134]  Within detailed parameters, counties and municipalities are only permitted to regulate firearms in their governments' buildings -- and they cannot prohibit people with concealed carry licenses from carrying firearms even in these sensitive government buildings.[135]  It strains credulity to believe that the General Assembly intended to forbid, for example, elected officials in the historic City of

---

[133] 11 *Del. C.* § 1457(a) provides:

> (a) Any person who commits any of the offenses described in subsection (b) of this section) [listing independent criminal offenses such as carrying a concealed deadly weapon without a license], or any juvenile who possesses a firearm or other deadly weapon, *and does so while in or on a "Safe School and Recreation Zone"* shall be guilty of the crime of possession of a weapon in a Safe School and Recreation Zone.

(emphasis added).

[134] *See* 9 *Del. C.* § 330(c)-(d); 22 *Del. C.* § 111(a)-(b).

[135] *See* 9 *Del. C.* § 330(d)(6) ("An ordinance adopted by the county government shall not prevent the following in county buildings or police stations: . . . (6) Carrying firearms and ammunition by persons who hold a valid license pursuant to either § 1441 or § 1441A of Title 11 so long as the firearm remains concealed except for inadvertent display or for self-defense or defense of others . . . ."); 22 *Del. C.* § 111(b)(6) (providing the same restriction as 9 *Del. C.* § 330(d)(6) for municipalities).

New Castle from enacting firearm regulations, yet allow agency officials to ban firearms in the entirety of Redden State Forest, an area nearly five times larger.[136]

The Seventh Circuit observed that "when a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering these places[.]"[137] The Agencies make the same argument here.[138] But, here, the Regulations' sweeping restrictions impose a total ban that forces Delaware citizens to choose between enjoying our more than 23,000 acres of State Parks and 18,000 acres of Forests on the one hand, and sacrificing what this Court has already unanimously held to be a constitutional right to public carry for defense of self and family on the other.[139] State Parks and State Forests also present a far different "place restriction" than one

---

[136] Redden State Forest is over 12,400 acres, *see* Forest Service, *Delaware State Forests*, DEL. DEP'T OF AGRICULTURE, http://dda.delaware.gov/forestry/forest.shtml, whereas the City of New Castle is 2,630.4 acres, *see* Gazetteer, *supra* note 118. To put this point into further perspective, Cape Henlopen State Park is 5,195 acres. *See Cape Henlopen State Park*, DEL. STATE PARKS, http://www.destateparks.com/park/cape-henlopen/history.asp. Delaware Seashore State Park (2,825 acres) is about the size of Bridgeville (2,964 acres). *See Delaware Seashore State Park*, DEL. STATE PARKS, http://www.destateparks.com/park/delaware-seashore/; Gazetteer, *supra* note 118. Brandywine Creek State Park (933 acres) is roughly triple the size of South Bethany (332 acres). *See Brandywine Creek State Park*, DEL. STATE PARKS, http://www.destateparks.com/park/brandywine-creek/; Gazeteer, *supra*. Several other parks dwarf, in size, many small towns such as the Town of Magnolia (125 acres). *See* Gazetteer, *supra* note 118.

[137] *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012).

[138] At oral argument, the State said, "[T]he State is not seeking to take anyone's guns away by banning guns in most circumstances from Parks and Forests. Rather, this . . . case is about asking folks to leave their guns at home when they go to those places, with the exception of hunting season and recreational shooting." Oral Argument at 23:49, https://livestream.com/accounts/5969852/events/7714841/videos/162711371/player.

[139] *Doe*, 88 A.3d at 665.

limiting possession of firearms in a school or courthouse -- traditional "sensitive places," where the courts in *Heller* and *Doe* suggested that restrictions might be constitutional.[140]

Although there certainly could be some "sensitive" areas in State Parks and State Forests where the carrying of firearms may be restricted, as is done in certain areas of National Parks,[141] there is no record here that the State has undertaken any effort to delineate such areas so as not to infringe on Section 20 rights. Further, there are several

---

[140] *Heller*, 554 U.S. at 626-27 ("[N]othing in our opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings[.]"); *Doe*, 88 A.3d at 668 (recognizing that firearm possession might be restricted at "a state office building, courthouse, school, college, or university").

[141] The federal approach recognizes sensitive areas within its parks and does not protect possession of firearms in visitors' centers or rangers' offices because possession of firearms in federal buildings is prohibited by statute. *See* 18 U.S.C. § 930; *cf. United States v. Bundy*, 2016 WL 3156309, at *4 n.3 (D. Or. June 3, 2016) (citing *Heller*, 554 U.S. at 626 n.26) (holding that 18 U.S.C. § 930 does not violate the Second Amendment); *see also* 54 U.S.C. § 104906(b) (barring the Secretary of the Interior from promulgating any regulation that restricts Second Amendment rights beyond other state and federal laws). Thus, the federal scheme appears to contemplate "sensitive areas" within National Parks -- but not the entirety of the parks. Although our State is certainly free to reach different conclusions than the Federal Government on various matters, including this one, we find the State's "public safety" justification for a total ban particularly dubious on this sparse record -- especially given that Congress has taken the opposite approach. Congress barred the Secretary of the Interior, whose jurisdiction includes the National Parks, from creating or enforcing any regulations that might restrict an individual's right to possess firearms to a greater extent than other federal laws or the laws of the state in which each park sits. *See* 54 U.S.C. § 104906(b). In passing this legislation in 2009, Congress expressly stated that its purpose was "to ensure that unelected bureaucrats and judges cannot again override the Second Amendment rights of law-abiding citizens on 83,600,000 acres of National Park System land and 90,790,000 acres of land under the jurisdiction of the United States Fish and Wildlife Service." Credit Card Accountability Responsibility and Disclosure Act of 2009, PL 111-24 § 512(a)(7), May 22, 2009, 123 Stat. 1734, 1765; 123 Stat. at 1765. It also stated that "[t]he Federal laws should make it clear that the second amendment rights of an individual" in such parks "should not be infringed." *Id.* at § 512(a)(8). Notably, our First State National Historical Park land, which now includes 1,100 acres in New Castle County, permits lawful firearms as a result of this legislation. *See First State - Frequently Asked Questions*, NAT'L PARK SERV. (last updated Mar. 15, 2017), https://www.nps.gov/frst/faqs.htm.

differences between parks and forests and traditional sensitive places that make the State's Regulations' *blanket* prohibitions problematic.[142]  In contrast to a permissible sensitive place such as a courthouse, where visitors are screened by security, most State Parks and State Forests do not have controlled entry points.  One can easily enter a State Park or State Forest with a weapon -- either intentionally or by inadvertently wandering across a State Park boundary while exercising the right to open carry or licensed concealed carry. Whereas courthouses are supervised by law enforcement personnel or easily accessible to law enforcement and other emergency responders, making the need to defend oneself with a personal firearm seemingly less acute,  State Parks and State Forests are relatively remote and, for example, have less than thirty rangers to police Delaware's entire State Parks.[143] In fact, the DOA's Hunting Rules and Regulations specifically warn that the Forest Service is unable to offer protection: "Camping is at your own risk . . . . [T]here is no after-hours, nighttime or weekend security."[144]  And, as this Court acknowledged in *Doe*, the rights of

---

[142] The State confirmed that the Agencies believe that every acre of State Parks and State Forests should count as a "sensitive place" because it would be hard to draw a line between what should be "sensitive" and what should not be. Oral Argument at 47:26, https://livestream.com/ accounts/5969852/events/7714841/videos/162711371/player.  That argument itself seems to admit that there are some places that should not otherwise count as sensitive places.  If the Federal Government is able to undertake this sort of line drawing in its parks, there is no reason why the State's Agencies cannot do the same to comply with Section 20 and the Second Amendment.

[143] Appellants claim that, as of 2010, there were only 21 park rangers for the entirety of Delaware Park lands.  Appellants' Opening Br. at 28 n.22.

[144] 7 *Del. Admin. C.* § 9201-7.5; App. to Appellants' Opening Br. at A372.

Delaware citizens to defend themselves with firearms is especially critical "when the intervention of society on their behalf may be too late to prevent injury."[145]

Responsible, law-abiding Delawareans should not have to give up access to State Parks and State Forests in order to enjoy their constitutional right to carry a firearm for self-defense. Our laws must leave such citizens some reasonable means of exercising their Section 20 constitutionally protected rights.[146] A blanket place restriction effectuating a total ban on carrying for self-defense that takes no account of which areas are truly "sensitive" and which are not presents a situation where a facial challenge must succeed.[147]

The dissent's citation to a few supposedly grandfathered local or municipal ordinances under the legislation limiting political subdivisions' power to regulate firearms proves nothing. In contrast to 22 *Del. C.* § 835(a)(6), which provides that "[n]othing contained herein shall be construed to invalidate existing municipal ordinances," Section 20 contains no such grandfathering provision.

And the references to "parks" in 11 *Del. C.* §§ 1441A and 1441B do not suggest that the General Assembly intended to grandfather the Regulations. These provisions were enacted when Delaware implemented the Federal Law Enforcement Officers Safety Act of

---

[145] *Doe*, 88 A.3d at 668.

[146] *See, e.g.*, *Wrenn*, 864 F.3d at 671 n.5 ("As we've noted, text and history and precedent urge that the Second Amendment requires governments to leave responsible citizens ample means for self-defense at home and outside.").

[147] In *Wrenn*, the D.C. Circuit court rejected the proposition that "densely populated or urban areas" such as Washington, D.C., might count as sensitive places that would justify restricting the right to carry. *Id.* at 660; *see id.* at 668 (granting preliminary injunction enjoining enforcement of the so-called "good reason" law because plaintiffs were likely to succeed on the merits of their argument that the law violated the Second Amendment on its face).

2004, 18 U.S.C. §§ 926B, 926C. The federal statutes and Delaware's analogues permit active and retired law enforcement officers to carry concealed weapons within or outside of their home jurisdictions irrespective of state laws to the contrary provided that certain conditions are met. Delaware's statutes were copied directly from the federal statute, and the bill's synopsis indicates that the General Assembly intended for them "to mirror the current federal law . . . ."[148] There is no suggestion or evidence cited that the General Assembly intended to sanction preexisting regulations concerning firearms in State Parks.

The Agencies additionally contend that, under 29 *Del. C.* § 10141(e), this Court should *presume* that the Regulations are lawful. But that view ignores the fundamental point that this Court, as the court of last resort for determining questions arising under our Constitution, bears ultimate responsibility for upholding our State Constitution. It cannot defer to unspecified reasons of unelected officials attempting to justify an infringement on a fundamental right.[149] Such a presumption is also inconsistent with the intermediate-

---

[148] Del. S.B. 45 syn., 148th Gen. Assem. (2015). *See also* Senate Debate on S.B. 45, 148th Gen. Assem. (May 7, 2015); House Debate on S.B. 45 at 1:15, 148th Gen. Assem. (July 1, 2015). Nor is there any evidence that the reclassification -- or declassification -- of penalties in 2016 was intended to ratify the Regulations implicitly. *See* Dissent at 72 n.243 and accompanying text. The General Assembly authorized the "declassification" of "minor violations associated with state parks" from unclassified misdemeanors to class D environmental violations so that the first of such infractions would not be reported on criminal history records and run the risk of impacting the job prospects of one-time offenders. Del. S.B. 114 syn., 148th Gen. Assem. (2015); *Minutes of Sen. Nat. Res. and Envtl. Control Comm. Meeting*, 148th Gen. Assem. (June 17, 2015), at 3-4. At the House Natural Resources Committee Meeting to consider the bill, the Deputy Director of DNREC responded to one member's inquiry about the types of violations that were to be declassified: "[s]he cited a number of specific examples including failure to purchase a surf fishing permit and failure to pay an entrance fee." *Minutes of House Nat. Res. Comm. Meeting*, 148th Gen. Assem. (June 25, 2015), at 1.

[149] As *Heller* observed, "[t]he very enumeration of the right takes it out of the hands of government . . . the power to decide on a case-by-case basis whether the right *is really worth* insisting upon. A

43

scrutiny standard employed in *Doe* that places the burden on the State to prove that its challenged regulations pass scrutiny.

The Agencies' argument also omits that § 10141(e) provides that, while courts should presume agency action is valid, regulations may be struck down if the complaining party shows the agency action was either "taken in a substantially unlawful manner and that the complainant suffered prejudice thereby," or that "the regulation, where required, was adopted without a reasonable basis on the record or is otherwise unlawful."[150] Here, the Regulations are plainly unlawful: they violate the Delaware Constitution.

### E. *The Agencies Lacked Authority to Enact the Regulations*

Relatedly, it is blackletter law that "administrative agencies . . . derive their powers and authority *solely* from the statute creating such agencies and which define their powers and authority."[151] "[I]t is axiomatic that delegated power may be exercised only in accordance with the terms of its delegation."[152] We have stated that "[a]n expressed legislative grant of power or authority to an administrative agency includes the grant of power to do all that is *reasonably necessary* to execute that power or authority," and no more.[153]

---

constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." 554 U.S. at 634.

[150] 29 *Del. C.*§ 10141(e).

[151] *Office of the Comm'r, Del. Alcoholic Beverage Control v. Appeals Comm'n, Del. Alcoholic Beverage Control*, 116 A.3d 1221, 1226 (Del. 2015) (citing *Wilm. Vitamin & Cosmetic Corp. v. Tigue*, 183 A.2d 731, 740 (Del. Super. Ct. 1962)).

[152] *New Castle Cty. Council v. BC Dev. Assocs.*, 567 A.2d 1271, 1275 (Del. 1989).

[153] *Atlantis I Condo. Ass'n v. Bryson*, 403 A.2d 711, 713 (Del. 1979) (emphasis added).

Pursuant to 7 *Del. C.* § 4701(a)(4), DNREC may "[m]ake and enforce regulations relating to the protection, care and use of the areas it administers . . . ."[154] That authority is limited by 29 *Del. C.* § 8003(7), which states that the Secretary of DNREC may "[e]stablish and promulgate such rules and regulations governing the administration and operation of the Department as may be deemed necessary by the Secretary *and which are not inconsistent with the laws of this State* . . . ."[155] For its part, the DOA has the power to "devise and promulgate rules and regulations for the enforcement of the state forestry laws and for the protection of forest lands . . . ."[156] Under 3 *Del. C.* § 101(3), the DOA is prohibited from adopting rules and regulations that "extend, modify, or conflict with any law of [the State of Delaware] or the reasonable implications thereof . . . ."[157]

The Regulations fall outside the scope of the Agencies' authority because they are inconsistent with the laws of this State (namely, Section 20) in violation of 29 *Del. C.* § 8003(7) and 3 *Del. C.* § 101(3).[158] The evisceration of the right to self-defense and defense

---

[154] 7 *Del. C.* § 4701(a)(4).

[155] 29 *Del. C.* § 8003(7) (emphasis added).

[156] 3 *Del. C.* § 1011.

[157] *Id.* § 101(3). Although the Regulations are also challenged on the basis of preemption, we question whether that doctrine is directly applicable here. "'Preemption' refers to circumstances where the law of a superior sovereign takes precedence over the laws of a lesser sovereign; for example, a federal law preempting a state law or a state law preempting a city or county ordinance." *A.W. Fin. Servs., S.A. v. Empire Res., Inc.*, 981 A.2d 1114, 1121 (Del. 2009). Instead, this appears to be a clear case of an agency exceeding its authority by violating its directive to comply with the State's laws -- which necessarily includes the Constitution.

[158] DNREC has recognized the narrow scope of its power. *See* 7 *Del. Admin. C.* § 9201-2.1 (DNREC may "adopt only those minimal Rules and Regulations that are essential to the protection of Park resources and improvements thereto and to the safety, protection, and general welfare of the visitors and personnel on properties under its jurisdiction.").

of family in the entirety of Delaware State Parks and Forests is inconsistent with Section 20 as the Agencies failed to show that they have not burdened the fundamental right to bear arms for defense of self and family more than reasonably necessary to achieve important government objectives. The State has made no attempt whatsoever to determine which areas of state park and forest lands are truly "sensitive" and which are not. We do not disagree that certain areas, such as places where classes of schoolchildren gather, may be deemed "sensitive." But the Regulations that completely ban lawful firearms in all areas are invalid, and by failing to conform to 29 *Del. C.* § 8003(7) and 3 *Del. C.* § 101(3), the Agencies have exceeded their statutory authority.[159]

## II. CONCLUSION

For the reasons set forth above, we REVERSE.

---

[159] As to our dissenting colleagues, we ignore many of their comments suggesting that any law, constitutional provision, or decision announcing or upholding the rights to keep and bear arms -- including Section 20, *Doe*, and *Heller* -- must be discounted as the product of a politically motivated, NRA-driven agenda. But we do pause to observe that the dissent's approach -- were it to have been the law -- would have troubling implications beyond this case. If, as they posit, agency regulations (such as those eviscerating fundamental Section 20 rights) are immune from any constitutional scrutiny, what principles could the Court then invoke if an agency were to ban the press from open meetings, or limit political or other speech in such areas?

46

**STRINE**, Chief Justice, dissenting, with **SEITZ**, Justice, joining:

## I.

We respectfully dissent.

To begin to explain why, we underscore what this case is about. The Majority sets aside a forty-year-old policy of the Division of Parks and Recreation of the Department of Natural Resources and Environmental Control ("DNREC") that prohibits firearm possession in our State Parks, except for lawful hunting in designated areas or with prior written approval of the Director of DNREC, and a fourteen-year-old policy of the Department of Agriculture ("DOA," and together with DNREC, the "Agencies") that prohibits firearm possession in our State Forests, except for legal hunting[1] or when otherwise waived for a special situation (each a "Regulation," and together, the "Regulations").[2] The Parks and Forests to which these longstanding Regulations apply are havens of recreation, relaxation, and education for Delaware families and children, offering school field trips,[3] summer camps,[4] recreational activities, including hiking, biking,

---

[1] DEL. DEP'T NAT. RES. & ENVTL. CONTROL, PARK RULES AND REGULATIONS § 8.04 (1977); DEL. DEP'T AGRIC., STATE FOREST REGULATIONS § 7.9 (2003).

[2] 3 *Del. Admin. C.* § 402-3.2 ("In special circumstances, events, or emergencies, the Secretary or Forestry Administrator may, when it is deemed to be in the public interest, waive a specific regulation or fee.").

[3] *See, e.g.*, *How to Plan a State Park Field Trip*, DEL. STATE PARKS, http://www.destateparks.com/school/plan.asp (last visited Sept. 8, 2017).

[4] *See, e.g.*, *Summer Camps at Delaware State Parks*, DEL. STATE PARKS, http://www.destateparks.com/programs/summer-camps/index.asp (last visited Sept. 8, 2017) ("Half-day camps for four- to six-year-olds are offered in summer, as well as full-day camps for six- to seventeen-year-olds. Many camps offer before and after care. . . . Single- or multi-day school break camps keep kids interested, active and learning when school is closed during the school year.").

boating, ice skating, cross-country skiing, bird watching, and horseback riding,[5] and

overnight trips to Cape Henlopen that have been a rite of passage for generations of

Delaware students.[6]  They also serve as a site for school, youth, and adult sporting events.[7]

What is unusual about this decision is that the Majority has discovered that Article

I, Section 20 of our State Constitution ("Section 20"), the 1987 amendment providing for

an individual right to bear arms, invalidated these decades-old Regulations.  Neither the

enactors of Section 20, nor anyone in Delaware, recognized that Section 20 affected the

state's ability to regulate firearm possession on its own land until the appellants filed suit

---

[5] *See, e.g.*, *Activities in Delaware State Parks*, DEL. STATE PARKS, http://www.destateparks.com/
activities/index.asp (last visited Sept. 8, 2017) (activities offered in Parks include adventure racing,
biking, mountain biking, birding, camping, disc golf, fishing, geocaching, golf, hayrides, hiking,
horseback riding, hunting, music and arts, paddling, picnicking, rock climbing, rappelling,
stargazing, summer camps, summer concerts, swimming, and tennis); *Delaware State Forests*,
DEL. FOREST SERV., http://dda.delaware.gov/forestry/forest.shtml (last visited Sept. 9, 2017)
(activities offered in Forests include hiking, horseback riding, hunting, running, bicycling, cross-
country skiing, primitive camping, picnicking, and fishing).
[6] *See, e.g.*, *R.E.E.C.H. at Cape Henlopen*, DEL. STATE PARKS, http://www.destateparks.com/
School/REECH/ (last visited Sept. 8, 2017) (overnight program for seventh and eighth graders in
operation since 1998 and school programs run by the Nature Center since the 1970s).
[7] *See, e.g.*, *Kickball*, DEL. SPORTS LEAGUE, https://www.delawaresportsleague.com
/leagues/kickball (last visited Nov. 20, 2017) (adult kickball league competing at Alapocas Run
State Park); *Schedule Entrance Fees & User Charges*, DIV. PARKS & RECREATION 29 (2017),
http://www.destateparks.com/downloads/fees/2017RatesFees Charges.pdf (setting the fee to rent
football or soccer fields for youth athletics); *Dewey Beach*, BEACH 5 SAND SOCCER SERIES,
http://www.beach5sandsoccerseries.com/locations5.php (last visited Nov. 20, 2017) ("best beach
soccer tournament on the east coast" with both "youth and adult divisions"); *Boys' Soccer—Varsity
Schedule*, HAWKS SPORTS, https://www.hawkssports.com/page9435 (last visited Nov. 20, 2017)
(high school boys' varsity soccer practice held at Cape Henlopen State Park).

twenty-eight years after Section 20's adoption,[8] inspired by federal decisions interpreting the Federal Constitution.

This decision is unusual in other respects, too. The 1977 Park Regulation prohibiting the possession, display, or discharge of firearms in Parks was not novel, but rather followed a lineage of Delaware park policies dating back to at least 1887.[9] And the 1979 Forest Regulation prohibiting firearm use except by licensed hunters for game in season, as amended in 2003 to prohibit firearm possession, is derived from hunting restrictions dating back to at least 1911,[10] some of which are still in effect today.[11] The Regulations were kept in place through the administrations of many governors from both political parties who did not recognize the seismic effect of Section 20 on their constitutionality. For example, Governor Castle, who was Senate Minority Leader when the Park Regulation was adopted by Governor DuPont's administration in 1977, Lieutenant Governor in Governor DuPont's second term when the Forest Regulation was last promulgated before the adoption of Section 20 in 1984, and Governor at the time of the

---

[8] Verified Compl. for Declaratory and Injunctive Relief, *Bridgeville Rifle & Pistol Club v. Small*, C.A. No. 11832-VCG (Del. Ch. Dec. 21, 2015).
[9] Wilm. C. (Charter) § 6 (1887).
[10] 16 Del. Laws ch. 165, § 8 (1911).
[11] 7 *Del. C.* § 704(d) ("No person shall shoot at, or kill any bird or animal protected by the laws of this State with any device, swivel or punt gun, or with any gun other than such as is habitually raised at arm's length and fired from the shoulder. Possession of such illegal device or gun while hunting shall be prima facie evidence of an offense under this subsection.").

3

adoption of Section 20 in 1987, kept the Regulations in place throughout his eight-year tenure.[12]

There is a reason for that: When adopted, no one thought Section 20 would affect existing laws and regulations, including these longstanding Regulations. And no one conceived or intended that Section 20 would bar the government from restricting firearms on state property. In amending the Delaware Constitution to adopt Section 20, the General Assembly did not intend to create new rights, repeal existing firearm laws, or limit its power to manage its own land. Rather, as the legislative history shows, the General Assembly intended to protect the status quo as it existed in 1987.[13]

So what is this case about? It is about a desire to read the Delaware Constitution in conformity with federal decisions that were not issued until 2008 and 2010: to wit, *District of Columbia v. Heller* and *McDonald v. City of Chicago*.[14] *Heller* and *McDonald* gave the Second Amendment a much broader reading and reversed interpretations of the Second Amendment by the Supreme Court of the United States that were well over a century old.

These cases were first used as a gloss on our own Constitution in this Court's decision in *Doe v. Wilmington Housing Authority*, which answered certified questions from the United States Court of Appeals for the Third Circuit.[15] In *Doe*, this Court addressed to

---

[12] *Governor Michael Newbold Castle*, NAT'L GOVERNORS ASS'N, https://www.nga.org/cms/michael-castle (last visited Nov. 21, 2017).
[13] *See generally* Audio tape: Del. H.B. 554, 133d Gen. Assem. (1986); Audio tape: Del. S.B. 30, 134th Gen. Assem. (1987).
[14] 554 U.S. 570 (2008); 561 U.S. 742 (2010).
[15] *Doe v. Wilmington Hous. Auth.*, 88 A.3d 654 (Del. 2014).

what extent our state government, as a landlord, could restrict the ability of its tenants to carry weapons for self-defense in common areas that it considered to be extensions of the home where the residents had to go to do daily chores like laundry. And although *Doe* purported to give Section 20 a broader meaning than the Second Amendment because of Section's 20 different text—an interpretation unnecessary to decide the case before it—the analysis in *Doe* was in essence identical to the revised interpretation *Heller* and *McDonald* gave to the Second Amendment. Consistent with *Doe*'s embrace of *Heller* and *McDonald,* *Doe* gave limited consideration to our state's own history of gun regulation and to the limited purpose behind the adoption of Section 20.

It was only after *Doe* that this suit was filed, in which the appellants urge us to read our own Constitution to restrict our government's ability to control firearm possession and use, even on its own land, further than the Second Amendment does. The Majority embraces *Heller* and *McDonald* and uses them as the foundation for their holding that Section 20 invalidated longstanding practices in park regulation, while giving little weight to the text and history bearing on our Constitution's meaning. The reality is that, rather than examine what the text of Section 20 means and how it was understood when it was adopted, the Majority has given Section 20 a federal coat of paint, a gloss of meaning more derived from Washington, D.C. than Dover, Delaware. Absent the process of epiphany about the meaning of our Constitution triggered by *Heller* and *McDonald*, the Regulations would have continued to operate without controversy.

As we show, neither the text of Section 20 nor its history suggests that it altered the historical understanding that our state government, through our elected officials, could determine whether and when firearms could be possessed on state property, and who could possess them. Likewise, nothing in Section 20 or our history suggests that our state government cannot create Parks and Forests as havens for recreation, relaxation, and education where firearm possession and use is restricted.

No one has the right to bear arms on another's property without their consent, and it was long recognized that the government could restrict possession in certain sensitive places, like Parks and Forests. In fact, as of 1977, firearms had been prohibited in one of the state's crown jewel parks for ninety years.[16] And, since 1938, the federal government had prohibited gun possession within national parks.[17]

But even if the Regulations prohibited conduct protected by Section 20, we would dissent. Under *Heller* and its progeny, the Regulations regulate sensitive areas, and thus are lawful. The notion that our government, as a proprietor, may determine that certain areas are sensitive and should be firearm-free was well understood in Delaware, and throughout the United States. It is therefore not surprising that for the forty years since the earliest of the Regulations was adopted in 1977,[18] no one in the General Assembly sought

---

[16] Wilm. C. (Charter) § 6 (1887).
[17] 36 C.F.R. § 2.2 (1938).
[18] DEL. DEP'T NAT. RES. & ENVTL. CONTROL, PARK RULES AND REGULATIONS (1977).

to introduce a bill overturning them, and no one claimed they violated our Constitution or the Second Amendment.

And even if they were not regulations of sensitive places, the Regulations would survive heightened scrutiny. Contrary to the Majority's characterization of the Regulations as a "total ban"[19]—a label it borrows from *Heller*[20]—the Regulations do not ban firearm possession statewide or even citywide, and are therefore distant from the citywide bans at issue in *Heller* and *McDonald*.[21] The Regulations affect only three percent of the land in Delaware.[22] And they are not even a total ban within the three percent occupied by Parks and Forests because they facilitate access to firearms for lawful hunting and allow for

---

[19] Majority Op. 1 ("Appellants challenge two regulations adopted by two different State agencies that result in a near total ban of firearms in Delaware's state parks and forests.").

[20] *District of Columbia v. Heller*, 554 U.S. 570, 574 (2008) ("[The Court of Appeals for the District of Columbia Circuit] held that the Second Amendment protects an individual right to possess firearms and that the city's total ban on handguns, as well as its requirement that firearms in the home be kept nonfunctional even when necessary for self-defense, violated that right.") (citing *Parker v. District of Columbia*, 478 F.3d 370, 395, 399–401 (D.C. Cir. 2007)).

[21] *Id.*; *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).

[22] DNREC's Park Regulation only governs "the use of all applicable lands [etc.] . . . administered by the Division of Parks and Recreation." DEL. DEP'T NAT. RES. & ENVTL. CONTROL, PARK RULES AND REGULATIONS § 2.2 (2016). And DOA's Forest Regulation only governs forests. DEL. DEP'T AGRIC., STATE FOREST REGULATIONS § 2 (2007). The Division of Parks and Recreation within DNREC manages 23,309 acres of land, and the DOA manages 17,762 acres of land. *Public Protected Lands*, STATE OF DEL., https://data.delaware.gov/Recreation/Public-Protected-Lands/whe2-8n4h/data (last visited Nov. 21, 2017). Given that Delaware comprises 1.3 million acres of land, only three percent of Delaware's acreage is managed by DNREC and DOA as Parks and Forests. *Delaware Geography*, STATE OF DEL., https://delaware.gov/topics/facts/geo.shtml (last visited Nov. 21, 2017). Another 58,269 acres are managed by DNREC's Division of Fish and Wildlife, but these acres are not subject to the Park Regulation. *Public Protected Lands*, STATE OF DEL., https://data.delaware.gov/Recreation/Public-Protected-Lands/whe2-8n4h/data (last visited Nov. 21, 2017).

7

waiver through an application for special permission, which could be used if a group wished to use a Park for a marksman's competition, or if, say, an FBI agent who does undercover work wished to bring a weapon into a Park because of her special need for personal protection.[23]

The Regulations serve an important governmental purpose and do not burden appellants' Section 20 rights more than necessary. When people come together in Parks and Forests for games and recreation, emotions can run high. When folks camp, they sometimes drink,[24] including at events within the Parks like beer and wine festivals.[25] When folks drink and carouse, they sometimes get jealous and angry. When folks play or attend sporting events, spirits run high and sometimes out of control. When folks get emotional around guns, things can get dangerous fast. When folks camp, there are no gun lockers, and they are near other visitors.[26] There are no natural boundaries in Parks and

---

[23] DEL. DEP'T NAT. RES. & ENVTL. CONTROL, PARK RULES AND REGULATIONS § 8.04 (1977); DEL. DEP'T AGRIC., STATE FOREST REGULATIONS § 7.9 (2003); 3 *Del. Admin. C.* § 402-3.2.

[24] Alcohol use is permitted at times in certain parks in areas such as campgrounds. *See* DEL. DEP'T NAT. RES. & ENVTL. CONTROL, PARK RULES AND REGULATIONS § 20.6 (2016). In other areas, it is restricted. *E.g.*, 7 *Del. Admin. C.* § 9201-3.1 (limits or prohibitions are imposed "when such action is deemed necessary for property management, protection of flora, faunas and their habitats or when it is in the best interest of the health, safety, and the general welfare of the visitors"); *id.* § 9201-20.6 (banning alcohol in Brandywine Creek State Park, Fort Delaware State Park, Wilmington State Parks, and Fox Point State Park); *id.* § 9201-20.7 (banning alcohol in rented vessels); *id.* § 9201-20.8 (banning possession of kegs without permission); *id.* § 9201-21.5 (prohibiting alcohol consumption while hunting).

[25] *See, e.g.*, DEL. DEP'T NAT. RES. & ENVTL. CONTROL, DELAWARE STATE PARKS FALL GUIDE, 13, 35, 38 (2017), http://www.destateparks.com/programs/DSPGuide.asp.

[26] *E.g.*, 74 Del. Laws ch. 360 (1994) (unlawful to allow a minor to access a firearm by "intentionally or recklessly stor[ing] or leav[ing] a loaded firearm within the reach or easy access

8

Forests signaling areas where park-goers can find safety from gunfire or natural barriers that stop flying bullets or arrows. These and other common sense reasons support the decisions of generations of governors and cabinet secretaries that the Regulations advance the public purposes served by our Parks and Forests, and facilitate the safe enjoyment of these public spaces by families and children.

Underscoring this reality are the briefs of the appellants and their friends in amicus that argue without evidence that our Parks and Forests are now dangerous places because of the Regulations.[27] We live in a state with a crime rate higher than the national average.[28] Our major city has a crime rate higher than that of Los Angeles and New York City[29] and its children are more at risk of being victims of gun violence than those in any other American city.[30]

---

of a minor and where the minor obtains the firearm and uses it to inflict serious physical injury or death upon himself or any other person," but the firearm being stored in a locked container is an affirmative defense).

[27] *See, e.g.*, Appellants' Amend. Opening Br. 27 ("The need for self-defense certainly exists in State Parks and Forests where individuals and their families may stay and sleep in expensive cabins, or camp, hike, and hunt in the presence of undomesticated animals and, potentially, criminals.").

[28] *Correction Statistics By State: Delaware*, NAT'L INST. CORRECTIONS, https://nicic.gov/statestats/?st=de (last visited Nov. 21, 2017) ("The [2015] crime rate in Delaware is about thirteen percent higher than the national average rate.").

[29] TABLE 8: OFFENSES KNOWN TO LAW ENFORCEMENT BY STATE BY CITY, FBI UNIFORM CRIME REPORTING (2015), https://ucr.fbi.gov/crime-in-the-u.s/2015/crime-in-the-u.s.-2015/tables/table-8/table_8_offenses_known_to_law_enforcement_by_state_by_city_2015.xls/view (violent crime rates, defined as the number of violent crimes per 100,000 people, are: 634.8 for Los Angeles, 585.7 for New York City, and 1,707.8 for Wilmington).

[30] Brittany Horn et al., *Wilmington: Most Dangerous Place in America for Youth*, NEWS J. (Sept. 8, 2017).

Given this backdrop, one would expect the appellants and their friends in amicus to be able to show that the Regulations have manifested themselves in a pattern of violent harm to visitors and a higher violent crime rate in our Parks and Forests than in other areas of our State. Instead, their adjectives and adverbs find themselves accompanied by one fact: an unsolved murder with its victim discovered in Blackbird State Forest in 1986.[31] One. That suggests the Regulations should not be disturbed by the Judiciary, and that we should trust the judgment of generations of elected governors and their cabinet secretaries to oversee state land and protect those invited to use it on a shared basis. Our General Assembly is well-positioned to constrain any overreaching by them. That a bill has never even been introduced to do so since 1987 suggests that we are overriding a durable, bipartisan, and sensible policy consensus.

## II.

To explain why we would find the Regulations valid under the Delaware Constitution, we proceed as follows: In Section III, we examine the 1776 and 1792 Delaware Constitutions and the fact that their framers did not adopt a constitutional right to bear arms. Instead, they left it to the General Assembly to address the extent to which Delawareans could bear arms.

---

[31] Amicus Curiae Br. of Law Enforcement Legal Defense Fund et al. 18, *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, C.A. No. S16C-06-018 THG, 2016 WL 7428412 (Del. Super. Dec. 23, 2016); *see generally Jane Prichard*, NEW CASTLE COUNTY DEL., http://www.nccde.org/1308/Jane-Prichard (last visited Nov. 6, 2017).

We illustrate in Section IV, by reference to specific instances of lawmaking and regulation, that Delaware has long regulated to what extent, where, and when firearms could be possessed and used. Likewise, we show that Delaware has long recognized the right of property owners to decide whether firearms could be possessed on their property. This understanding included the notion that the government could regulate firearm possession on its own lands, including within its Parks and Forests.

In Section V, we address the circumstances the Agencies faced when they adopted the Regulations and why those decisions were presaged by prior regulation and not controversial.

Then, in Section VI, we address Section 20, which added to the Delaware Constitution the right to keep and bear arms that is the focus of this case. We address its limited purpose, and in particular, the lack of any purpose on the part of its drafters to disturb longstanding restrictions on firearm possession and use on government property. The General Assembly intended to codify the existing status quo: No one thought or intended that Section 20 would limit Delaware's power to regulate firearm possession and use on its own property, like any other proprietor may. We note that, in 1981, Kent County adopted an ordinance like the Regulations that prohibited the possession and use of firearms in its county parks, and the absence of any suggestion that Section 20 invalidated that ordinance.

In Section VII, we address the implications of silence: the three decades following the adoption of Section 20 when there was no constitutional or administrative challenge to

11

the Regulations, no bill filed to overturn the Regulations, and no directive from the Governor to do so. In fact, any legislative action taken during this period confirmed the constitutionality of the Regulations. And, in 1998, New Castle County adopted the same policy as the Regulations by prohibiting the possession and use of firearms in its parks.

In Section VIII, we address what began the process of discovery that resulted in this suit: the federal decisions of *Heller* and *McDonald*. We do not think that Delawareans need these federal cases—postdating our adoption of Section 20 by twenty-one years—to tell us what it meant when it was adopted almost a generation earlier.

In Section IX, we note that even in the wake of these federal decisions, there was no action challenging the constitutionality of the Regulations under either the State or Federal Constitution. Rather, this case was only filed after this Court answered a question certified by the United States Court of Appeals for the Third Circuit in 2014.[32] In *Doe*, this Court embraced the analysis in *Heller* and *McDonald*, reading them into the Delaware Constitution and inspiring the appellants' discovery that the longstanding Regulations violated Section 20. But, even after *Doe*, the General Assembly adopted legislation that accepted the Regulations as state policy on two occasions.

Finally, in Section X, we give context to the Regulations by explaining the role of our Parks and Forests in the lives of Delawareans. We then show that the Regulations do not burden conduct protected by Section 20. We also explain how, even if the Regulations

---

[32] *Doe v. Wilmington Hous. Auth.*, 88 A.3d 654 (Del. 2014).

do burden conduct protected by Section 20 and the federal cases the Majority relies upon apply, the Regulations are lawful as regulations of sensitive places and, in any event, survive heightened scrutiny.

## III.

From the Majority decision, it might be confusing whether we are addressing a case arising under a Delaware constitutional amendment adopted in 1987, Second Amendment decisions issued by federal courts in 2008 and 2010, or the State Constitution, first adopted in 1776.

We start with the latter suggestion, which rests on the odd notion that Delaware's decision not to create a constitutional right to bear arms amounted to a recognition that there was an unwritten right to bear arms that could not be altered by the General Assembly, the common law, or local regulation authorized by the General Assembly. To show why this is not convincing, we begin with the obvious. Delaware's 1776 Constitution did not include a right to bear arms. And the drafters of Delaware's 1792 Constitution debated whether to adopt a constitutional right to bear arms, but decided not to do so.

## A.

Delaware's first Constitution, adopted in 1776,[33] did not include a right to bear arms, but three provisions evidence the state's understanding that it could regulate firearm

---

[33] PROCEEDINGS OF THE CONVENTION OF THE DELAWARE STATE HELD AT NEW-CASTLE ON TUESDAY THE TWENTY-SEVENTH OF AUGUST, 1776 26 (2d ed. 1927).

13

possession and use: i) Article 24, which continued the acts of the General Assembly in force,[34] including prohibitions on dueling and riots;[35] ii) Article 25, a placeholder that continued the then-existing common law of England while the details of the Constitution could be filled out,[36] including the prohibition on "riding or going armed with dangerous or unusual weapons";[37] and iii) Article 28, which prohibited the carrying of arms to the

---

[34] DEL. CONST., art. 24 (1776) ("All acts of Assembly in force in this state on the fifteenth day of May last (and not hereby altered, or contrary to the resolutions of Congress, or of the late House of Assembly of this state) shall so continue until altered or repealed by the Legislature of this state, unless where they are temporary, in which case they shall expire at the times respectively limited for their duration.").

[35] 1 Del. Laws ch. 4 (1700) ("That who[s]oever [s]hall threaten the per[s]on of another to wound, kill or de[s]troy him, or do him any harm in per[s]on or e[s]tate; and the per[s]on [s]o threatened [s]hall appear before a ju[s]tice of the peace, and atte[s]t, that he believes that by [s]uch threatening he is in danger to be hurt in body or e[s]tate; [s]uch per[s]on [s]o threatening as aforefaid, [s]hall be bound over, with one [s]ufficient [s]urety, to appear at the next [s]e[s][s]ions or county court, to be holden for the county where [s]uch offence was committed, to be proceeded again[s]t according to law; and, in the mean time, to be of his good behaviour, and keep peace towards all the king's [s]ubjects."); *Id.* ch. 93 ("That if any per[s]on within this government [s]hall challenge any other per[s]on to fight With [s]word, pi[s]tol, rapier, or any other dangerous and de[s]tructive weapon, every [s]uch per[s]on [s]o challenging, being legally convicted thereof, by bill, plaint, or information, in any Court, of Quarter Salons within this government, [s]hall forfeit and pay the [s]um of Twenty Pounds, or [s]uffer three, months impri[s]onment in the common gaol of the [s]aid county."); *id.* ch. 51 ("[A]ny per[s]ons, to the number of three, or upwards, meet together within this government, with clubs, [s]taves, or other hurtful weapons, to the terror of any of the peaceable people or inhabitants of the [s]ame, and shall commit, or attempt to commit, violence or injury upon the per[s]on or goods of any of the [s]aid inhabitants . . . shall be adjudged and puni[s]hed according to the laws and [s]tatutes of Great Britain again[s]t riots and unlawful a[s][s]emblies.").

[36] DEL. CONST., art. 25 (1776).

[37] *See, e.g., State v. Huntly*, 25 N.C. 418, 420–21 (1843) (citing 4 BL. COM. 149) (internal citation omitted) (when "a man arms himself with dangerous and unusual weapons in such a manner, as will naturally cause a terror to the people," this offense "is said to have been always an offence at common law and strictly prohibited by many statutes").

14

first election of the General Assembly, to be held in the county courthouses.[38]  Delaware's first Constitution thus recognized existing firearm laws and restricted the possession of arms on sensitive government property.

The Majority references Article 25 to support the notion that Delawareans understood a right to bear arms "even before the founding."[39]  That Article states:

> The common law of England, as well as so much of the statute law as have been heretofore adopted in practice in this state, shall remain in force, unless they shall be altered by a future law of the Legislature; such parts only excepted as are repugnant to the rights and privileges contained in this constitution and the declaration of rights, *& c.* agreed to by this convention.[40]

Article 25 made up for the original Constitution's brevity, which contained only thirty articles,[41] and protected individual rights until the General Assembly had the opportunity to draft its own bill of rights.[42]  In 1792, the General Assembly made the anticipated changes and removed Article 25.[43]  The removal of Article 25 did not revoke the application of English common law in Delaware, but rather, reinforced the

---

[38] DEL. CONST., art. 27–28 (1776) ("To prevent any violence or force being used at the said elections, no persons shall come armed to any of them; and no muster of the militia shall be made on that day . . . .").

[39] Majority Op. 17–18.

[40] DEL. CONST., art. 25 (1776).

[41] DEL. CONST. (1776).

[42] RANDY J. HOLLAND, THE DELAWARE STATE CONSTITUTION 76 (2d ed. 2017) ("Article XXV of the 1776 Constitution . . . provided that the common law of England would remain in force in Delaware until altered by the newly formed General Assembly.").

[43] *Compare* DEL. CONST. (1776) *with* DEL. CONST. (1792); *see also id.* at 13.

15

understanding that the Delaware General Assembly's creation of its own Constitution and statutes would take primacy over English law.[44]

## B.

Delaware based its Bill of Rights in the 1792 Constitution on English common law and Pennsylvania's Constitution.[45] Although both English common law and the Pennsylvania Constitution included a right to bear arms, Delaware rejected a proposal to include one.[46]

---

[44] DEL. CONST., art. 25 (1776) (English Common Laws "shall remain in force, unless they shall be altered by a future law of the Legislature."). The following three constitutions repeated this sentiment, incorporating existing Delaware laws unless inconsistent or altered. DEL. CONST., art. 8, § 10 (1776) (laws existing at the time of the constitution's enactment remained in force if "not inconsistent" with the constitution and "unless . . . altered by future laws"); DEL. CONST., art. 7, § 9 (1831) (same); DEL. CONST., Sched. § 18 (1897) (same). In *Quillen v. State*, the Supreme Court noted that our law is "in general" the common law of England, "[a]part from statute." 110 A.2d 445, 450 (Del. 1955). Addressing Delaware's homicide laws, the court applied English common law because "no important changes in the law of homicide have been made by our legislature." *Id.*; *see also Delaware Optometric Corp. v. Sherwood*, 128 A.2d 812, 816 (1957) (applying the English common law granting courts the duty of maintaining the standards of the legal profession, because there had not been "any attempt on the part of the General Assembly to control it").

[45] HOLLAND, *supra* note 42, at 76. John Dickinson was President of the 1792 Convention and no stranger to English and Pennsylvania Law, having studied in England as a contemporary of William Blackstone and having served as Governor of Pennsylvania from 1782 to 1785. *Id.* at 12, 34. Many provisions of the 1792 Bill of Rights were identical to the 1790 Pennsylvania Constitution, and the similarities are frequently attributed to Dickinson's influence. *Id.* The only rights found in the Pennsylvania Bill of Rights that Delaware did not adopt, aside from the right to bear arms, were ex post facto laws, impairment of contract laws, and free speech. *Id.* at 13. The General Assembly also removed the right to form a militia from the 1776 Constitution. *Id.*

[46] *Id.* at 88. There is no evidence that the drafters rejected the right to bear arms because the English law already covered the topic—if so, there would have been no need to adopt any of the amendments that duplicated English law. On the contrary, in *Claudio v. State*, 585 A.2d 1278, 1296 (Del. 1991), the Supreme Court explained that Delawareans, including the drafters, "were acutely aware of the need to set forth an intention to perpetuate fundamental rights, as they had

The constitutional convention delegates debated a provision protecting an individual right to bear arms, and considered at least four versions of such a provision. The first proposal, identical to the 1790 Pennsylvania provision,[47] stated: "The Right of *the Citizens to bear Arms* in defence of themselves and the State, shall not be questioned."[48] This conception of an unqualified right was met with amendments that would have added important provisos, including limiting the right to those "*acting in strict subordination to the Civil Power*," "*qualified to vote for Representatives*," and who did not "*disturb the Peace and Happiness, or Safety of Society*."[49]

> This Court acknowledged this history in *Doe*, observing:
>
> In 1791, Delaware delegates to the state constitutional convention were unable to agree on the specific language that would codify in our Declaration of Rights the right to keep and bear arms in Delaware. After several attempts, the effort was abandoned. Concerns over groups of armed men stood in the way of an agreement even though there was an apparent consensus among the delegates on an individual's right to bear arms in self-defense.
>
> Not until almost 200 years later did the Delaware General Assembly agree on the language to be used.[50]

---

existed at common law, in unambiguous language." But the drafters did not include the right to bear arms as one of the fundamental common law rights to be perpetuated; considering and rejecting it instead.

[47] PA. CONST., art. 1, § 21 (1790). *See also* PA. DECLARATION OF RIGHTS, cl. XIII ("That the people have a right to bear arms for the defence of themselves and the state; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; And that the military should be kept under strict subordination to, and governed by, the civil power.").

[48] PROCEEDINGS OF THE HOUSE OF ASSEMBLY OF THE DELAWARE STATE 1781–1792 AND OF THE CONSTITUTIONAL CONVENTION OF 1792 785 (Claudia L. Bushman et al. eds., 1988).

[49] *Id.*

[50] *Doe v. Wilmington Hous. Auth.*, 88 A.3d 654, 663–64 (Del. 2014).

17

But then still concluded:

> Although Section 20 was not enacted until 1987, Delaware has a long history, dating back to the Revolution, of allowing responsible citizens to lawfully carry and use firearms in our state. . . . Like the citizens of our sister states at the founding, Delaware citizens understood that the "right of self-preservation" permitted a citizen to "repe[l] force by force" when "the intervention of society in his behalf, may be too late to prevent an injury." An individual's right to bear arms was "understood to be an individual right protecting against both public and private violence." The right to keep and bear arms was also understood to exist for membership in the militia and for hunting.[51]

To us, it is not surprising that Delaware did not adopt a constitutional right to bear arms. Aside from the concern that a situation could arise where the national government would prevent states from raising militias—a concern with origins in the struggle for independence from England—there was no plausible reason to believe that the political process would not address firearm possession and use in a fair manner. And as we shall soon discuss, the English tradition did not bar Parliament—the equivalent of our General Assembly—from regulating gun possession and use.

The drafters' decision not to constitutionalize any right to weapons means that any claim of right was subject to regulation by the ordinary political process. *Doe*'s dictum suggesting that the failure to agree on a right reflects a "consensus" that it existed,[52] to us, turns history and law upside down and has an Orwellian character. The supposed

---

[51] *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 594–95, 598–99 (2008)).
[52] *Id.*

18

originalism of some is supposed to be based on what constitutional text says and was understood to mean, not to ground constitutional rights in absent text.[53]

Turning our founders' decision not create a constitutional right to bear arms into evidence of a fundamental right immune to legislative regulation is not only inconsistent with principles of legislative interpretation, it is belied by the actions of generations of Delawareans that followed. They often legislated to restrict weapons possession and use, unconstrained by any belief that they were compromising an unwritten state constitutional right.

Our friends in the Majority ground an unwritten right to bear arms in our English law heritage.[54] But the English regulatory tradition does not support the notion that our founders considered our English law heritage to be the source of an unwritten right to bear arms.[55] In fact, one of the only things the nine federal Justices who were split five-to-four

---

[53] Justice Antonin Scalia, Judicial Adherence to the Text of Our Basic Law: A Theory of Constitutional Interpretation, Address at the Catholic University of America (Oct. 18, 1996) ("You will never hear me refer to original intent, because I am first of all a textualist, and secondly, an originalist. If you are a textualist, you don't care about the intent, and I don't care if the Framers of the U.S. Constitution had some secret meaning in mind when they adopted its words. I take the words as they were promulgated to the people of the United States, and what is the fairly understood meaning of those words.").

[54] Majority Op. 26–28.

[55] Consistent with this reality, by 1792, England had long restricted where guns could be possessed, enacting in 1328 the Statute of Northampton, which stated that no person shall "go nor ride armed by Night nor by Day in Fairs, Markets" as a means of prohibiting the private use of arms to promote individual justice and preventing armed overthrow of the government. Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 CLEV. ST. L. REV. 1, 8, 13 (2012). Later laws prohibited shooting within a quarter-mile of a city or market and traveling on a highway with a loaded gun, as well as carrying small

in *Heller* agreed on was that any right to bear arms in England was subject to restriction by Parliament.[56]

Nor can it be thought that the drafters of our Constitution relied upon the Second Amendment to the Federal Constitution as a substitute for a state constitutional right to bear arms. By its plain terms, the Second Amendment was a restraint on federal—not state—action, and understood as such in 1792.[57] Thus, as of our state's founding, there was no constitutional right to bear arms, and the General Assembly had the responsibility of regulating gun possession and use.

## IV.

In keeping with the decision to not create a constitutional right to bear arms and with the English tradition of regulating gun possession and use, Delaware lawmakers early

---

handguns within the court or a three-mile radius of it. LOIS G. SCHWOERER, GUN CULTURE IN EARLY MODERN ENGLAND 59, 61 (2016) (citing 3 STATUTES OF THE REALM 832–35 (Alexander Luders et al. eds., 1963)). And laws setting the length of a lawful handgun to no less than "one whole yarde" had the effect of preventing concealed carry. *Id.* at 59. These length restrictions were meant to address "little shorte handguns and little hagbuttes" responsible for "detestable and shameful murders, robberies, felonies, riot and route." *Id.*

[56] *Heller*, 554 U.S. at 593 (the English Bill of Rights, "long understood to be the predecessor to our Second Amendment," was "like all written English rights . . . held only against the Crown, not Parliament") (internal citations omitted); *id.* at 665 (Stevens, J., dissenting) (the right to bear arms in the English Bill of Rights "was only available subject to regulation by Parliament ('as allowed by Law').") (internal citation omitted).

[57] *See, e.g.*, *Barron v. Mayor of Baltimore*, 7 Pet. 243, 248–49 (1833) (holding that the first eight Amendments to the Federal Constitution only applied to the federal government and did not extend to the states); AKHIL R. AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 128 (1998) (the consensus that the Bill of Rights did not "b[i]nd state governments," "epitomized by *Barron v. Baltimore*," "survived well into [the twentieth] century.").

on regulated where, when, and what weapons could be possessed within our State. Likewise, Delaware respected that proprietors, including the government itself, could restrict the possession and use of firearms on their own property. And one prominent example of that understanding involved a ban on firearm possession in a key public park.

**A.**

We touch on some of this history now, beginning with one of the earliest regulations of where guns could be used. In 1812, the General Assembly prohibited the firing of firearms within the limits of any town,[58] later enacting a form of the English Statute of Northampton under which: "Any justice of the peace may also cause to be arrested . . . all who go armed offensively to the terror of the people, or are otherwise disorderly and dangerous"[59] and which prohibited the firing or discharge of any firearm in any public place in the State.[60] With the authority of the General Assembly, municipalities also regulated firearms. Wilmington prohibited discharging firearms within its city limits,

---

[58] *See* Joseph Blocher, *Firearm Localism*, 132 YALE L.J. 82, 119 (2013) (citing An Act to Prevent the Discharging of Fire-Arms Within the Towns and Villages, and Other Places Within this State, and for Other Purposes, 4 Del. Laws ch. 329 (1812)); *see also* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 163 (2007) (citing An Act to Prevent the Discharge of Firearms Within Towns and Villages, Del. Sess. Laws 1812). The Act provided for exceptions for "days of public rejoicing," where authorization was provided by state law, or where deemed necessary. *Id.*

[59] REVISED STATUES OF THE STATE OF DELAWARE, TO THE YEAR OF OUR LORD ONE THOUSAND EIGHT HUNDRED AND FIFTY-TWO 333 (Dover, W.B. Keen 1852).

[60] 42 Del. Laws ch. 180, § 2 (1939).

except on days of public rejoicing,[61] as well as target shooting within town limits or "at any place of public resort" unless the location was surrounded by walls at least ten feet high and four inches thick.[62] Likewise, Dover prohibited the discharge of firearms within the town limits.[63]

**B.**

As did the rest of the United States,[64] Delaware respected the rights of real property owners—including private landowners and the government itself—to control their land and

---

[61] Wilm. C. (Charter) § 6 (1856).

[62] 19 Del. Laws ch. 266 (1891).

[63] *Farrow v. Hoffecker*, 79 A. 920, 921 (Del. Super. 1906).

[64] *E.g. Davis v. Commonwealth of Mass.*, 167 U.S. 43, 47 (1897), *distinguished by Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939) ("As representative of the public, [the legislature] may and does exercise control over the use which the public may make of such places, and it may and does delegate more of less of such control to the city or town immediately concerned. For the legislature absolutely or conditionally to forbid public speaking in a highway or public park is no more an infringement of the rights of a member of the public than for the owner of a private house to forbid it in his house. When no proprietary rights interfere, the legislature may end the right of the public to enter upon the public place by putting an end to the dedication to public uses. So it may take the less step of limiting the public use to certain purposes."); *Light v. United States*, 220 U.S. 523, 536 (1911) ("[T]he nation is an owner, and has made Congress the principal agent to dispose of its property. . . . Congress is the body to which is given the power to determine the conditions upon which the public lands shall be disposed of. The government has, with respect to its own lands, the rights of an ordinary proprietor to maintain its possession and to prosecute trespassers. . . . All the public lands of the nation are held in trust for the people of the whole country. And it is not for the courts to say how that trust shall be administered. That is for Congress to determine. The courts cannot compel it to set aside the lands for settlement, or to suffer them to be used for agricultural or grazing purposes, nor interfere when, in the exercise of its discretion, Congress establishes a forest reserve for what it decides to be national and public purposes. In the same way and in the exercise of the same trust it may disestablish a reserve, and devote the property to some other national and public purpose. These are rights incident to proprietorship, to say nothing of the power of the United States as a sovereign over the property belonging to it. Even a private owner would be entitled to protection against willful trespasses . . . .") (internal citations omitted); *see also* RESTATEMENT (FIRST) OF PROPERTY, § 521 (1936) ("The

22

the conditions on which visitors could enter. For example, "willfully enter[ing] into, upon, or trespass[ing] upon [a private landowner's] ways, lands or premises" was a nuisance in Delaware.[65] Private landowners could prohibit hunters with firearms from entering their property, and state law made disobeyance a violation of state law, just as the State prohibited trespass on state property for certain private uses.[66]

## C.

This established history of respecting private property extended to parks controlled by the government and is evidenced by state regulations limiting possession and use of weapons in those parks. History belies the idea that late twentieth century state policymakers were the first to regulate Parks and Forests as places for recreation in which possession and use of firearms might be inconsistent with the public purposes of the land.

---

fact that one has that relationship to land which is called possession is sufficient in and of itself to induce the law to give him protection as having a property interest against the world at large. To receive protection as the owner of a possessory interest one must have, in general, such a physical relation to the land as to give him a certain degree of physical control over it, and an intent to so exercise such control as to exclude other members of society, in general, from any present occupation of it.").

[65] *David v. State*, 89 A. 214, 214 (Del. Super. 1913) (citing Del. Rev. Code ch. 128, § 21). Furthermore, property owners owed no duty of care to trespassers. *Villani v. Wilmington Hous. Auth.*, 106 A.2d 211, 213 (Del. Super. 1954) ("The law is well settled that an owner or person in charge of property has no duty to a trespasser, except to refrain from injuring him intentionally, wilfully, or wantonly.").

[66] AN ACT TO PREVENT TRESPASSES BEING COMMITTED ON THE LANDS ON THE NORTH EAST SIDE OF LEWIS-CREEK, CALLED THE CAPE, IN THE COUNTY OF SUSSEX, REVISED STATUES OF THE STATE OF DELAWARE, TO THE YEAR OF OUR LORD ONE THOUSAND EIGHT HUNDRED AND FIFTY-TWO 124 (Dover, W.B. Keen 1852).

The state's administrative structure at this time employed the "hydra-headed commission system of administration,"[67] with local commissions performing public administrative functions outside of the control of the Governor.[68] As early as the 1860s, a Brandywine Park in Wilmington was contemplated because of its potential to "raise land values throughout the city and . . . to improve 'the culture, taste and morals of the community'" by addressing the absence of "a place where the mothers with their children, or the aged people can stroll, away from the noise and dust of the city, without being trespassers."[69] To address this need, the General Assembly created the Board of Park Commissioners of Wilmington in 1883 "for the purpose of providing and maintaining one or more open places or parks for the promotion of the health and recreation of the people of the City of Wilmington and its vicinity"[70] and to "provide a contrast to the existing city, a refuge from its noise, its oppressive darkness, from the crowdedness and the inhuman surfaces of the streets."[71]

---

[67] PAUL DOLAN, ORGANIZATION OF DELAWARE STATE ADMINISTRATION 13 (1951).

[68] *Id.* at 58 ("No inherent power of appointment or removal resides in the Delaware governor.") (citing *Collison v. State*, 39 Del. 468 (1938) and *State v. Wise*, 200 A. 418, 421 (1938)).

[69] CAROL E. HOFFECKER, WILMINGTON, DELAWARE: PORTRAIT OF AN INDUSTRIAL CITY, 1830–1910 74 (1974).

[70] 17 Del. Laws ch. 204, § 1 (1883).

[71] SUSAN MULCHAHEY CHASE, DAVID L. AMES, & REBECCA J. SIDERS, SUBURBANIZATION IN THE VICINITY OF WILMINGTON, DELAWARE, 1880–1950+/-: A HISTORIC CONTEXT 16.

The General Assembly itself established some regulations for Wilmington city parks in 1883,[72] and under delegated authority from the General Assembly,[73] the Board of Park Commissioners of Wilmington established additional regulations governing visitor conduct in its parks in 1887, one of which stated: "No person shall carry fire-arms or shoot birds or other animals within the Park, or throw stones or missiles therein. Penalty, $5.00."[74] The 1898 park rules stated: "No person shall carry firearms, shoot birds, or other animals, nor throw stones or other missiles, or in any way disturb or annoy the birds or animals within the boundaries of the Park."[75]

These Wilmington rules were consistent with the federal government's emerging approach:

- In 1872, the federal government prohibited the use of guns while killing or trapping wild animals;[76] and

---

[72] 17 Del. Laws ch. 204, §§ 6, 7 (1883) (prohibiting alcohol, political gatherings, and meetings assembled through advertising). "[F]or the better preservation of the public peace and order," the General Assembly extended all laws and regulations of the City of Wilmington to the city parks. *Id.* § 6.

[73] *Id.* (Board of Parks Commissioners can develop rules and regulations "not inconsistent with the laws and constitution of the United States or of the State of Delaware or with the ordinances of the City of Wilmington").

[74] Wilm. C. (Charter) § 6 (1887).

[75] REPORT OF THE BOARD OF PARK COMMISSIONERS 25 (1898). The 1898 rule remained in effect through 1910. REPORT OF THE BOARD OF PARK COMMISSIONERS 25 (1910). And the "Condensed Park Rules" published in the Board of Park Commissioners' 1912 annual report stated: "Firearms not permitted in parks." REPORT OF THE BOARD OF PARK COMMISSIONERS 10 (1912).

[76] *See, e.g.,* 16 U.S.C. § 26 (in Yellowstone National Park, "[a]ll guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons within said park limits when engaged in killing, trapping, ensnaring, or capturing such wild beasts, birds, or wild animals shall be forfeited to the United States . . . and may be seized by the officers in said

---

25

- In 1938, the Department of the Interior prohibited the possession and use of firearms in all national parks, except with written permission.[77]

In that same era, Delaware began developing a statewide park system, establishing in 1937 the State Park Commission,[78] whose responsibilities were later assumed by DNREC, which the General Assembly authorized to establish rules and regulations governing Parks.[79] The State Park Commission regulated firearms within Parks, prohibiting hunting on land under its jurisdiction as directed by the General Assembly.[80]

By 1951, it appears that the State Park Commission had moved toward the federal policy of prohibiting firearm possession in Parks.[81] In 1962, a unanimous State Park Commission adopted a rule prohibiting the possession, display, and discharge of firearms in any Park.[82] And in 1968, the General Assembly allowed hunting in certain Park areas designated by the State Park Commission,[83] which, in response, revised its rules to reflect

---

park and held pending the prosecution of any person or persons arrested under charge of violating the provisions of this section").
[77] 36 C.F.R. § 2.2 (1938).
[78] 41 Del. Laws ch. 259, § 1 (1937) (authorizing the State Park Commission to "preserve and protect the scenic, historic, scientific, prehistoric and wildlife resources of the State, and to make them available for public use and enjoyment").
[79] *Id.* §§ 2, 3.
[80] *Id.* § 2 ("All state parks and other areas acquired primarily for recreational use shall, from the date of their establishment as such, come under the jurisdiction of the State Park Commission of Delaware and be closed to hunting.").
[81] Editorial, *Gunning in the Park*, JOURNAL-EVERY EVENING (Oct. 24, 1951) (calling for an overturning of a "blanket ban on shooting in state parkland").
[82] STATE PARK COMMISSION OF DELAWARE, RULES AND REGULATIONS FOR USE OF STATE PARKS § 10 (1962).
[83] 56 Del. Laws ch. 407 (1968) ("All State Parks and other areas acquired primarily for recreational use shall, from the date of their establishment as such, come under the jurisdiction of the State

this change.[84]  A year later, the General Assembly began transitioning Park management

to DNREC, led by a Secretary the Governor appointed with the advice and consent of the

Senate.[85]  During the twentieth century, the State also developed structures and policies for

governing its Forests, first through the State Board of Forestry, established in 1909,[86] and

through the DOA after 1974.[87]  As was the case with Parks, firearms were regulated in

Forests, with the first prohibition on use dating back to 1911.[88]

---

Park Commission of Delaware and shall be closed to hunting, except in areas designated by the Commission for such purpose.").

[84] DEL. DEP'T NAT. RES. & ENVTL. CONTROL, PARK RULES AND REGULATIONS § 9.01(b) (1969) ("The display or discharging of firearms upon the lands and waters administered by the Commission is prohibited without prior written permission, except in those areas designated for hunting and trapping by the State Park Commission.").

[85] 57 Del. Laws ch. 302, § 1 (1969) (DNREC assumed the responsibilities of various State-created commissions, including the Board of Game and Fish Commissioners, the State Park Commission, and the State Forestry Department).  In this period of transition, existing agency regulations were left in place until revoked or changed by DNREC.  *Id.*  In 1970, references to the State Park Commission and references to the State Forestry Department were replaced with references to DNREC.  57 Del. Laws ch. 739 (1970).

[86] 25 Del. Laws ch. 71, § 1 (1909).

[87] *Id.* § 6 (the State Forester and forest wardens had the duty to "enforce all forest laws of this State; to protect all public lands or State forest reserves and see that all rules, regulations and laws are enforced"); *see generally* W.D. STERRETT, REPORT ON FOREST CONDITIONS IN DELAWARE AND A FOREST POLICY FOR THE STATE 47 (1907) (suggesting that the General Assembly create a State Forestry Department, acquire non-productive land to be used as Forests, and protect trees with aesthetic and commercial value, in recognition of the fact that the concentrated effort necessary "to put an end to forest destruction, lies within the State—its government and private land owners.").  Responsibility for the conservation, management, and promulgation of rules and regulations for Forests moved to the State Board of Agriculture in 1921, the State Forestry Department in 1927, and DNREC's Division of Parks, Recreation, and Forestry in 1969, before moving to DOA in 1974.  32 Del. Laws ch. 39, § 1 (1921); 35 Del. Laws ch. 50, §§ 1, 4 (1927); 57 Del. Laws ch. 302, § 1 (1969); 59 Del. Laws ch. 372, § 1 (1974).

[88] 16 Del. Laws ch. 165, § 8 (1911).

**D.**

The General Assembly's regulation of firearms was not, of course, limited to where guns could be possessed and used, much less to firearm restrictions in Parks and Forests. The General Assembly also regulated the manner in which Delawareans could possess and use weapons throughout the State.

For example, the General Assembly banned the carrying of concealed deadly weapons for thirty years "on the ground of public policy and for public protection" to remove the "temptation and tendency to use it under excitement."[89] The General Assembly also banned the intentional pointing, "either in jest or otherwise," of a firearm on similar grounds.[90] In 1911, the General Assembly tempered this concealed carry prohibition by creating a limited exception that allowed the Court of General Sessions to grant licenses for concealed carry.[91]

---

[89] 16 Del. Laws ch. 548, § 1 (1881); *State v. Costen*, 39 A. 456, 456 (1897).

[90] 16 Del. Laws ch. 548, § 3 (1881). This prohibition, "a most excellent and necessary one," recognized that "the reckless use of firearms is entirely too common with very many people" and

> was enacted for the two-fold purpose of preventing loss of life by the acts of irresponsible people who are prone to jest with deadly weapons, and to punish others who endanger life by the use of such weapons, not jestingly but seriously, yet in a manner to escape indictment for assault with intent to commit murder.

Remarks of the Court in Imposing Sentence, *State v. Naylor*, 90 A. 880, 891 (Del. 1913); *State v. Gam*, 74 A. 7, 7 (Ct. Gen. Sess. 1909).

[91] Eligibility to be licensed required the applicant to: (1) submit the certificate of five persons within the same election district attesting to the applicant's age, sobriety, and good moral character, reputation for peace and good order in the community, and the necessity of carrying a concealed deadly weapon; (2) publish the applicant's name and address in a daily newspaper before the

28

But Delaware courts did not view this licensing scheme as a broad mandate to allow exceptions to the broader restriction on concealed carry. The Court of General Sessions refused to allow introduction of evidence of a need for self-defense as a justification for carrying a concealed deadly weapon without a license because "[t]o hold otherwise would be to aid and encourage the very common and dangerous practice of carrying concealed deadly weapons, and permit any one to indulge in such practice who is willing to swear that he did it for self-defense."[92] And lawful reasons for concealed carry continued to be interpreted as "specific, and, in a sense, temporary."[93]

In the late nineteenth and early twentieth centuries, the General Assembly also regulated who could bear arms, prohibiting "tramps" from possessing a firearm,[94] and restricting "unnaturalized foreigner[s]" and minors from possessing a firearm while

---

application was to be considered; and (3) obtain approval by the Court of General Sessions, after an evidentiary hearing. 26 Del. Laws ch. 275 (1911).

[92] *Id.* (citing *State v. Ingram*, 26 Del. 439 (Ct. Gen. Sess. 1912)).

[93] *State v. Iannucci*, 55 A. 336, 336 (Ct. Gen. Sess. 1903). This understanding of the right to use a firearm in self-defense was consistent with the development of self-defense as a justification:

> Where one is assaulted upon a sudden affray and reasonably believes himself to be in imminent danger of being killed or of receiving great bodily harm, he may use a deadly weapon in self-defense. But in exercising such right of defense, he must be closely pressed, and must have retreated as far as he conveniently and safely could, in good faith, with the honest intent to avoid the violence and peril of the assault upon him.

*State v. Lee*, 74 A. 4, 5 (Ct. Gen. Sess. 1909).

[94] 16 Del. Laws ch. 155, §§ 1, 8 (1879) ("[T]ramps," i.e., "[a]ny person without a home in the town or hundred in which he may be found wandering about without employment, and the regular and visible means of living," were guilty of a misdemeanor if found carrying a firearm.).

hunting.[95]   And by 1968, the General Assembly had prohibited firearm possession by persons convicted of a felony, crime of violence, or unlawful use or possession of drugs; and persons committed to a mental institution.[96]

Delaware also regulated the types of weapons its citizens could carry, prohibiting while hunting "any device or instrument known as a swivel or punt gun, or with any gun other than such as are habitually raised at arm's length and fired from the shoulder," and making possession of these guns while in possession of a protected animal prima facie evidence of poaching.[97]   And beyond the realm of hunting, the General Assembly prohibited air guns, spring guns, and maximum silencers.[98]

## E.

As the careful reader has no doubt noticed, our discussion has not focused on the Second Amendment. This is for a good reason. Throughout the period 1792 to 1977, the Second Amendment was irrelevant to the question of whether and under what conditions Delawareans could use and possess deadly weapons.

---

[95] 26 Del. Laws ch. 164 (1911) (any "unnaturalized foreigner" hunting while in possession of a firearm without the required hunting license was guilty of a misdemeanor); 30 Del. Laws ch. 176, § 7 (1919) (minors under the age of fifteen prohibited from hunting anywhere in the State with any kind of rifle or shotgun unless accompanied by an adult who is lawfully hunting).
[96] 56 Del. Laws ch. 384, § 1 (1968).
[97] 17 Del. Laws ch. 507, § 5 (1885); 16 Del. Laws ch. 165, § 8 (1911).
[98] 41 Del. Laws ch. 212 (1937).

The Supreme Court of the United States held on multiple occasions that the first eight amendments did not apply to the states.[99] Clarifying that this meant that the Second Amendment did not apply to the states, the Supreme Court held in *Cruikshank* in 1875 that the Second Amendment only declared that the right to bear arms for a lawful purpose shall not be infringed by Congress.[100] And in 1886, the Supreme Court in *Presser* held that the Second Amendment "is one of the amendments that has no other effect than to restrict the powers of the national government."[101]

In 1894, the Supreme Court in *Miller v. Texas* again stated that the Second Amendment "operate[s] only upon the federal power, and [has] no reference whatever to proceedings in state courts."[102] And in the 1939 *United States v. Miller* decision, which remained the Supreme Court's leading Second Amendment decision into the mid-twentieth century, the Court further held that the Second Amendment only prevented the federal government from infringing the rights of states to raise militias.[103]

---

[99] The two earliest cases considering whether the first eight Amendments applied to the states found that they did not. *Barron v. Mayor of Baltimore*, 7 Pet. 243, 248–49 (1833); *Slaughter-House Cases*, 83 U.S. 36, 79 (1872).

[100] *United States v. Cruikshank*, 92 U.S. 542, 552 (1875).

[101] *Presser v. Illinois*, 116 U.S. 252, 265 (1886).

[102] 153 U.S. 535, 538 (1894).

[103] 307 U.S. 174, 178 (1939) ("With obvious purpose to assure the continuation and render possible the effectiveness of such forces the declaration and guarantee of the Second Amendment were made. It must be interpreted and applied with that end in view.").

**F.**

Because the Majority relies upon our English heritage to justify their decision to overturn the Regulations, we pause to show the state of firearm regulation in England as of 1977.[104]  But this reliance is surprising given the reality that the English tradition was that any right to bear arms was subject to legislative sufferance.[105]

In fact, England's regulation of firearm possession and use during the nineteenth and twentieth centuries was more stringent than Delaware's.  To condense this history, by 1977, England had: i) given constables the authority to search and seize weapons "kept for a purpose dangerous to the public peace";[106] ii) created a national gun registration system;[107] iii) restricted the sale of guns to "unfit" persons;[108] and iv) required certificates issued by local police to purchase, possess, use, or carry any firearm or ammunition.[109]  As

---

[104] *See, e.g.*, Majority Op. 18–19, 26–28.  In particular, the Majority cites to Article VII of the 1689 English Bill of Rights, which provided that Protestant subjects: "may have Arms for their Defence suitable to their Conditions, and *as allowed by Law*."  *Id.* at 18–19 (citing *District of Columbia v. Heller*, 554 U.S. 570, 593; 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441) (emphasis added).  But support in the English tradition for a broad unwritten state constitutional right to bear arms is inconsistent with that Article's explicit limitation of the right as existing only "as allowed by law."  Peter Buck Feller & Karl L. Gotting, *The Second Amendment, A Second Look*, 61 Nw. U. L. Rev. 46, 48 (1966).

[105] *See supra* note 55.

[106] Seizure of Arms Act, 1 Geo. 4, ch. 2 (1820) (Eng.).

[107] The Gun License Act, 33 & 34 Vict., ch. 57 (1870) (Eng.).

[108] Pistols Act, 3 Edw. 7, ch. 18 (1903) (Eng.) (prohibiting drunk persons and those "not of sound mind" from owning guns).

[109] Firearms Act, 10 & 11 Geo. 5, ch. 43, s. 1, 1(2), 1(2)(a) (1920) (Eng.) (firearm certificates were only to be granted for "good reason[s]" and never to anyone "of intemperate habits or unsound mind" or "for any reason unfitted to be trusted with firearms").

of 1977, no Delawarean would have found any support in the English tradition for the idea that our Constitution's failure to create a constitutional right to bear arms precluded legislation regulating gun possession and use.

To complete this part of our story, since 1977, England's firearm regulations have become even stricter, resulting in a near prohibition on the ownership of handguns and automatic weapons.[110] Lawful firearm possession in England today is subject to registration and storage requirements,[111] as well as the requirement that owners provide a "good reason," beyond self-defense, to secure a license to possess a firearm.[112]

England enacted these restrictions without believing itself constrained by the existence of any constitutional or inalienable right to own a firearm and carry it anywhere,

---

[110] *See* Firearms (Amend.) Act of 1997, ch. 27, s. 5(1), 5(3), 5(A), 12(2) (Eng.) ("[A]ny firearm which either has a barrel less than 30 centimeters in length or is less than 60 centimeters in length overall, other than an air weapon, a small-calibre pistol, a muzzle-loading gun or a firearm designed as signaling apparatus" is a "weapon[] subject to general prohibition." It is a crime to possess such a weapon without authority "given in writing by the Secretary of State (in or as in regards England and Wales), or the Scottish Ministers (in or as regards Scotland)" unless the gun is being used in a theatrical performance approved by the Defence Council to showcase the prohibited weapon, or the gun is being "kept or exhibited as a part of a collection."); HM GOVERNMENT, ENDING GANG AND YOUTH VIOLENCE: A CROSS-GOVERNMENT REPORT 45 (2011) ("The last 20 years have seen a significant toughening of the laws on weapons possession and supply including a ban on all hand-guns . . . ."); Firearms (Amend.) Act of 1988, ch. 45 (Eng.) (banning "semi-automatic and pump-action rifles; weapons which fire explosive ammunition; short shotguns with magazines; and elevated pump-action and self-loading rifles").

[111] *See, e.g.*, Firearms (Amend.) Act of 1988, ch. 45 (Eng.) (mandating registration for shotguns, "which were required to be kept in secure storage").

[112] An applicant must demonstrate they use their firearm on a "regular, legitimate basis for work, sport or leisure (including collections and research)" to be granted a firearm certificate. Firearms (Amend.) Act of 1997, ch. 27, s. 27(b), s. 28(1A)(b) (Eng.). The chief of police may subject any certificate to individualized restrictions. *Id.* s. 27(1A)(2), s. 28(1C)(b).

much less on government property, free from legal restraint. At the same time, this continuation of stringent regulation has resulted in lower violence rates than those in Delaware[113] and the United States,[114] where gun regulation is less stringent.

Meanwhile, England's proud hunting tradition still thrives.[115]

---

[113] For example, in a city with less than one percent of the United Kingdom's population, Wilmington has already this year suffered forty-eight percent of the homicides by firearm that entire country expects in any given year. Adam Duvernay, *Total Shooting Victims in Wilmington Surpasses 2013*, NEWS J. (Sept. 25, 2017) (twenty-five people in Wilmington had been killed by gunfire as of September 25, 2017); *Interactive Maps and Charts of Armed Violence Indicators*, SMALL ARMS SURVEY, http://www.smallarmssurvey.org/tools/interactive-map-charts-on-armed-violence.html (last visited Nov. 21, 2017) (on average, fifty-two people in the United Kingdom died of homicide by firearm per year between 2010–2015); *Population, Total*, WORLD BANK, https://data.worldbank.org/indicator/SP.POP.TOTL (last visited Nov. 21, 2017) (sixty-five million people live in the United Kingdom); *Quick Facts: Wilmington City, Delaware*, U.S. CENSUS BUREAU, https://www.census.gov/quickfacts/fact/table/wilmingtoncitydelaware,DE/PST045216 (last visited Nov. 21, 2017) (about 71,000 people live in the city of Wilmington).

[114] Homicide by firearm is thirty-one times more common in the United States than in England and Wales. *Homicide Statistics: Homicide by Firearm*, UNITED NATIONS OFF. ON DRUGS & CRIME, https://www.unodc.org/documents/data-and-analysis/statistics/Homicide/Homicides_by_firearms.xls (last visited Nov. 21, 2017) (the United States' homicide by firearm rate per 100,000 people in 2009 was 3.3, compared to 0.1 in England and Wales). In fact, being killed by a gun in England is about as likely as dying of contact with agricultural machinery here in the United States. Kevin Quealy & Margot Sanger-Katz, *Comparing Gun Deaths by Country: The U.S. Is in a Different World*, N.Y. TIMES (June 13, 2016).

[115] *See, e.g., Research and Surveys: Common pheasant* Phasianus colchicus, GAME & WILDLIFE CONSERVATION TR., https://www.gwct.org.uk/research/long-term-monitoring/national-gamebag-census/bird-bags-summary-trends/common-pheasant/ (last visited Nov. 21, 2017) (the number of pheasants shot during recorded hunting activities in the United Kingdom was two and a half times greater in 2010 than in 1961). At the iconic Rules, its "Famous Grouse" is touted with the fair warning that "game birds may contain lead shot." *Menu*, RULES, http://www.rules.co.uk/wp-content/uploads/2013/11/Menu-food.pdf (last visited Nov. 21, 2017).

## V.

In 1977, there was no reason for DNREC to view adopting a regulation restricting the possession and use of firearms within the state's own Parks and Forests to be controversial. As we have shown:

- There was no Delaware state constitutional right to keep or bear arms;[116]

- The Second Amendment to the Federal Constitution did not apply to the states, but rather, was interpreted to only prevent federal action that would impair the states' right to form militias;[117]

- There was an established history in Delaware of regulating where, to what extent, in what manner, and what types of weapons could be used;[118]

- There was an established history of respecting private property and the rights of property owners to determine the conditions on which anyone could enter their property; and[119]

- This established history of respecting private property extended to parks controlled by the government, as exemplified by the City of Wilmington's 1887 ban on firearms in its parks, the federal government's 1938 ban on firearm possession in the national parks, and the State Park Commission's own prior regulations, including its 1962 prohibition on the possession and use of firearms in Parks.[120]

To summarize, in 1977, it was understood that the government could establish parks, condition access to them on entry and conduct requirements, and limit the activities that people might do on its property. By way of example, we do not quibble with the proposition that in the state of nature, human beings fashioned weapons and used them to

---

[116] *See supra* notes 48–55 and accompanying text.
[117] *See supra* notes 102–103 and accompanying text.
[118] *See supra* Part IV, Sections A–D.
[119] *Id.*
[120] *See supra* notes 16–17, 82.

protect themselves in the case of attacks by wild animals and to kill them for food. But, to survive, human beings also did other things one can think of as fundamental. For example, they used fire to stay warm long before bearing firearms. But consideration of Smokey the Bear makes clear that when you enter a public park, however beautiful and however natural, you are not in the state of nature. You are using a public park established by a republican democracy and must follow the rules it set for its use, whether that means not lighting a fire for warmth when the rules prohibit that or not carrying a gun to fight off wildlife when you are not allowed to do so. If you don't like the rules, then you don't have to go into the park. In 1977, this was not a controversial proposition in Delaware or the United States.

## A.

DNREC's 1977 Park Regulation made it unlawful

to display, possess or discharge firearms of any description, air rifles, B.B. guns or sling shots upon any lands or waters administered by the Division, except those persons lawfully hunting in those areas designated for hunting by the Division, or except with prior written approval of the Director or his authorized agent.[121]

This sentiment was reiterated in the section on hunting, which stated: "It shall be prohibited to possess or discharge a rifled firearm on State Park lands or waters at anytime [sic]. No firearm, other than a shotgun, may be used for hunting on areas designated for hunting within State Park lands."[122]

---

[121] DEL. DEP'T NAT. RES. & ENVTL. CONTROL, PARK RULES AND REGULATIONS § 8.04 (1977).
[122] *Id.* § 10.01(f).

36

DOA followed DNREC's lead by including in its first forest rules a regulation restricting firearm use. The first version of the Forest Regulation, promulgated in 1979 and governing Blackbird State Forest stated: "The discharge or use of a firearm of any sort is prohibited, *except* by licensed hunters for game in season. No target shooting is permitted at any time."[123]

The Agencies exercised the state's rights as a proprietor to restrict certain conduct on its property through the promulgation of the Regulations, which had the effect of law and included modest penalties set by the General Assembly,[124] as well as doing things like setting the hours Parks and Forests were open to the public, restricting where fires could be built and how many consecutive days campers could stay, and charging entrance fees.[125]

**B.**

In light of this long history of firearm regulation, it is unsurprising that the adoption of the Regulations did not inspire protest. We note that, when the Regulations were adopted in 1977 and 1979, they were subject to review under Delaware's Administrative

---

[123] DEL. DEP'T AGRIC., FOREST RULES AND REGULATIONS § 8 (1979).

[124] 56 Del. Laws ch. 85, § 1 (1967).

[125] For example, DNREC set the hours parks were open to the public, limited the number of consecutive days people could camp in state parks, prohibited alcohol within organized youth group camps, and charged an entrance fee for certain parks, as permitted by the General Assembly. DEL. DEP'T NAT. RES. & ENVTL. CONTROL, PARK RULES AND REGULATIONS §§ 1, 2.16, 3.04(a), 11 (1977). And DOA's regulation of Forests mirrored DNREC's regulation of Parks. DOA prohibited the building of a fire except in certain designated areas, restricted camping to one day except with a written permit, and prohibited the cutting of its standing trees and shrubs. DEL. DEP'T AGRIC., FOREST RULES AND REGULATIONS §§ 1, 2 (1979).

37

Procedures Act ("APA"). A challenge under the APA could have been mounted within thirty days of the Regulations' adoption on the basis that they were arbitrary and capricious, or contrary to law.[126]

But in the years after 1977 and 1979, no administrative challenge was mounted; no constitutional challenge was mounted; and no action was taken by the General Assembly suggesting the adoption of the Regulations was beyond the scope of the Agencies' delegated authority. That the Regulations were uncontroversial is explained by their consistency with longstanding firearm restrictions and their purpose in facilitating the function of the Parks and Forests as safe, shared havens for families and individuals for relaxation, recreation, and enjoyment of the outdoors.[127]

---

[126] 60 Del. Laws ch. 585 (1976) (codified at 29 *Del C.* § 6441(d)); *Baker v. Del. Dep't of Nat. Res. & Envtl. Control*, 2015 WL 5971784, at *12 (Del. Super. Oct. 15, 2015) (citing 29 *Del. C.* § 10161(b)) ("DNREC, as an agency, is subject to subchapter I (Policy and Definitions, consisting of §§ 10101 and 10102 of Title 29) and subchapter II (Agency Regulations, consisting of §§ 10111–19 of Title 29) of the APA as well as § 10141 (review of regulations), § 10144 (stay pending review) and § 10145 (commencement of review). If DNREC promulgates regulations, those regulations must comply with the APA.").

[127] We also note that, in the time period between 1977 and 1987, the General Assembly continued to restrict the possession and use of firearms in the State. *See, e.g.*, 61 Del. Laws ch. 372, § 1 (1978) (prohibiting the discharge of a firearm within fifteen yards of a public road or right-of-way unless it is a road or right-of-way within an area controlled by the agencies charged with management of certain state or federal land and designated as open to hunting or trapping); 64 Del. Laws ch. 373, § 1 (1984) (same); *id.* ch. 653, § 1 (establishing Safety Zones and making it unlawful for any "person, except the owner or occupant, [to] discharge a firearm within 100 yards of an occupied dwelling, house or residence or any barn, stable or any other building used in connection therewith, while hunting or trapping of wild birds [or] wild animals of any kind."); *id.* ("[I]t shall be unlawful to shoot at any wild bird or wild animal while it is within such safety zone without the specific advance permission of the owner or tenant.").

The uncontroversial nature of the Regulations is also evidenced by the status of similar regulations in national parks. Between 1977 and 1987, the national parks continued to ban firearm possession,[128] and there was no suggestion the Second Amendment was inconsistent with that policy.[129]

Closer to home, in 1981, Kent County demonstrated the acceptance in Delaware of park regulations restricting the possession and use of firearms. That year, Kent County prohibited firearm possession in its parks:

> Carrying or possessing, while in any area covered by this part [i.e., Kent County Parks], a gun, air gun, bow and arrow, sling, dart, projectile thrower, knife with blade more than three inches long or any other dangerous weapon is prohibited, provided that nothing in this section shall be construed as to prevent the use of target ranges and the use of bows and arrows by park visitors on officially established archery ranges.[130]

## VI.

To understand Section 20's genesis and intended effect, it is important to understand the status of Second Amendment jurisprudence as of the adoption of Section 20. As of 1987, the leading Supreme Court decision held that the Second Amendment only applied

---

[128] 36 C.F.R. § 2.2 (1938).

[129] Although the Department of the Interior in 1983 established limited exceptions permitting travelers and those living within national parks to carry unloaded arms, it did so not because of a recognition that its existing policy violated an individual right to bear arms, but rather, because enforcing the prohibition was infeasible from an administrative perspective, and required horseback riders and those traveling on foot to secure a permit to carry a firearm. *Id.*

[130] Kent Cty. C. § 168-35 (1981); *see also* KENT COUNTY DEP'T CMTY. SERVS., GENERAL PARK RULES § 1 (2013), http://www.co.kent.de.us/media/766210/General-park-rules-2013.pdf.

to the federal government and protected the states' right to form militias.[131]  That is, the Second Amendment was not understood to create a personal right to bear arms for the purpose of self-defense or hunting, or to apply to the states.

Gun rights advocates, most notably the National Rifle Association ("NRA"), opposed these longstanding interpretations of the Second Amendment[132] and campaigned for state constitutions to provide a personal right to bear arms, unconnected to any militia purpose, that would be enforceable under state law.[133]  As we will discuss, as an adjunct to

---

[131] *United States v. Miller*, 307 U.S. 174, 178 (1939) (the Second Amendment guarantees no right to keep and bear a firearm that does not have "some reasonable relationship to the preservation or efficiency of a well regulated militia"); *see also Lewis v. United States*, 445 U.S. 55, 65 (1980) ("These legislative restrictions on the use of firearms are neither based upon constitutionally suspect criteria, nor do they trench upon any constitutionally protected liberties."); *United States v. Casson*, 288 F. Supp. 86, 88 (D. Del. 1968) ("In the absence of some showing that the possession or use of the shotgun bears some reasonable relationship to the preservation or efficiency of a well regulated Militia, the Second Amendment does not guarantee defendant the right to keep and bear such a firearm.").

[132] James Podgers, *First Legal Shots Fired over Handgun Ordinance*, 67 AM. BAR ASS'N J. 969, 969 (1981) (NRA general counsel James Featherstone said that "Despite *Miller*, the Second Amendment does protect the right to possess handguns."); Reva B. Siegel, *Dead or Alive: Originalism as Popular Constitutionalism in* Heller, 122 HARV. L. REV. 191, 224–25 (2008) ("Even though the number of law review articles on the right to bear arms increased in the 1980s, at least nineteen of the twenty-seven articles written between 1970 and 1989 espousing the view that the Second Amendment protected an individual right to bear arms were 'written by lawyers who had been directly employed by or represented the NRA or other gun rights organizations, although they did not always so identify themselves in the author's footnote.'") (quoting Carl T. Bogus, *The History and Politics of Second Amendment Scholarship: A Primer*, in THE SECOND AMENDMENT IN LAW AND HISTORY 1, 4 (Carl T. Bogus ed., 2000)).

[133] Patrick J. Charles, *The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why It Matters*, 64 CLEV. ST. L. REV. 373, 471 (2016) (citing David Conover, *To Keep and Bear Arms*, AM. RIFLEMAN, Sept. 1985, at 40–41; Darrell A.H. Miller, *Institutions and the Second Amendment*, 66 DUKE L.J. 69, 115–16 (2016) ("[T]he NRA has translated its vision of the Second Amendment into gun-rights legislation and 'strict scrutiny' protections in state constitutions.").

this movement, gun advocates also sought to pass state laws preventing local governments from adopting jurisdiction-wide regulations of firearm possession and use within the borders of their counties, cities, or towns that would undercut state constitutional protections and otherwise regulate gun possession and use in a more stringent fashion than state law.[134]

By the time Delaware amended its Constitution in 1987 to add Section 20, the NRA's lobbying had resulted in the adoption of constitutional amendments of this kind in six states.[135] It was as part of this movement that Delaware came to adopt Section 20,

---

[134] In the late 1980s, the NRA switched its attention from the national stage to state firearm regulations, lobbying simultaneously for state constitutional amendments and local preemption laws. HARRY S. WILSON, GUN POLITICS IN AMERICA: HISTORICAL AND MODERN DOCUMENTS IN CONTEXT 408 (2016) ("[T]he NRA became more active in state politics when it was evident that the national-level pendulum might be swinging toward gun control advocates."). The NRA argues preemption laws are necessary because varying local laws create confusion. *Firearm Preemption Laws*, NRA, https://www.nraila.org/issues/preemption-laws/ (last visited Nov. 20, 2017). But most believe the true reason behind the preemption push was the NRA's desire to "avoid having to fight the issue of gun control in thousands of city and town halls across the country." William S. Harwood, *Gun Control: State Versus Federal Regulation of Firearms*, 11 ME. POL'Y REV. 58, 65 (2002). The NRA succeeded on its preemption campaign, increasing the number of states with laws preempting local regulation from seven to forty-five. Joe Palazzolo, *Gun Rights Groups Target Local Rules*, WALL ST. J. (Feb. 6, 2013 9:23 AM), https://blogs.wsj.com/law/2013/02/06/how-gun-rights-groups-suppressed-local-firearm-regulations/; Rebecca Leber, *City Falls to NRA Campaign to Repeal Local Laws Preventing Gun Violence*, THINKPROGRESS (June 3, 2013, 9:20 PM), https://thinkprogress.org/city-falls-to-nra-campaign-to-repeal-local-laws preventing-gun-violence-83ed9f761f66.

[135] NEV. CONST., art. I, § 11(1) (1982) ("Every citizen has the right to keep and bear arms for security and defense, for lawful hunting and recreational use and for other lawful purposes."); N.H. CONST., pt. 1, art. 2-a (1982) ("All persons have the right to keep and bear arms in defense of themselves, their families, their property and the state."); N.D. CONST., art. I, § 1 (1984) ("All individuals . . . have certain inalienable rights, among which are . . . to keep and bear arms for the defense of their person, family, property, and the state, and for lawful hunting, recreational, and other lawful purposes."); UTAH CONST., art. I, § 6 (1984) ("The individual right of the people to

proposed at the behest of the Delaware State Sportsmen's Association ("DSSA"), the local affiliate of the NRA and one of the appellants in this case.[136]

## A.

The proponents of what became Section 20 took care to address the concerns we just noted. They took a coordinated, two-pronged approach. The first thing they did was to introduce a bill that limited the ability of local Delaware governments, such as counties and municipalities, to regulate gun possession and use on a jurisdiction-wide basis (the "Preemption Bill").[137]

---

keep and bear arms for security and defense of self, family, others, property, or the state, as well as for other lawful purposes shall not be infringed; but nothing herein shall prevent the legislature from defining the lawful use of arms."); N.M. CONST., art. II, § 6 (1986) ("No law shall abridge the right of the citizen to keep and bear arms for security and defense, for lawful hunting and recreational use and for other lawful purposes, but nothing herein shall be held to permit the carrying of concealed weapons. No municipality or county shall regulate, in any way, an incident of the right to keep and bear arms."); W. VA. CONST., art. III, § 22 (1986) ("A person has the right to keep and bear arms for the defense of self, family, home and state, and for lawful hunting and recreational use."). Maine adopted its version, which looks like the 1776 Pennsylvania Constitution's, in November 1987. ME. CONST., art. I, § 16 (1987) ("Every citizen has a right to keep and bear arms and this right shall never be questioned.").

[136] Audio tape: Del. S.B. 30, 134th Gen. Assem. 19:15 (1987); Appellants' Amend. Opening Br. 2 n.4 ("Plaintiff Below/Appellant Delaware State Sportsmen's Association has been Delaware's affiliate of the National Rifle Association since 1968."); *see also* Patrick J. Charles, *supra* note 133, at 433–75 (2016) (describing the NRA's campaign to amend state constitutions); J. Warren Cassidy, *United We Stand*, AM. RIFLEMAN, Feb. 1989, at 7 ("Through preemption bills, right to keep and bear arms amendments in the state constitutions, and the reform of onerous permit to carry concealed laws, we are attempting, with good success, to restore citizens' Second Amendment rights wherever these have been abridged.").

[137] Del. H.B. 66, 133d Gen. Assem. (1985) (codified at 22 *Del. C.* § 835(a)(6) and 9 *Del. C.* § 330(c)).

42

The Preemption Bill was introduced and passed in 1985, ahead of the introduction of the constitutional amendment.[138] Starting with the Preemption Bill was consistent with the approach of the national movement, of which DSSA was a part. The NRA was concerned that the success they achieved at the state level could be undone if local governments, including those of major cities whose citizens may be more supportive of gun regulation, could enact citywide regulations restricting gun possession and use.

And the reality of our constitutional amendment process was also a consideration. As is well-known, to adopt an amendment to our Constitution by action of our General Assembly, each chamber of two successive General Assemblies must pass the amendment by a two-thirds vote.[139] Thus, even after the first leg of an amendment is adopted, the amendment is not effective until the second leg is adopted by the next General Assembly.[140]

The Preemption Bill reads in a way that underscores it is about jurisdiction-wide regulation of ownership and possession:

> [Municipalities and counties cannot] prohibit, restrict or license ownership, transfer, possession or transportation of firearms or components of firearms or ammunition, except that the discharge of a firearm may be regulated; provided that any regulation or ordinance incorporates the justification defenses as found in Title 11 of the Delaware Code. . . .
>
> Nothing contained herein shall be construed to invalidate existing municipal ordinances.[141]

---

[138] *Id.*
[139] DEL. CONST., art. 16, § 1.
[140] *Id.*
[141] *Id.*

The language of the Preemption Bill makes sense in light of what gun advocates were concerned about, which was not restricting the ability of local governments to prohibit the possession and use of firearms on their own land. It was about the NRA's national goal to confine regulation of possession and use of firearms to state legislatures, where the NRA had been successful, and to avoid having that success undermined by local jurisdictions enacting jurisdiction-wide regulation of gun possession and use.[142]

But, there was a key aspect of the Preemption Bill that was important in the consideration of both it, and in the next year, Section 20: the concession by the advocates of the bill and Section 20 that confirmed the bill would not "be construed to invalidate existing municipal ordinances."[143]

Despite the compromise struck in 1985, a member of the Wilmington City Council attempted to circumvent the General Assembly's intent by identifying what she thought was a loophole in the original Preemption Bill. The City Council member felt that she could bypass the Preemption Bill by acting by city ordinance, rather than a charter change, and proposed an ordinance that would have outlawed the public display of dangerous weapons in Wilmington (i.e., "open carry").[144] The General Assembly acted to close any

---

[142] *See supra* note 134.

[143] Del. H.B. 66, 133d Gen. Assem. (1985) (codified at 22 *Del. C.* § 835(a)(6) and 9 *Del. C.* § 330(c)).

[144] Eileen Gilligan, *Ban on Local Gun Laws Sent to Governor*, MORNING NEWS (Wilmington, Del.), May 28, 1986, at 13 (describing legislation proposed by Wilmington City Councilwoman Loretta Walsh that she pushed "after she claimed to have found a loophole in a similar law that prohibits municipalities from banning guns through charter changes").

arguable gap in the original Preemption Bill, by adopting a supplemental bill, making it plain that it did not matter how a municipality tried to regulate gun possession and use. Together, the two Preemption Bills preempted municipal firearm regulation by law, regulation, or ordinance postdating the approval of the original Preemption Bill, and thereby achieved the original Preemption Bill's intended effect.[145]

*  *  *

Absent from the Preemption Bills' text and any statement of its supporters was that the bill had any effect on the ability of any local government, including the county governments, to prohibit the possession and use of firearms on their own property. As we have discussed, in 1981, Kent County enacted an ordinance prohibiting gun possession within its county parks. No proponent of the Preemption Bills in 1985 or 1986 argued that its text operated to preempt that ordinance, and no one filed suit alleging that Kent County's ordinance violated the Preemption Bills. One would expect that, if the Preemption Bills were intended to preempt existing county regulation on firearm use and possession on government property, Kent County's ordinance would have been discussed, or at least challenged after the bill passed.

---

[145] Del. H.B. 430, 133d Gen. Assem. (1986) (codified at 22 *Del. C.* § 838).

**B.**

It was against this the backdrop that the first leg was considered in July 1986. The purpose of the first leg was to "explicitly protect[] the traditional lawful right to keep and bear arms."[146] Section 20 was thus written in a way that made clear that the rights it secured were personal and not confined to protecting the types of gun ownership necessary to participation in a militia. The text of Section 20 states:

> A person has the right to keep and bear arms for the defense of self, family, home and state, and for hunting and recreational use.[147]

Consistent with earlier assurances that Section 20 was not designed to unsettle existing municipal regulations, the General Assembly's consideration of Section 20 provides no evidence that it intended to undermine the state's traditional recognition of the right of property owners to exclude firearms from their property. To the contrary, General Assembly members at the first House debate addressing Section 20 confirmed that it "doesn't give everyone carte blanche to carry a weapon,"[148] but instead, "continues to give the state the right to regulate . . . things not within the realm of sportsmen and hunters."[149]

There is also no evidence that the General Assembly intended for Section 20 to cover more ground than the Second Amendment; instead, the proponents of Section 20 just wanted to make clear that the right to bear arms to which Section 20 referred was not conditioned on any connection to raising a militia. In the debates on Section 20's first leg,

---

[146] Del. H.B. 554 syn., 133d Gen. Assem. (1986) (codified at 22 *Del. C.* § 838).
[147] DEL. CONST., art. I, § 20 (1987).
[148] Audio tape: Del. H.B. 554, 133d Gen. Assem. 2:00 (1986).
[149] *Id.* at 2:38.

one Representative explained that Section 20 would incorporate the Second Amendment to the State of Delaware and provide "the same rights we have under the Second Amendment to the United States Constitution . . . . That's all the bill does, there's nothing added, nothing detracted, that I know of, that we don't already have in the United States Constitution's Second Amendment."[150] After this statement, the House called roll and passed the bill approving Section 20, which the Senate then passed without debate.

The Senate debate on Section 20's second leg in 1987 reflects the same understanding documented in the first leg, with the Senators confirming that Section 20 was intended to address the longstanding fact that the Second Amendment only restricted federal, not state, action and did not protect a right to bear arms unconnected to raising a militia.[151] John Thompson, President of the DSSA, testified that Delaware needed this Amendment because the Second Amendment did not apply to the states under the "Doctrine of Selective Incorporation."[152] The DSSA was concerned about a recent Seventh Circuit case that held the "possession of handguns by individuals is not part of the right to

---

[150] *Id.* at 3:55.
[151] Under the Doctrine of Selective Incorporation, certain rights in the Bill of Rights are made applicable to the states "because a denial of them would be a denial of Due Process of law." *Malloy v. Hogan*, 378 U.S. 1, 5 (1964); *see also* Thomas J. Walsh, *The Limits and Possibilities of Gun Control*, 23 CAP. U. L. REV. 639, 656–57 (1994).
[152] Audio tape: Del. S.B. 30, 134th Gen. Assem. 16:30 (1987); *see id.* at 19:30 ("[I]n order to confirm what most Delawareans believe, we have proposed this [Amendment] . . . to protect our right to keep and bear arms as an individual matter.").

keep and bear arms."[153] The NRA encouraged its Delaware members to advocate for the passage of Section 20:

> The National Rifle Association is advising its members in Delaware to contact their state senators and urge passage of an amendment to the state constitution providing for the "right to keep and bear arms." *In a letter dated April 9, the NRA's Institute for Legislative Action says that passage of H.B. 30 "will prevent the banning and/or confiscation of firearms from law-abiding citizens of Delaware."* The organization says a number of courts have ruled that the Second Amendment to the U.S. Constitution is not binding on the states.[154]

Thus, according to testimony at the debate, Delaware needed Section 20 to "protect the rights of individuals."[155] Senator Holloway stated: "What I read in the Bill, I read in the Constitution of the United States—that the right to keep and bear firearms shall not be infringed upon."[156]

Both the DSSA and Senators acknowledged that the legislation was preemptive, intending to prevent *future* regulations from infringing on individuals' right to bear arms.[157] As Senator Neal explained, "the whole purpose of this [Amendment] . . . was not based on anything that's happened in Delaware, but based on judicial cases in other states that have

---

[153] *See Quilici v. Vill. of Morton Grove*, 695 F.2d 261, 271 (7th Cir. 1982).

[154] Tom Greer, *NRA Pushes Amendment*, MORNING NEWS (Wilmington, Del.), Apr. 15, 1987, at 27 (emphasis added).

[155] Audio tape: Del. S.B. 30, 134th Gen. Assem. 19:30 (1987).

[156] *Id.* at 44:50.

[157] Senator McDowell questioned Thompson about whether any jurisdiction in the State of Delaware had banned the ownership of weapons, and Thompson conceded that none had. *Id.* at 29:45.

said that the federal provision does not apply."[158]  This was reiterated by Senator Adams, who clarified that Section 20 would "not change [legislation banning automatic firearms] in any way."[159]  The NRA and its Delaware affiliate was focused on preventing "*the banning and/or confiscation of firearms*"[160] not on limiting the ability of property owners, and the government, to regulate possession and use of firearms on their own land.  The Senate approved Section 20, and the House then passed it without debate, thereby completing the second leg of the process, and Section 20 took effect on April 16, 1987.[161]

*     *     *

Lacking from the text of Section 20, its legislative history, or our Second Amendment jurisprudence is any suggestion that Section 20 limited the ability of our state government to restrict the possession and use of firearms on its own property.  Much less did anyone intend that Section 20 or the Preemption Bills would open our Parks and Forests, and those of Kent County, to weapons possession and use.

Had they argued that Section 20 was a silent destroyer of the government's ability to continue longstanding policies regulating use of its own land, the need for the proponents to grandfather existing municipal regulations and to make assurances to members of the

---

[158] *Id.* at 35:15.

[159] *Id.* at 16:25.

[160] Greer, *supra* note 154, at 27.

[161] 66 Del. Laws ch. 10 (1987).  Our friends in the Majority accuse us of "cherrypicking" statements by legislators in the debates.  Majority Op. 24, n.85.  But, they cite to nothing in the debates to support the notion that Section 20 was intended to be broader than the Second Amendment, because there is no mention of their interpretation.  *Doe*'s interpretation is also inconsistent with how other states have interpreted the same or similar constitutional provisions.  *See infra* note 236–239 and accompanying text.

General Assembly about the limited purpose of Section 20 suggests that they would likely have not succeeded in securing the necessary votes.

## VII.

In the wake of its adoption, no proponent of Section 20 sought to challenge the Regulations. That is telling because the NRA, one of the appellants' friends in amicus, was the driving force behind Section 20, as our explanation of the legislative history shows.[162] Yet, after Section 20 was passed, the NRA at no time sought to sue and argue that it invalidated the Regulations. Nor did its local affiliate, the DSSA, despite being quite active in the legislative process, procure even the introduction of a bill proposing to overturn the Regulations.[163]

---

[162] *See generally*, Alonzo H. Garcelon, *The President's Column*, AM. RIFLEMAN, Dec. 1985, at 47 ("Thanks to the efforts of the ILA [the NRA Institute for Legislative Action] and you, the NRA member, anti-gun proposals at all levels of government have been beaten back while laws strengthening the right to keep and bear arms have been enacted across the nation. Consider that 24 states now have firearm pre-emption laws that will prevent local towns and city governments from enacting handgun bans and other anti-gun laws; fourteen states have enacted hunter harassment laws; and 40 states have constitutional amendments to keep and bear arms. All of this is a direct result of efforts by ILA.").

[163] *See, e.g.*, *Mission*, DEL. STATE SPORTSMEN'S ASS'N, http://dssa.us/mission/ (last visited Nov. 21, 2017) ("For over 20 years, the DSSA has stood ever vigilant in defense of the right to keep and bear arms. Through our efforts, with the support of the National Rifle Association, the rights of the people of[] Delaware have not been compromised."); Appellants' Amend. Opening Br. 2 n.4 ("Plaintiff Below/Appellant Delaware State Sportsmen's Association has been Delaware's affiliate of the National Rifle Association since 1968.") (internal citations omitted). For an example of the DSSA's continued involvement in the Delaware legislative process, see *Governor Jack Markell Unveils Gun Control Plan to Leave You Defenseless*, DEL. STATE SPORTSMEN'S ASS'N (Jan. 16, 2013), http://dssa.us/2013/01/16/governor-jack-markell-unveils-gun-control-plan-to-leave-you-defenseless/ (urging DSSA members to "[c]all and e-mail IMMEDIATELY and make [their] voice[s] be heard on" Governor Markell's "broad gun control plans" to ban semi-

Consistent with the General Assembly's confirmed purpose in adopting Section 20, we find no seismic shift in Delaware's regulation of firearms. Rather, in the years following the adoption of Section 20, the state's regulation of firearms was true to its historical approach.

**A.**

Delaware continued to restrict concealed carry of deadly weapons. In fact, in 1989, the General Assembly re-codified Delaware's concealed carry licensing statute as it was written, but provided that "no requirements in addition to those specified in this paragraph may be imposed for the renewal of a license."[164]

And Delaware courts held that the limited nature of the concealed carry permit did not change in light of the adoption of Section 20, noting that Delaware's concealed carry statute is "supported by a legitimate State interest."[165] In considering whether the conditions attached to a concealed carry license abridge a "fundamental" constitutional right, the Superior Court noted: "A license to carry a concealed deadly weapon is not one of the 'fundamental' rights guaranteed by the federal constitution, the state constitution, or

---

automatic firearms, restrict magazine capacity, mandate reporting of lost or stolen guns, require background checks for private firearm sales, and create a "gun free" zone around schools).

[164] 67 Del. Laws ch. 41 (1989).

[165] *Application of McIntyre*, 552 A.2d 500, 501 n.1 (Del. Super. 1988) (reviewing the renewal of concealed carry permit and rejecting the Petitioner's argument that her position is enhanced by the adoption of Section 20, stating: "The Court notes that 'the right to keep and bear arms' does not of necessity require that such arms may be kept concealed.").

by the courts."[166]  The Superior Court applied a rational basis test to the challenge to the conditions placed on a concealed carry permit, reasoning "no 'fundamental' right to bear arms exists and a restriction or condition on a license to carry a concealed deadly weapon may be imposed without violating the Applicant's right to substantive due process."[167]  And in 2005, this Court reiterated that the defendant had the burden of proving possession of a concealed carry license and noted that Delaware's concealed carry statute predated Section 20 and was unchanged by it.[168]

The State also continued to restrict firearm possession and use in other ways.  For example, in 1990, the General Assembly directed educational institutions with on-campus housing to develop regulations "governing the possession and use of firearms on campus by employees, students, and visitors."[169]  In 1991, this Court affirmed the constitutionality of the General Assembly's prohibition on firearm possession by convicted felons.[170]  In 1994, the General Assembly made it unlawful to allow a minor access to a firearm.[171]  A

---

[166] *Application of Wolstenholme*, No. 92M-04-006, 1992 WL 207245, at *1 (Del. Super. Aug. 20, 1992).

[167] *Id.*

[168] *Smith v. State*, 882 A.2d 762, 2005 WL 2149410 (Del. Aug. 16, 2005) (TABLE).

[169] 72 Del. Laws ch. 329 (1990).

[170] *Short v. State*, 586 A.2d 1203, 1991 WL 12101, at *1 (Del. Jan. 14, 1991) (TABLE) ("Courts throughout the country in considering statutes similar to 11 [*Del. C.*] § 1448 have uniformly ruled that the right to bear arms as guaranteed in various state constitutions and the federal constitution may be subject to reasonable restrictions for the public safety . . . .").

[171] 69 Del. Laws ch. 360 (1994).  A person violated the statute if by "intentionally or recklessly stor[ing] or leav[ing] a loaded firearm within the reach or easy access of a minor and where the minor obtains the firearm and uses it to inflict serious physical injury or death upon himself or any

year later, it recognized the crime of aggravated menacing, when a person "display[s] what appears to be a deadly weapon [and] intentionally places another person in fear of imminent physical injury."[172]

And Delaware,[173] and the United States,[174] continued to recognize the rights of property owners—including the government[175]—to exclude others from their land.

---

other person," but could assert an affirmative defense when, among other possible factors, the firearm was stored in a locked container. *Id.*

[172] 70 Del. Laws ch. 159 (1995).

[173] *See Carson v. Springfield Coll.*, C.A. No. 05C–10–002–PLA., 2006 WL 2242732, at *3 (Del. Super. Aug. 4, 2006) ("[A] fundamental element of private property is the right to regulate access to it.").

[174] *See* RICHARD EPSTEIN, TAKINGS: PRIVATE PROPERTY AND THE POWER OF EMINENT DOMAIN 63 (1985) (stating that the "notion of exclusive possession" is "implicit in the basic conception of private property"); *see also, e.g.*, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) ("The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights."); *Dolan v. City of Tigard*, 512 U.S. 374, 393 (1994) (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)) ("[T]his right to exclude others is 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'").

[175] *See United States v. Curtis-Nevada Mines, Inc.*, 611 F.2d 1277, 1283 (9th Cir. 1990) ("Historically the United States has managed the lands within the public domain as fee owner and trustee for the people of the United States. Also, in the management of public lands, the United States has historically allowed the general public to use the public domain for recreation and other purposes, and often without a specific, formal permit. Such access has been described as an implied license."); *Armuchee Alliance v. King*, 922 F. Supp. 1541, 1548–49 (N.D. Ga. 1996) (noting that "[b]ecause Congress's power over public lands 'is without limitations,' any right to use and occupy national forests is strictly a statutory benefit" and that there is no liberty or property interest in using or occupying the forest, but rather, use of the forest "is a privilege, not a right"); *United States v. Patzer*, 15 F.3d 934, 941 (10th Cir. 1993) (holding that a two-year prohibition on recreational activity on any U.S. Forest Land or national park in Wyoming or the United States is reasonable for a conviction of engaging in a commercial service, outfitting, and filming of movies on U.S. Forest Land without the required special use authorization).

**B.**

The common and accepted understanding that neither Section 20 nor the Preemption Bills were meant to infringe on the government's right to restrict the possession and use of firearms on its own land was further confirmed in 1998, when our largest county, New Castle County, prohibited the possession or discharge of firearms in its parks:

> No person shall carry a knife upon his or her person having a blade three (3) inches or longer in length or have possession of or discharge a BB gun, air rifle, pistol, firearm, paint ball gun, bow and arrow or any other type of lethal weapon in any park.[176]

New Castle County's parks offer many of the same activities as our Parks,[177] including educational and other activities for children,[178] and host sporting events,[179] at

---

[176] New Castle Cty. C. § 24.01.014.

[177] *See infra* notes 252–258.

[178] *See, e.g.*, *School Tours*, NEW CASTLE COUNTY DEL., http://de-newcastlecounty.civicplus.com/911/School-Tours (last visited Nov. 15, 2017) (school field trips hosted at Rockwood Park, a historic nineteenth century estate); *Rockwood History*, NEW CASTLE COUNTY DEL., http://de-newcastlecounty.civicplus.com/1198/Rockwood-History (last visited Nov. 15, 2017) ("The mission of the site—owned, maintained and operated by New Castle County—is to serve residents and visitors through education and recreation, while preserving and maintaining the historic 19th Century mansion, its collections and grounds. The county advances that mission by presenting an ongoing variety of youth- and family-friendly public programming in the historic buildings and on the grounds, as well as hosting signature annual events and offering facility rental. The county is committed to [the] past owners' intention for the unique site to benefit the public."); *Carousel Park Equestrian Center*, NEW CASTLE COUNTY DEL., http://de-newcastlecounty.civicplus.com/425/Carousel-Park-Equestrian-Center (last visited Nov. 15, 2017); *About Us*, NEW CASTLE COUNTY DEL., http://de-newcastlecounty.civicplus.com/966/About-Us (last visited Nov. 15, 2017) (riding lessons available at a 217-acre equestrian center).

[179] *Delcastle Recreational Facility*, NEW CASTLE COUNTY DEL., http://www.nccde.org/Facilities/Facility/Details/Delcastle-Recreational-Park-66 (last visited Nov. 15, 2017). To take one example, soccer leagues play at Banning Regional Park, Bonsall Park, Delcastle Recreational Park, Hann Park, Rogers Manor Park, River Road Park, Talley Day Park,

54

which spirits often run high and tempers can flare.  The New Castle County parks also host

annual events, such as Carousel Park's overnight family camping event, Sleep Under the

Stars, which, since May 2000,[180] has attracted thousands of residents to New Castle County

parks for a night of activities such as hayrides, a dance party, art activities with the

Delaware Children's Museum, a tent decorating contest, and movie screening.[181]

The New Castle County ordinance was never challenged under either Section 20 or

the Preemption Bills, or by a bill in the General Assembly to overturn it.   To this day, the

prohibition on possession of firearms in parks is still in the New Castle County Code,[182]

included in trail guides available to the public,[183] and posted on event-specific registration

---

and Weiss Park.  *Soccer Field Directions and Comments*, NEW CASTLE COUNTY DEP'T CMTY. SERVS., http://de-newcastlecounty.civicplus.com/DocumentCenter/Home/View/1540 (last visited Nov. 20, 2017); *Facilities*, NEW CASTLE COUNTY Del., http://www.nccde.org/Facilities?clear=False (last visited Nov. 20, 2017).

[180] Tara Lynn Johnson, *Sleep Under the Stars at Carousel's Weekend Camporee*, NEWS J. (Wilmington, Del.), May 12, 2000 (Take the Kids), at 16 (describing events offered at the inaugural Spring Camporee).

[181] News Release, New Castle County Exec. Office, County Executive Invites Public to Fall Sleep Under the Stars at Carousel Park (Oct. 21, 2015) ("At last year's Fall Sleep Under the Stars over 5,000 people including families, community and youth groups such as Boy and Girl Scout Troops enjoyed the crafts, entertainment and activities in the great outdoors."); *Fall Sleep Under the Stars: Carousel Park Equestrian Center*, IN WILMINGTON, http://inwilmingtonde.com/events/fall-sleep-under-stars-0 (last visited Nov. 15, 2017).

[182] New Castle Cty. C. § 24.01.014.

[183] *E.g.*, *Christina River Riparian Corridor Guide*, NEW CASTLE COUNTY DEL., http://www.nccde.org/DocumentCenter/View/19167 (last visited Nov. 15, 2017) ("No one shall carry any knife having a blade three (3) inches or longer on the grounds.  The possession or discharge of BB guns, air guns, firearms, bows and arrows, or any lethal weapon is prohibited."); *Iron Hill Park Trail Guide*, NEW CASTLE COUNTY DEL., http://www.nccde.org/DocumentCenter/View/1250 (last visited Nov. 15, 2017) (same).

websites park visitors use to sign up for certain events.[184] And Kent County's parallel ban dating from 1981 remains in effect.[185] That these county ordinances are in full force suggests that the Preemption Bills were neither intended nor understood to disturb county-level regulation of firearm possession and use on county property.[186]

## VIII.

Against this backdrop of continued firearm regulation, unchanged by the adoption of Section 20, the Supreme Court of the United States in 2008 and 2010 decided the two cases that began the appellants' process of discovering what Section 20 meant and impelled this facial challenge: *District of Columbia v. Heller* and *McDonald v. City of Chicago*.[187] *Heller* and *McDonald* addressed the issues that inspired Delaware's and other states' adoption of a state constitutional right to bear arms: that the Second Amendment had been

---

[184] *E.g.*, *Fall Sleep Under the Stars: Carousel Park Equestrian Center*, IN WILMINGTON, http://inwilmingtonde.com/events/fall-sleep-under-stars-0 (last visited Nov. 15, 2017) ("Our goal is to make Sleep Under the Stars a safe and fun event for everyone. To make this possible we ask that you follow these simple rules. . . . The possession of weapons and firearms are prohibited in New Castle County parks.").

[185] Kent Cty. C. § 168-35 (1981); *see also General Park Rules*, KENT COUNTY DEP'T CMTY. SERVS., http://www.co.kent.de.us/media/766210/General-park-rules-2013.pdf (last visited Nov. 20, 2017). Sussex County opened its first county park, Woodland Park, in 2016. *Sussex County Comprehensive Plan: County Planning and Zoning Commission*, SUSSEX COUNTY 17 (June 16, 2017), https://sussexplan.com/app/uploads/2017/06/Sussex-County-Comp-Plan-PZ-workshop-6-16-17.pdf. The other parks in Sussex County are state-owned Parks subject to the Regulations. *State Parks*, SUSSEX COUNTY, https://sussexcountyde.gov/state-parks (last visited Nov. 20, 2017).

[186] *See supra* note 143.

[187] *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

long held: i) not to apply to the states; and ii) not to protect an individual right to bear arms outside the collective right to raise a militia.

**A.**

At issue in *Heller* was a series of ordinances passed by the District of Columbia that the Supreme Court Majority found amounted to a "total ban" on the possession of handguns anywhere within the city including in private residences, and on the possession of other operable firearms within the home.[188] The challenged ordinances were held to be a total ban because they: i) criminalized the carrying of an unregistered firearm; ii) prohibited the registration of a handgun; iii) prohibited the carrying of a handgun without a one-year license issued by the chief of police; and iv) required that firearms other than handguns that could have been lawfully possessed within the District of Columbia be unloaded and dissembled or bound by a trigger lock, unless located in a place of business or used for recreational activities.[189] Under these ordinances, the respondent, Dick Heller, a special police officer authorized to carry a handgun while on duty at a judiciary building, was not granted a registration certificate for a handgun he wanted to keep at home.[190] The five-to-four Majority, addressing the constitutionality of this citywide ban on handguns, resolved the issue of whether the Second Amendment guaranteed an individual right to bear arms

---

[188] *Heller*, 554 U.S. at 574–75.
[189] *Id.* at 574–75.
[190] *Id.* at 575–76.

57

in the manner sought by gun advocates, stating: "There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms."[191] In doing so, it took a position different than several prior Supreme Court decisions,[192] and many Federal Court of Appeals decisions.[193]

The Supreme Court Majority, basing its reasoning on separate analyses of the text of the Second Amendment's operative and prefatory clauses in their historical context, also held that "the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense."[194] The Supreme Court Majority acknowledged that the Second Amendment's prefatory clause identifies preservation of the militia as a purpose of the right to bear arms, but relying on its own appreciation of popular sentiment in the late eighteenth century, found that this is just one reason that the right to bear arms was valued and that "most [Americans in 1789] *undoubtedly* thought it even

---

[191] *Id.* at 595.
[192] *See United States v. Miller*, 307 U.S. 174, 178 (1939) (holding that the Second Amendment only protected the right to raise a militia); *Lewis v. United States*, 445 U.S. 55, 65 (1980) (same).
[193] *See, e.g.*, *Cody v. United States*, 460 F.2d 34, 37 (8th Cir. 1972) (the guarantee of the Second Amendment extends only to use related to the preservation of the militia); *United States v. Johnson*, 497 F.2d 548, 550 (4th Cir. 1974) (the Second Amendment provides only a collective right to bear arms that is related to the preservation of the militia); *United States v. Warin*, 530 F.2d 103, 106 (6th Cir. 1976) (the Second Amendment applies only to the states' right to maintain a militia).
[194] *Heller*, 554 U.S. at 635.

more important for self-defense and hunting."[195]  Because the District of Columbia ordinances at issue applied to handguns, the type of weapon "overwhelmingly chosen by American society for [the] lawful purpose" of self-defense, and because the ordinances extended "to the home, where the need for defense of self, family, and property is most acute," the Supreme Court found the ordinances to be unconstitutional.[196]

In so doing, *Heller* cautioned that:

[N]othing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, *or laws forbidding the carrying of firearms in sensitive places such as schools*

_____

[195] *Id.* at 599 (emphasis added).  The bare *Heller* Majority had no doubt that the Second Amendment that referred in plain terms to having the purpose of protecting from federal overreaching the ability of states to raise militias was understood by "most Americans" to be more important as a federal right to be free from state regulation of gun possession and use for personal self-defense. *Id.*  To us, this makes little sense as a textual-focused approach.  That is even more the case when the founding generation understood that the English tradition was that any right to bear arms for personal self-defense was subject to Parliamentary restriction.  Thus, it made sense for the founding generation to protect the states from federal action impeding them from raising militias, while leaving to state legislatures, who the founders assumed would be closer to and more representative of state-level sentiment, the authority, as Parliament had, to regulate possession and use of firearms at the state level.  We admit, of course, that whenever law-trained judges, including ourselves, use history in a time-pressured way, based on partisan input, to resolve cases, there is a serious risk of error.  But that is why doubts should be resolved in favor of judicial restraint.  The most dangerous course of action would seem to be when judges far distant from events discern that they now know much better about what text meant than the preceding generations, who were, by conventional standards of epistemology, closer in time and thus better positioned to understand what the prevailing meaning of the text was when it was adopted.  *Heller* is odd in this and other respects, such as its decision to give the militia purpose no weight and to imply that states and the federal government may ban the sale and ownership of the weapons that would be most useful to the member of any twenty-first century militia (such as a national guard unit).  *Heller*, 554 U.S. at 599.  In other words, the *Heller* Majority, in the name of originalism, has denuded the text of the Second Amendment of any meaning as to its most evident meaning, while employing its own judgment about evolving social policy to make the Second Amendment a tool to restrict state legislatures from playing their historical role in regulating gun possession and use.
[196] *Id.* at 628–29 (internal citations omitted).

*and government buildings*, or laws imposing conditions and qualifications on the commercial sale of arms.[197]

Two years later, the Supreme Court, addressing the other issue that motivated Section 20, reversed the venerable Supreme Court authority holding that the Second Amendment did not restrict action by states, but only by the federal government.[198] In *McDonald v. City of Chicago*, the Supreme Court evaluated the constitutionality of a Chicago city ordinance that prohibited possession of an unregistered handgun and prohibited "registration of most handguns, thus effectively banning handgun possession by almost all private citizens who reside in the City,"[199] and an Oak Park ordinance that made it unlawful to possess any firearm, including handguns.[200] The Supreme Court relied on its conclusion in *Heller* that "citizens must be permitted 'to use [handguns] for the core lawful purpose of self-defense,'"[201] and held that the Second Amendment is applicable to the states, finding it "clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our

---

[197] *Id.* at 626–27 (emphasis added).
[198] *See Barron v. Mayor of Baltimore*, 7 Pet. 243, 248–49 (1833) (holding that the first eight Amendments to the Federal Constitution only applied to the federal government and did not extend to the states); *Slaughter-House Cases*, 83 U.S. 36, 79 (1872) (Second Amendment does not restrict the states); *United States v. Cruikshank*, 92 U.S. 542, 552 (1875) (same).
[199] *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).
[200] *Id.*
[201] *Id.* at 767–68.

system of ordered liberty."[202]    The Court then invalidated the ordinances as unconstitutional.

But as *McDonald* reaffirmed, *Heller*:

[D]id not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."[203]

Even after these decisions, no bill was introduced in the General Assembly to overturn the Regulations, and no lawsuit was filed challenging the Regulations' constitutionality under the Second Amendment or Section 20.[204]

---

[202] *Id.* at 778.

[203] *Id.* at 786 (quoting *Heller*, 554 U.S. at 626–27).

[204] We acknowledge that, in 2008, the Department of the Interior revised its rules on the carrying of firearms in national parks to reflect state laws authorizing the possession of loaded concealed firearms, allowing possession for individuals with authority to do so from the state in which the national park is located. But this change to the federal national park regulations was prompted by a desire to "make every effort to give the greatest respect to the democratic judgments of State legislatures with respect to concealed firearms," not *Heller*.  73 Fed. Reg. 74966-02 (Dec. 10, 2008) (to be codified at 36 C.F.R. pt. 2 and 50 C.F.R. pt. 27) ("During the pendency of our public comment period, the Supreme Court announced its decision in *District of Columbia v. Heller*, which held that the Second Amendment protects an individual's right to possess a firearm unconnected with service in a government militia, and to use that firearm for traditionally lawful purposes, such as self-defense within the home.  Several individuals, including two members of Congress, wrote the Department suggesting that the Court's decision in this case is of significance to the proposal, and that the Department should extend the public comment period to allow citizens to comment on the potential impacts of this case on the proposed rule.  In our view, the Supreme Court's decision in *Heller* does not directly impact our proposal to revise existing Federal regulations to more closely conform our regulations to appropriate state laws.").

**IX.**

Following yet another period of silence, in which no constitutional challenges to the Regulations were brought after the Supreme Court's decisions in *Heller* and *McDonald*, this Court reviewed in 2014 the constitutionality of certain public housing leases under Section 20 of the Delaware Constitution in answering certified questions posed by the United States Court of Appeals for the Third Circuit.[205]

It would take *Doe* to ignite the Edison switch of the DSSA and its allies and for them to light on the idea that the forty-year-old Park Regulation and the fourteen-year-old Forest Regulation violated Section 20.

**A.**

The challenged provisions in *Doe* prohibited residents of a housing complex managed by the Wilmington Housing Authority and their guests from displaying or carrying a firearm in the common areas of their apartment complex, unless they were transporting the firearm to or from their unit or using it in self-defense, and required residents to produce documents showing they could legally own or possess the firearm when there was reasonable cause to believe the provisions had been violated.[206] The provisions applied to "'various community spaces such as daycare facilities, libraries, and

---

[205] *Doe v. Wilmington Hous. Auth.*, 88 A.3d 654 (Del. 2014).
[206] *Id.* at 659.

community rooms,' as well as laundry rooms and administrative offices."[207] The common areas also included the rooms that offered residents use of a computer, used by children when doing their homework, and television rooms.[208] Violation of the provisions would result in immediate termination of the resident's lease and eviction.[209]

Two residents of WHA-managed apartment complexes brought suit alleging that the lease provisions infringed on their right to keep and bear arms in common areas they used in the same way as parts of their private residences.[210] The District Court considered the constitutionality of the lease provisions under both the Second Amendment and Section 20.[211] Observing that "[n]othing in the language of the Delaware constitutional provision speaks directly to the possession of firearms in common areas of public housing facilities," the District Court, following federal precedent requiring that it predict the decision of a state's highest court where that court has not yet addressed the critical issue in the case before it, conducted no independent analysis of Section 20.[212]

The District Court, noting that the lease provisions do "not severely limit those [Second Amendment] rights inside the home—or come close to the level of infringement struck down in *Heller*,"[213] analyzed the lease provisions under intermediate scrutiny. The

---

[207] *Doe v. Wilmington Hous. Auth.*, 880 F. Supp. 2d 513, 528 (D. Del. 2012).
[208] *Id.* at 528.
[209] *Doe v. Wilmington Hous. Auth.*, 88 A.3d at 659.
[210] *Doe v. Wilmington Hous. Auth.*, 880 F. Supp. 2d at 531.
[211] *Id.* at 518.
[212] *Id.* at 539 (citing *Novosel v. Nationwide Ins. Co.*, 721 F.2d 894, 897 (3d Cir. 1983)).
[213] *Id.* at 535.

63

District Court found that because "WHA, as a state agency, has an important and substantial interest in protecting the health, safety, and welfare of its residents, their guests, its employees, and the public at large while on WHA property," the lease provisions furthered a substantial government interest in public safety by limiting opportunities for violence in places where children and the elderly made up a large proportion of the people using the common areas.[214] Holding that the lease provisions did not "constitute a complete ban on use of firearms for self-defense in the common areas," the District Court determined that the lease provisions did not burden any Second Amendment right any more than reasonably necessary to achieve the government objective, and therefore, were constitutional under the Second Amendment.[215]

The District Court also held that the challenged provisions were constitutional under Section 20 based on its "predict[ion] that, if faced with the instant dispute, the Delaware Supreme Court, in interpreting the Delaware Constitution, would look to *Heller, McDonald, Marzzarella* [a Third Circuit case holding that a federal law prohibiting possession of a firearm with an obliterated serial number survives intermediate scrutiny], and other authority from the U.S. Supreme Court and Third Circuit construing the Second Amendment."[216]

---

[214] *Id.* at 536–37.
[215] *Id.* at 537–38.
[216] *Id.*

The residents appealed the District Court's decision that the lease provisions are constitutional under Section 20, but did not appeal its decision on the constitutionality of the lease provisions under the Second Amendment.[217] The Third Circuit, recognizing that the appeal raised unresolved state constitutional law questions, requested that this Court answer two questions related to the constitutionality of the lease provisions under Section 20: whether firearm possession and display could be limited in the common areas of the apartment complex, and whether WHA could require residents and their guests to produce documentation related to firearm ownership or transportation upon request when there was reasonable cause to believe the provisions had been violated.[218]

This Court, presented with these certified questions, used the fledgling federal approach of *Heller* and *McDonald* to answer these certified questions under state law. That is, although *Doe* posed questions of our state's law, the *Doe* Court let *Heller* and *McDonald* shape the lens it used to examine if the lease provisions violated Section 20. After doing so, the *Doe* Court found the provisions to be unconstitutionally overbroad because of their burden on the residents' right to "keep and bear arms for the defense of self, family, and home."[219] Noting that the "[r]esidents have a possessory interest in both their apartments and the common areas,"[220] this Court observed that "[w]ith the Common Area Provision

---

[217] *Doe v. Wilmington Hous. Auth.*, 88 A.3d 654, 661 (Del. 2014).
[218] *Doe v. Wilmington Hous. Auth.*, 568 Fed. Appx. 128, 128–29 (3d Cir. 2014).
[219] *Doe v. Wilmington Hous. Auth.*, 88 A.3d at 667.
[220] *Id.* at 668.

in force under penalty of eviction, reasonable law-abiding adults become disarmed and unable to repel an intruder by force in any common living areas when the intervention of society on their behalf may be too late to prevent an injury."[221] "[T]he Common Area Provision severely burdens the right by functionally disallowing armed self-defense in areas that Residents, their families, and guests may occupy as part of their living space."[222] This Court "decline[d] to determine whether Second Amendment rights extend outside the home,"[223] but noted that Section 20 "is intentionally broader than the Second Amendment and protects the right to bear arms outside the home, including for hunting and recreation. Section 20 specifically provides for the defense of self and family *in addition to* the home."[224]

The Majority gives *Doe* an expansive reading that slights the precise nature of the certified questions of law presented to this Court by a federal appellate court.[225] To us, *Doe* is best rationalized as affording to residents of public housing the right to bear arms in areas of their own apartment complex that, as a matter of day-to-day living, the *Doe* Court felt the residents had to use for quotidian activities like laundry. *Doe* can be seen as holding that our state government cannot, through an agency that "essentially replicates for

---

[221] *Id.*
[222] *Id.* at 668–69.
[223] *Id.* at 665 n.47.
[224] *Id.* at 665.
[225] *Id.* at 661.

66

low-income families services similar to those provided by a private landlord,"[226] deny to low income residents the right to bear arms in their residences and attached common areas in which they, as residents, have a "possessory interest"[227] and a need to use them for core residential functions. By its own terms, *Doe* made plain that the Wilmington Housing Authority was not providing services like those provided on government property. Rather, *Doe* focused on whether the state constitutional right extended to the common areas because they are an extension of the residents' homes. As *Doe* stated:

> The common areas are effectively part of the residences. The laundry rooms and TV rooms are similar to those typically found in private residences; and the Residents, their families, and their guests will occupy them as part of their living space.[228]

We do not read *Doe* as at all addressing the question of the government's right to act as a proprietor when it is not renting homes to others, or to regulate firearm use and possession on its own property when it is in full control of its own possessory rights. In fact, *Doe* itself noted that "the right to bear arms under the Delaware Declaration of Rights . . . is not absolute."[229] For these reasons, *Doe* is best rationalized, in our view, as embracing heightened scrutiny out of a concern that the government should not, as a landlord, deny poor renters the same ability to carry guns as those who own homes.

---

[226] *Id.* at 668.
[227] *Id.*
[228] *Id.*
[229] *Id.* at 667.

67

And to the extent that *Doe* is interpreted to say more than necessary to answer the precise question before it, we disagree with it. Although we are not asked to consider if *Doe* was correct, we view the cursory consideration *Doe* gave to the realities of apartment life, as well as *Doe*'s failure to consider its implications for owners of private apartment complexes, to be problematic.

To wit, *Doe* failed to give any weight to the interests of residents using shared spaces with other families in having those spaces be free of weapons. Those residents have children, and may want their children and themselves to be in spaces free from deadly weapons. *Doe*'s failure to give weight to the reality that residents' children did homework in the common areas exemplifies this.[230] *Doe* also gave little weight to the nuanced determination of the WHA's provisions, which allowed its renters to carry their firearms to and from their residences, and keep them there. As concerning, *Doe*'s reasoning, if accepted on its face, would suggest that owners of private apartment and condominium complexes could not limit weapon possession and use on their own private property.

For present purposes, we content ourselves with noting that this Court's answer to the certified question in *Doe* did not require it to consider whether Section 20 involved a silent determination that our government cannot set the rules of access for entry to its own land, when it is not acting as a landlord. The absence of any careful consideration of the

---

[230] *Id.* at 668 (acknowledging that the common areas, described as the laundry rooms and TV rooms, are similar to the spaces within a private residence, but not considering the effect of the lease provisions on spaces where children might gather, such as the computer rooms where residents' children complete their homework).

68

legislative history of Section 20 or prior Delaware history in *Doe* underscores the residential-focused nature of that case.

In fact, *Heller* noted that "the need for defense of self, family, and property is most acute" in the home.[231] *Doe* echoed that sentiment.[232] And *Heller* and *McDonald* dealt with jurisdiction-wide prohibitions on possession and use of firearms, even within private residences. They in no manner imply a right to possession and use of guns on someone else's property. The provisions at issue in *Doe* applied to extensions of the residents' homes: laundry, television, and computer areas. But, here, the Regulations do not prohibit the appellants from possessing or using firearms in their homes, or even in extensions of them. And, as to Parks and Forests, our government is the owner and full steward, not a landlord.

And we do not believe that the phrase "self, family, home and State" in Section 20 can be reasonably read as referring to separate independent concepts.[233] Rather, they should be understood as expressing the collective idea that the most important interests associated with life may be defended by a weapon. For example, we doubt that the

---

[231] *Heller*, 554 U.S. 570, 628–29 (2008) (internal citations omitted).
[232] *Doe v. Wilmington Hous. Auth.*, 88 A.3d at 667–68 ("In *Griffin v. State* we explained that an individual's interest in the right to keep and bear arms is strongest when 'the weapon is in one's home or business and is being used for security.' Residents have a possessory interest in both their apartments and the common areas. And although Residents cannot exclude other residents or the public from the common areas, their need for security in those areas is just as high for purposes of Section 20 as it would be inside their apartment or business.") (internal citations omitted).
[233] DEL. CONST., art. I, § 20 (1987).

69

reference to "home" means that a home may be protected by any weapon of any kind. We know, for example, that no one contends that Section 20 should be read in a literal way to permit a homeowner to shoot a bullet at an adolescent who eggs his house on mischief night or throws a snowball at it on a winter's day. It is illegal in Delaware to defend property with lethal force without the justification that it was necessary in self-defense.[234] We also do not think the use of the words "self" and "family" can be read to create a license to bear arms anywhere in Delaware. Rather, they are more logically read in a way connected to the concept gun advocates have embraced of home as a safe, personal, and family "castle."[235] Of the two states with provisions nearly identical to Delaware's,[236]

---

[234] 11 *Del. C.* § 466 ("The use of deadly force for the protection of property is justifiable only if the defendant believes that: (1) The person against whom the force is used is attempting to dispossess the defendant of the defendant's dwelling otherwise than under a claim of right to its possession; or (2) The person against whom the deadly force is used is attempting to commit arson, burglary, robbery or felonious theft or property destruction and either: a. Had employed or threatened deadly force against or in the presence of the defendant; or b. Under the circumstances existing at the time, the defendant believed the use of force other than deadly force would expose the defendant, or another person in the defendant's presence, to the reasonable likelihood of serious physical injury.").

[235] *See, e.g., "Castle Doctrine" Self-Defense Law*, NRA INSTITUTE FOR LEGISLATIVE ACTION (Apr. 26, 2005), https://www.nraila.org/articles/20050426/castle-doctrine-self-defense-law (quoting former NRA president Marion Hammer "This law is about affirming that your home is your castle and, in Florida, you have a right to be absolutely safe inside its walls.").

[236] *Compare* DEL. CONST., art. I, § 13 (1987) ("A person has the right to keep and bear arms for the defense of self, family, home and State, and for hunting and recreational use.") *with* W.V. CONST., art. III, § 22 (1986) ("A person has the right to keep and bear arms for the defense of self, family, home and state, and for lawful hunting and recreational use.") *and* KAN. CONST., Bill of Rights § 4 (2010) ("A person has the right to keep and bear arms for the defense of self, family, home and state, for lawful hunting and recreational use, and for any other lawful purpose.").

seven states with similar provisions in that they provide for defense of the home,[237] and three states that provide for defense of "property," without referencing the home,[238] none have found that their provision is "intentionally broader" than the Second Amendment because it "provides for the defense of self and family *in addition to* the home."[239]

*    *    *

We also underscore another reality: nothing in Section 20 can be read as allowing anyone to trample another's property rights by armed trespass. After this Court's decision

---

[237] *Cf.* COLO. CONST., art. I, § 15 (1876) ("The right of no person to keep and bear arms in defense of his home, person, and property or in aid of the civil power when thereto legally summoned, shall be called in question . . . ."); MISS. CONST., art. III, § 12 (1890) ("The right of every citizen to keep and bear arms in defense of his home, person, or property or in aid of the civil power when thereto legally summoned, shall not be called into question . . . ."); MO. CONST., art. I, §23 (1945) ("That the right of every citizen to keep and bear arms . . . in defense of his home, person family and property, or when lawfully summoned in the aid of the civil power, shall not be questioned."); MONT. CONST., art. II, §12 (1889) ("The right of any person to keep or bear arms in defense of his home, person, and property, or in aid of the civil power when thereto legally summoned, shall not be called into question . . . ."); NEB. CONST., art. I, § 1 (1988) ("All persons . . . have certain inherent and inalienable rights; among these are . . . the right to keep and bear arms for security and defense of self, family, home, and others, and for lawful common defense, hunting, recreational use, and all other lawful purposes . . . ."); OKLA. CONST., art. I, § 4 (1907) ("The right of a citizen to keep and bear arms in defense of his home, person, or property, or in aid of the civil power, when thereunto legally summoned, shall never be prohibited . . . .").

[238] *Cf.* N.H. CONST., pt. 1, art. 2-a (1982) ("All persons have the right to keep and bear arms in defense of themselves, their families, their property and the state."); N.D. CONST., art. I, § 1 (1984) ("All individuals . . . have certain inalienable rights, among which are . . . to keep and bear arms for the defense of their person, family, property, and the state, and for lawful hunting, recreational, and other lawful purposes, which shall not be infringed."); UTAH CONST., art. I, § 6 (1984) ("The individual right of the people to keep and bear arms for security and defense of self, family, others, property, or the state, as well as for other lawful purposes shall not be infringed; but nothing herein shall prevent the legislature from defining the lawful use of arms.").

[239] *Doe v. Wilmington Hous. Auth.*, 88 A.3d 654, 665 (Del. 2014).

in *Doe*, Delaware enacted legislation to loosen registration and licensing requirements for retired police officers to obtain and carry concealed weapons.[240] Delaware also enacted Sections 1441A and 1441B, which adopted portions of the Federal Law Enforcement Officers Safety Act.[241] Both the Federal and Delaware provisions state that the special firearm rules for retired officers do not "supersede or limit the laws of any state that . . . (1) Permit private persons or entities to prohibit or restrict the possession of concealed firearms on their property; or (2) *Prohibit or restrict the possession of firearms on any state or local government property, installation, building, base, or **park**.*"[242]

In 2016, the General Assembly also reclassified the penalties associated with a violation of the Regulations, implicitly ratifying the Regulations.[243] That is, even after the General Assembly reviewed the Regulations and codified the new penalties for violations thereof, the General Assembly did not consider the Regulations to infringe on any right protected by Section 20, but rather, to be a valid exercise of its power to regulate its own land.

---

[240] Majority Op. 7 n.25; 11 *Del. C.* § 1441.
[241] 18 U.S.C. §§ 926c–926b (2015).
[242] 18 U.S.C. §§ 926c–926b; 11 *Del. C.* §§ 1441A–1441B (emphasis added).
[243] 80 Del. Laws ch. 161 (2016); Sec. Order No. 2016-P-0006 (Feb. 15, 2016).

## X.

Discovering by way of *Heller*, *McDonald*, and *Doe* that the longstanding Regulations violated Section 20, the appellants brought this suit in 2015.[244] In attacking the Regulations, the appellants make a simple contention: that they are inhibited from enjoying the Parks and Forests because they cannot carry deadly weapons in them for personal protection.[245] They do not argue that they need the weapons for lawful hunting, as they admit that lawful hunting is permitted.[246] Rather, they say, for example, that they would rent a cabin in a Park for their family but do not do so because they will not be able to use deadly force to protect their rented "home"[247] or that they would go surf fishing if they could take a gun for personal protection.[248] That is, the appellants argue that the problem with the Regulations is that the State, as proprietor of its own land, infringes their rights under Section 20 by not allowing firearm possession in the Parks and Forests, except for lawful hunting or with special permission.[249]

In arguing that the State may not restrict use of its Parks and Forests to those who agree not to bear arms in compliance with the Regulations, the appellants rely on *Doe*'s

---

[244] *See supra* note 8.

[245] Appellants' Amend. Opening Br. 12 ("But for the Regulations adopted by the Agencies, the Sportsmen would exercise their State constitutional rights to keep and bear firearms within Delaware State Parks and State Forests.").

[246] *Id.* at 1–2.

[247] *Id.* at 1 n.3 ("This ban covers expensive cabins that can be rented at State Parks for weeks at a time to house families."); *id.* at 9–10, 26.

[248] *Id.* at 12.

[249] *Id.* at 6.

tight embrace of *Heller* and *McDonald* as a gloss on our State Constitution's meaning.[250] The appellants stress *Doe*'s suggestion that Section 20 is even broader than the expanded, sweeping reach of the eighteenth century Second Amendment first recognized in those twenty-first century decisions. Having discovered by way of these cases that the forty-year-old Park Regulation and the fourteen-year-old Forest Regulation, as amended to match the Park Regulation in 2003, now impinge on the thirty-year-old Section 20, the appellants raise a facial challenge, contending that the right to bear arms extends well beyond the home to the right to do so in our state-owned Parks and Forests.[251]

## A.

Before we examine the appellants' claims, we pause to highlight the purpose and function of our Parks and Forests: providing a haven for recreation, education, family-oriented activities, and athletics.

As was the case in 1977, Delaware's Parks and Forests remain places where families gather for picnics, camping, and Girl and Boy Scout activities.[252] Our Parks and Forests support our schools by hosting field trips and providing kids with experiences in nature

---

[250] *Id.*

[251] *Id.* at 15.

[252] *See Programs at Delaware State Parks*, DEL. STATE PARKS, http://www.destateparks.com/programs/index.asp (last visited Sept. 8, 2017) (overview of public programs, school group programs, scout programs summer camps, and school break day camps offered in state parks); *see also* ANNUAL REPORT 2016, DEL. FOREST SERV. 21–22 (2016), http://delawaretrees.com/dfs_fy16_annualreport.pdf (description of school groups and community organizations making use of state forests in 2016).

that they may otherwise not have.[253]  Summer camps in the Parks and Forests offer adult

supervision during parents' working hours and continued education outside of the school

year.[254]  Our Parks and Forests serve as the home field for school sporting events, cross-

country meets, lacrosse games, rugby matches, and other sports,[255] as well as a venue for

corporate events and weddings.[256]  And, of course, the Parks and Forests are used for

outdoor activities like hiking, fishing, birding, and camping.[257]  These activities are not

---

[253] *See How to Plan a State Park Field Trip*, DEL. STATE PARKS, http://www.destateparks.com/school/plan.asp (last visited Sept. 8, 2017).

[254] *See Summer Camps at Delaware State Parks*, DEL. STATE PARKS, http://www.destateparks.com/programs/summer-camps/index.asp (last visited Sept. 8, 2017) ("Half-day camps for four- to six-year-olds with various nature themes are offered in summer, as well as full-day camps for six- to seventeen-year-olds.  Many camps offer before and after care. Summer camp information is posted in January.  Single- or multi-day school break camps keep kids interested, active and learning when school is closed during the school year.").

[255] DELAWARE STATE PARKS 2016 ANNUAL REPORT 11, 13 (2016), http://destateparks.com/FY2016/AnnualReport.pdf; *Kickball*, DEL. SPORTS LEAGUE, https://www.delawaresportsleague.com/leagues/kickball (adult kickball league competes at Alapocas Run State Park); *Schedule Entrance Fees & User Charges*, DIV. PARKS & RECREATION (2017), http://www.destateparks.com/downloads/fees/2017RatesFeesCharges.pdf (fee to rent football or soccer fields for youth athletics); *Registration*, BEACH 5 SAND SOCCER SERIES, http://www.beach5sandsoccerseries.com/registration5.php (last visited Nov. 21, 2017) ("best beach soccer tournament on the east coast" with both "youth and adult divisions" at Dewey Beach, Delaware, among other locations); *Boys' Soccer—Varsity Schedule*, ST. GEORGES TECH. HIGH SCH., https://www.hawkssports.com/page9435 (last visited Nov. 21, 2017) (listing Cape Henlopen State Park as one of the team's scheduled practice locations).

[256] *See* DELAWARE STATE PARKS: HISTORIC ELEGANCE, RUSTIC CHARM, SEASIDE ROMANCE (2016), http://pubs.hawthorncreative.com/delawarestateparks/ (state park sites available for weddings); ANNUAL REPORT 2016, DEL. FOREST SERV. 21–22 (2016), http://delawaretrees.com/dfs_fy16_annualreport.pdf (events held by community organizations in Forests).

[257] *See generally Activities in Delaware State Parks*, DEL. STATE PARKS, http://www.destateparks.com/activities/index.asp (last visited Sept. 8, 2017) (activities offered in Parks include adventure racing, biking, mountain biking, birding, camping, disc golf, fishing, geocaching, golf, hayrides, hiking, horseback riding, hunting, music and arts, paddling, picnicking,

75

done in isolation, one user at a time. Our Parks and Forests are shared spaces that host thousands of visitors each year.[258]

Our Parks and Forests are places where Delawareans can seek refuge from the hurly-burly of daily life and enjoy the beauty of nature. These are not places to which people can demand exclusive access, but instead, places people must share in a way consistent with everyone's safe enjoyment and in compliance with the rules of access, behavior, and use set by those selected by our Governor and confirmed by our Senate to operate them. The property to which the Regulations apply is state property.

**B.**

Turning now to the appellants' claims, we first note that the appellants did not challenge an application of the Regulations to any specific situation, mount a precise challenge to the Regulations, or argue that the Regulations are overbroad in some particular respect. Instead, the appellants chose to make a facial challenge.[259] Federal courts

---

rock climbing, rappelling, stargazing, summer camps, summer concerts, swimming, and tennis); *Delaware State Forests*, DEL. FOREST SERV., http://dda.delaware.gov/forestry/forest.shtml (last visited Sept. 9, 2017) (activities offered in Forests include hiking, horseback riding, hunting, running, bicycling, cross-country skiing, primitive camping, picnicking, and fishing).

[258] In 2016, the Forests welcomed "an estimated 26,565 visitors [who] logged 26,238 user-days with such popular activities as hunting, wildlife observation, hiking, and horseback riding" and the state forests reported 97,479 participants to state park nature centers and historic buildings and 47, 414 participants in the state park summer concerts. ANNUAL REPORT 2016, DEL. FOREST SERV. 2 (2016), http://delawaretrees.com/dfs_fy16_annualreport.pdf; DELAWARE STATE PARKS 2016 ANNUAL REPORT 11, 13 (2016), http://destateparks.com/FY2016/AnnualReport.pdf.

[259] Appellants' Amend. Opening Br. 6–7, 43; *see Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51 (2008) ("Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of 'premature

76

considering a facial challenge to an agency regulation, aware they "are [not] a legislature charged with formulating public policy,"[260] require that the challenger "establish that no set of circumstances exists under which the [regulation] would be valid."[261] Our law is identical.[262]

This position of deference to those charged with setting public policy is reflected in our jurisprudence and the governing statute of Delaware's APA, which together establish the standard under which this Court must consider the appellants' sweeping attacks on the validity of longstanding government regulations. Under generations of Delaware decisional law, when a stark claim like that of the appellants' is made, this Court exercises

---

interpretation of statutes on the basis of factually barebones records.' Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither 'anticipate a question of constitutional law in advance of the necessity of deciding it' nor 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.' Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that '[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'") (internal citations omitted).

[260] *Reno v. Flores*, 507 U.S. 292, 315 (1993) (quoting *Schall v. Martin*, 467 U.S. 253, 281 (1984)).

[261] *Id.* at 301 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *Salerno*, 481 U.S. at 745 ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.").

[262] *Hazout v. Tsang Mun Ting*, 134 A.3d 274, 287 n.43 (Del. 2016) (gathering authorities showing the great caution that must be used in addressing a facial challenge); *Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 948–49 (Del. Ch. 2013) ("[T]he plaintiffs' burden on this motion challenging the facial statutory and contractual validity of the bylaws is a difficult one: they must show that the bylaws cannot operate lawfully or equitably *under any circumstances. . . .* The plaintiffs voluntarily assumed this burden by making a facial validity challenge, and cannot satisfy it by pointing to some future hypothetical application of the bylaws that might be impermissible.").

77

judicial restraint, with "a strong presumption of constitutionality attending a legislative

enactment which, unless the evidence of unconstitutionality is clear and convincing, the

court will be reluctant to ignore."[263]  This presumption applies to challenges to statutes and

agency regulations promulgated under delegated authority, which have the force and effect

of law,[264] is codified in the Delaware's APA, which provides:

> [T]he agency action shall be presumed to be valid and the complaining party shall have the burden of proving either that the action was taken in a substantially unlawful manner and the complainant suffered prejudice thereby, or that the regulation, where required, was adopted without a reasonable basis on the record or is otherwise unlawful.[265]

When a challenge is made to a longstanding regulatory policy, the presumption is

given even more weight.[266]  The General Assembly "is presumed to be aware of existing

---

[263] *Justice v. Gatchell*, 325 A.2d 97, 102 (Del. 1974) (citing *State Highway Dep't v. Del. Power & Light Co.*, 167 A.2d 27 (Del. 1961)).

[264] *E.g.*, *Ringler v. Paintin*, 1980 WL 332988, at *2–3 (Del. Super. July 24, 1980) ("As rules and regulations enacted by administrative agencies pursuant to the powers delegated to them have the force and effect of laws, the traditional test provides the applicable framework for our analysis.") (internal citations omitted).

[265] *Stevenson v. Del. Dep't of Nat. Res. & Envtl Control*, 2014 WL 4937023, at *7 (Del. Super. Sept. 22, 2014) (citing 29 *Del. C.* § 10141)).  "Agency action" includes an agency's regulation, defined as "any statement of law, procedure, policy, right, requirement or prohibition formulated and promulgated by an agency as a rule or standard, or as a guide for the decision of cases thereafter by it or by any other agency, authority or court."  29 *Del. C.* §§ 10102(2), (7).

[266] *Council 81, Am. Fed'n of State, Cty. & Mun. Emps., AFL-CIO v. State of Del., Dep't of Fin.*, 293 A.2d 567, 571 (Del. 1972) (In interpreting an ambiguous statute, the Court will "give due weight to the practices and policies existing at the time [Section] 2713 was enacted and which continued thereafter for 17 years.  A long-standing, practical, and plausible administrative interpretation of a statute of doubtful meaning will be accepted by this Court as indicative of legislative intent.") (citations omitted); *Harvey v. City of Newark*, No. 5023-VCS, 2010 WL 4240625, at *6 (Del. Ch. Oct. 20, 2010) ("Similarly, when a statute has been applied by the relevant government organ in a consistent way for a period of years, that is strong evidence in favor of interpreting the statute in accordance with that practical application.").

law."[267] This Court recognizes that "[e]xtended legislative inaction following executive practice is indicative of legislative intent and, relatedly, longstanding executive construction of a 'doubtful' statute is given weight."[268] The General Assembly's non-interference with a longstanding agency regulation is the sort of legislative inaction this Court recognizes as indicative of legislative intent.[269] Under these principles, the appellants must therefore overcome the strong presumption that the Regulations are valid, and any doubts must be resolved against the appellants on this facial challenge.[270]

This procedural posture is important to a fair resolution. As we have noted, the Regulations were not challenged under the APA when promulgated. At the time the Regulations were adopted, there was no reason to believe they were controversial under

---

[267] *Giuricich v. Emtrol Corp.*, 449 A.2d 232, 239 n.13 (Del. 1982).

[268] *Jackson v. Danberg*, C.A. No. 07M-09-141 RRC, 2008 WL 1850585, at *4 (Del. Super. Apr. 25, 2008).

[269] *Watson v. Burgan*, 610 A.2d 1364, 1367 (Del. 1992) ("[T]he original regulation adopted by the Department remained in effect for fourteen years without interference by the General Assembly. Such inaction may well constitute acquiescence and be indicative of legislative intent. More importantly, the Department's parole eligibility regulation was implicitly adopted by prosecutors, defense lawyers and judges throughout the State in the negotiation of guilty pleas.").

[270] *State v. Blount*, 472 A.2d 1340, 1346 (Del. Super. 1984) ("Furthermore, the Court must, and should, keep in mind the principal of statutory construction which has been followed by courts from time immemorial: that a statute will be presumed to be constitutionally firm unless the evidence is clearly to the contrary. Thus, a party asserting the unconstitutionality of a statute must show that the question of the constitutionality of the statute is fairly debatable. Moreover, once a party has established that the constitutionality of the statute is fairly debatable, he must, in order to overcome the presumption of constitutionality, establish *clearly* and *convincingly* the lack of constitutionality of the statute.") (internal citations omitted); *see generally City of Chicago v. Morales*, 527 U.S. 41, 77–81 (Scalia, J., dissenting) ("[B]efore declaring a statute to be void in all its applications (something we should not be doing in the first place), we have at least imposed upon the litigant the eminently reasonable requirement that he establish that the statute was unconstitutional in all its applications.").

existing Delaware or federal law, and the Regulations were anticipated by generations of similar city, state, and federal policies.

The traditional deferential standard of review with which we are required to approach this case is a reminder of the care that ought to be taken when we are tempted to discover that a longstanding practice supported and implemented by generations of Delaware governors and cabinet secretaries of both parties, and never the subject of legislative controversy, has, from its inception, been unconstitutional.[271]

With these principles of judicial restraint in mind, we next explain why the Regulations do not intrude on any conduct protected by Section 20: because Section 20 does not grant anyone a right to possess or use a weapon on someone else's property, that of the State. We then explain why, even if the Regulations do regulate conduct protected by Section 20, they are not subject to intermediate scrutiny because they are regulations of gun possession and use in sensitive places, and even if intermediate scrutiny did apply, they pass constitutional muster.

---

[271] The Majority points to some arguable inconsistencies in the General Assembly's regulation of firearms to support its conclusion that the Regulations "are grossly out of step with the types of 'place'-based restrictions adopted by our General Assembly." Majority Op. 37. That our General Assembly has not been consistent in all respects in the regulation of weapons does not distinguish this subject form most others. Legislating is complex, and arguable or genuine inconsistencies can crop up in many areas. The Judiciary is not charged with writing judicial decisions that correct that. As we show, if anything, the General Assembly's action acknowledges the validity and existence of the Regulations.

## C.

We would reject the appellants' claims for a simple reason. The Parks and Forests are not the commons; they are places that are restricted in access in many ways, and only account for three percent of the state's acreage.[272] As we have shown, nothing in the text or history of Section 20 supports the idea that it limits the General Assembly's ability to restrict the possession and use of firearms on its own property.[273] To the contrary, both the text and its understood meaning support the constitutional validity of the Regulations.

## D.

The Regulations apply to places our society has long recognized as sensitive places where the possession and use of firearms is contrary to settled public policy objectives. In *Doe*, this Court noted that "where the government is a proprietor or employer, it has a legitimate interest in controlling unsafe or disruptive behavior on its property. . . . [O]ccupying the status of government landlord, alone and without more, does not control. How the property is used must also be considered."[274] As we have shown, the state-owned land at issue here is sensitive because of its regular and shared use by families, children, and adults for education, leisure, and recreation. Operating as a proprietor of the Parks and

---

[272] *Public Protected Lands*, DEL. OPEN DATA, https://data.delaware.gov/Recreation/Public-Protected-Lands/whe2-8n4h/data (last visited Oct. 28, 2017) (mapping Delaware's Outdoor Recreation Inventory of state owned lands).

[273] *Ezell v. City of Chicago*, 651 F.3d 684, 702 (2011) ("Accordingly, if the government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment—1791 or 1868—then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review.").

[274] *Doe v. Wilmington Hous. Auth.*, 88 A.3d 654, 668 (Del. 2014).

Forests, the Agencies control unsafe behavior in these sensitive areas by restricting firearm possession and use. The demonstrated practice of generations of federal, state, and local policymakers to regulate gun possession and use in Parks and natural areas like the Forests underscores that they are sensitive places within the meaning of *Heller* and *McDonald*, which purport to rely on societal understandings. When a durable, bipartisan consensus judgment has existed for generations that these are sensitive places, the principles of judicial restraint that bind us on this facial challenge instruct us to respect that decision, not to supplant it with a judicial substitute.

Although *Heller* does not require regulation of sensitive places to be longstanding to be lawful,[275] history shows that the Regulations are of a type that is longstanding. The Regulations: i) predate the adoption of Section 20; ii) are rooted in Delaware policies dating back to 1887 and are in accord with Park policies dating back to at least 1962 and the Kent

---

[275] In *Heller*, the word "longstanding" only qualified one set of restrictions, and not those involving sensitive places. 554 U.S. at 626–27 ("Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."); *id.* at 626 n.26 ("We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive."). *McDonald* reaffirmed this part of *Heller*, but moved the term "longstanding" to the front of a list including regulation of sensitive places. *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.'") (internal citations omitted).

County ordinance adopted in 1981; iii) are consistent with the federal policy adopted in 1938 prohibiting possession and use in the national parks; iv) have been amended, subject to public notice and comment without constitutional challenge, even after 1987; v) have been observed by Park and Forest visitors and employees since their adoption; vi) were referenced in legislation addressing concealed carry by law enforcement officers in 2015 and were an exception to the legislative scope; and vii) have had their penalties for violation reviewed and amended by the General Assembly as recently as 2016.[276]

### E.

But even if the Regulations were subject to heightened scrutiny, they pass constitutional muster. Second Amendment challenges under intermediate scrutiny require the government to show that the regulation: i) serves an important governmental interest; ii) is substantially related to that interest; and iii) does not burden the right more than reasonably necessary.[277]

---

[276] 80 Del. Laws ch. 161 (2016); DEP'T OF NAT. RES. & ENVTL. CONTROL, APPROVING FINAL REGULATIONS TO AMEND 7 DE ADMIN. CODE § 9201: REGULATIONS GOVERNING STATE PARKS, Secretary's Order No.: 2016-P-0006 2 (Feb. 15, 2016) ("The primary purpose of this proposed regulatory promulgation is to adopt as final the aforementioned proposed *revised* Amendments to 7 DE Admin. Code §9201, *Regulations Governing State Parks* . . . to mirror the recent changes made to Delaware law as a result of the passing of Senate Bill 114 . . . by the 148th General Assembly in 2015. This bill declassifies a number of minor violations associated with state parks by changing some violations from an unclassified misdemeanor to a Class 'D'" environmental violation."). The Park Regulation is now a Class D environmental violation. *Id.* at 28.
[277] *Doe*, 88 A.3d. at 666–67.

The Agencies have an important interest in promoting public safety within their Parks and Forests. The General Assembly has authorized DNREC and DOA to maintain and administer Parks and Forests for the enjoyment of the public.[278] And the Regulations further the Agencies' public safety objective by allowing visitors to enjoy the activities offered in Parks and Forests without fear of injury from firearms or intimidation by their presence.[279]

---

[278] 7 *Del. C.* § 4701(a)(4) (authorizing DNREC to "[m]ake and enforce regulations relating to the protection, care and use of the areas it administers"); 3 *Del. C.* § 1011 (authorizing DOA to "execute all matters pertaining to forestry within the jurisdiction of the State; devise and promulgate rules and regulations for the enforcement of the state forestry laws and for the protection of forest lands, and impose fines in furtherance thereof").

[279] It is not unusual to say that places where children play and firearms do not mix. *See Tingle v. Ellis*, No. Civ.A 97C-11-020, 1999 WL 743651, at * 4 (Del. Super. Aug. 10, 1999) ("The goal of [Section 1456 of Title 11, which criminalizes unlawfully allowing a minor access to a firearm] is to keep firearms from minors who might injure themselves or others in operating or handling a firearm."); *People v. Heber*, 745, N.Y.S.2d 835, 839 (N.Y. Sup. Ct. June 3, 2002) ("Because of a growing public concern regarding the accidental shootings of children in the homes of gun owners, 18 states have enacted safe storage laws for firearms. Known as Child Access Prevention ('CAP') laws, most of the statutes generally make it a crime for a gun owner to store a loaded firearm in a manner in which he knows or reasonably should know a child may gain access to the weapon[.] If a child does gain access to the gun and uses it to inflict injury or death upon him/herself or another person, the gun owner is held criminally liable."). That firearms can be dangerous, or at least perceived as such, is also understood. *See generally Embody v. Ward*, 695 F.3d 577, 579 (6th Cir. 2012) (noting that Embody, carrying an AK-47 in a Tennessee state park, "anticipated his appearance at the park would attract attention" and confirming that park visitors reported his presence to park rangers); DEP'T OF NAT. RES. & ENVTL. CONTROL, APPROVING FINAL REGULATIONS TO AMEND 7 DE ADMIN. CODE § 9201: REGULATIONS GOVERNING STATE PARKS, *supra* note 276 (classifying mechanical bait casters as firearms and stating, "beaches are frequently at capacity, and anglers are in close proximity of each other. The Department has safety concerns for other users groups in such areas, such as kayakers, walker, body surfers and swimmers, when a device such as this is being operated within such close proximity. Moreover, operator error with such a device draws additional safety concerns when used on Division-managed lands. The Department notes that just one individual improperly using such a device could severely injur[e] or kill other recreational users of the park.").

And the Agencies further that interest through the Regulations, which are not a "total ban,"[280] but rather, apply to just three percent of our state's acreage.[281] Unlike the ordinances at issue in *Heller* and *McDonald* that applied to the entire polity, the Regulations are far more limited in their geographic scope.[282] And even within the Parks and Forests, the Regulations are not a "total ban" because they allow firearms for legal hunting, and with written permission in the Parks and administrative waiver in the Forests.[283] If the Majority's characterization of the Regulations as a "total ban" is correct, restrictions on firearms in schools, courthouses, and other public spaces would each also be a "total ban," because they too delineate a limited geographic space in which firearm possession and use is regulated.

The appellants argue that the Agencies' failure to demonstrate that the Regulations further public safety results in the Regulations' failure to satisfy intermediate scrutiny.[284]

---

[280] Majority Op. 1 ("Appellants challenge two regulations adopted by two different State agencies that result in a near total ban of firearms in Delaware's state parks and forests.").

[281] *See supra* note 22; *see also United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010) ("The District of Columbia's handgun ban is an example of a law at the far end of the spectrum of infringement on Second Amendment rights. It did not regulate possession of handguns: it prohibited it, even for the stated fundamental interest protected by the right—the defense of hearth and home.") (internal citations omitted).

[282] *See, e.g.*, *Calguns Found., Inc. v. Cty. of San Mateo*, 218 Cal. App. 4th 661, 678 (2013) (finding an ordinance prohibiting the possession and use of guns in county parks was not a total ban because, unlike a citywide or countywide prohibition on handgun possession in San Francisco, this ordinance "merely regulate[d] the possession or use of firearms on county property.") (discussing *Fiscal v. City & Cty. of S.F.*, 70 Cal. Rptr. 3d 324, 338–39 (2008)).

[283] DEL. DEP'T NAT. RES. & ENVTL. CONTROL, PARK RULES AND REGULATIONS § 8.04 (1977); DEL. DEP'T AGRIC. § 7.9 (2003); 3 *Del. Admin. C.* § 402-3.2.

[284] Appellants' Amend. Opening Br. 19–20.

And it is true that *Doe* required the government to establish more than a "general safety concern" to pass intermediate scrutiny.[285] But *Doe* addressed firearms inside the home and explained that "[i]n *this context*, [Defendants] must show more than a general safety concern."[286] This is consistent with the Supreme Court's understanding in *McDonald* and *Heller* that "the need for defense of self, family, and property is most acute in the home."[287] Courts addressing firearm prohibitions *outside* the home have found that general safety concerns qualify as important governmental interests.[288]

Despite this contention and the appellants' facial challenge, they and their friends in amicus debate the effect of gun control on public safety. Their briefs conjure up visions

---

[285] *Doe v. Wilmington Hous. Auth.*, 88 A.3d 654, 667 (Del. 2014).

[286] *Id.* at 668 (emphasis added).

[287] *McDonald v. City of Chicago*, 561 U.S. 742 (2010) (quoting *Heller v. McDonald*, 554 U.S. 742, 628 (2010)) (internal citations omitted).

[288] *See, e.g.*, *Hall v. Garcia*, No. C 10–03799 RS, 2011 WL 995933, at *2 (N.D. Cal. Mar. 17, 2011) (upholding a prohibition on firearms near school property, explaining "[i]t is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling,'" and reiterating that that the United States Supreme Court has "sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights") (quoting *New York v. Ferber*, 458 U.S. 747, 756–57 (1982)); *United States v. Masciandaro*, 638 F.3d 458, 473 (4th Cir. 2011) (finding that "the government has a substantial interest in providing for the safety of individuals who visit and make use of the national parks" and noting that "large numbers of people, including children, congregat[ing] for recreation, . . . justif[ies] reasonable measures to secure public safety"); *GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers*, 212 F. Supp. 3d 1348, 1369 (N.D. Ga. 2016) (finding that the "Army Corps undoubtedly has a substantial interest in 'providing the public with safe and healthful recreational opportunities while protecting and enhancing [its] resources'") (quoting 36 C.F.R. § 327.2)); *Bonidy v. U.S. Postal Service*, 790 F.3d 1121, 1125–26 (10th Cir. 2015), *cert. denied*, 136 S. Ct. 1486 (2016) (finding that USPS's desire to "creat[e] a safe environment for its patrons and employees" was an important governmental interest). In fact, it appears no other courts have objected to general safety concerns when analyzing important government interests under intermediate scrutiny.

that, for generations, Delaware Park users and Forest walkers have been subject to violent attacks by criminals and wild animals, citing in support of this contention the vast expanse of Park land, the fact that Delaware only has twenty-one park rangers to cover that land, and the existence of threatening wild animal species in the Parks and Forests.[289]

The appellants contend that the correlation between firearms regulation and violence is inconclusive, and further, that "[t]he Legislature has not found possession and carrying of firearms in a majority of the public space throughout the State to be a risk to public safety."[290] But their inability to accompany with data their vivid descriptions of why deadly weapons might be needed by a Park or Forest visitor suggests that, in comparison to other places in Delaware where it would be easy to find many examples of gun violence, our Parks and Forests are safer. This is too thin a gruel to provide a basis for overturning the judgment of generations of officials charged with operating our Parks and acting as stewards of our Forests that they should be weapons-free, with limited exceptions.

The appellants' inability to make this showing is important given our duty to exercise restraint and to accord the benefit of the doubt to those entrusted with operating our Parks and Forests in the public interest. Their judgment that limiting the possession and use of firearms within Parks and Forests best facilitates the safe enjoyment of these special places as havens for education, family time, recreation, athletics, and outdoor

---

[289] Appellants' Amend. Opening Br. 27–28; Appellants' Corrected Reply Br. 12.
[290] Appellants' Amend. Opening Br. 19–20 (citing *Moore v. Madigan*, 702 F.3d 933, 938–39 (7th Cir. 2012)).

activities should not be lightly upset, even if there was data that could create a reason for debate. Because the appellants and their friends in amicus fail to provide any support for the proposition that the Regulations have failed in their intended and compelling public purpose, this Court's precedent requires that we stay our hand and defer to those entrusted with the responsibility to run our Parks and Forests.

Of course, the Majority faults the Agencies for failing in 1977 to anticipate federal decisions issued in 2008 and 2010 and apply them to the Regulations.[291] But it cannot be that our Executive Branch officials are expected to live out of chronological time and to factor into their decisions federal judicial decisions that post-date their actions by nearly thirty years. In many religious traditions, only the Creator is seen as existing out of ordinary time, and humans are seen as having more mundane abilities. Nostradamus made many predictions, but among them were not the *Heller* and *McDonald* decisions, nor the decision in *Doe*.

It also comes with some chutzpah for the Judiciary, which works in a place where firearm possession is denied to all but security staff, to demand that generations of seasoned administrators parade social science research supporting their common sense

---

[291] Majority Op. 25 ("More than two decades later, the United States Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), finally settled the questions that had served as an impetus for Section 20.").

determination that our Parks and Forests will be safer if they are as free as possible from

the presence of deadly force. [292]

Deferring to the legislative judgment that the Regulations further the important

governmental objective of public safety and acknowledging the Regulations' provision for

---

[292] Distinguished scholars have reviewed the arguments of pro-gun advocates that firearm regulation in the United States and elsewhere has not been associated with lower rates of violence and homicide. Their comprehensive analysis contradicts that assertion and provides evidence that governmental regulation of firearm possession and use can be effective in reducing violence. *See, e.g.*, John Donohue & Ian Ayres, *Shooting Down the More Guns, Less Crime Hypothesis*, 55 STAN. L. REV. 1193 (2003); *see also* John J. Donohue III et al., *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Controls Analysis*, (Stanford Law and Economics Olin Working Paper No. 508, Columbia Business School Research Paper No. 17-67, Stanford Public Law Working Paper), https://papers.ssrn.com/sol3/Delivery.cfm/SSRN_ID3034416_code445373.pdf?abstractid=2990220&type=2. This is despite the fact that states and localities with gun control legislation in the United States must deal with the reality that if their neighboring jurisdictions do not enact gun control legislation, guns can find their way to the mentally ill and those with criminal records in jurisdictions that do not limit their access. In addition, guns (for example, those that can act like a machine gun) that are not legal in their jurisdictions can travel in from neighboring jurisdictions that allow that type of weapon. On a comparative basis, compelling evidence exists that the higher prevalence of firearms in the United States results in a level of gun violence far exceeding similar nations. The United States has far more guns per capita than the nations we consider similar to our own. German Lopez, *Ted Cruz Accidentally Explained America's Gun Problem in One Sentence*, Vox (Nov. 7, 2017), https://www.vox.com/policy-and-politics/2017/11/6/16615218/ted-cruz-gun-control-sutherland-springs-texas-shooting (reporting that in the United States, there are an average of eighty-nine guns per one hundred people, as compared to, for example, thirty-one guns per one hundred people in Canada, fifteen guns per one hundred people in Australia, six guns per one hundred people in England and Wales, and six-tenths of a gun per one hundred people in Japan). Consistent with the greater prevalence of guns, Americans suffer far more deaths by gun per capita than our friends in ally nations. *Id.* (in the United States, there are an average of 2.97 gun-related homicides per one hundred thousand people, as compared to, for example, 0.51 gun-related homicides per one hundred thousand people in Canada, 0.14 gun-related homicides per one hundred thousand people in Australia, 0.07 gun-related homicides per one hundred thousand people in England and Wales, and 0.01 gun-related homicides per one hundred thousand people in Japan). The explanation that the prevalence of firearms explains those differences is more savory than assuming that Americans are just more violent and murderous than Europeans, Asians, Canadians, or Australians.

exceptions, we would find that the Regulations do not burden the right to bear arms any more than necessary. The Regulations limit firearm possession and use in specific areas on government property the public is invited to enjoy in a shared way, where children are encouraged to be present, and for purposes that may cause emotions and spirits to run too high at times. A core purpose of Section 20, to allow use of guns for hunting, is facilitated by the Parks and Forests. Delaware's Parks and Forests account for three percent of the state's total acreage, and the activities available in Parks and Forests can be enjoyed in places other than on state property.[293] And the Regulations provide for exception or waiver.[294]

That the Park and Forest Regulations do not burden conduct protected under Section 20 any more than reasonably necessary, if at all, is underscored by the reality of what Parks and Forests are. They do not consist of separate, locked, walled enclosures, where firearm possession and use can be cabined and confined. They are open places, without natural barriers to trap bullets or flying arrows, or to restrict where guns can be possessed and used. Setting aside the Regulations on the speculation that there are safe, practicable, and inexpensive ways to open our Parks and Forests to discrete possession and use of weapons

---

[293] We also note that the penalties associated with a violation of the Regulations are modest. For example, a Park Regulation violation is classified as an environmental misdemeanor that subjects a first-time violator to a fine between fifty and one hundred dollars, and a Forest Regulation violation, an unclassified misdemeanor, subjects a first time violator to a fine between twenty-five and two hundred and fifty dollars. 7 *Del. Admin. C.* § 9201-25.0; 3 *Del. Admin. C.* § 402.10.0.

[294] DEL. DEP'T NAT. RES. & ENVTL. CONTROL, PARK RULES AND REGULATIONS § 8.04 (1977); DEL. DEP'T AGRIC., STATE FOREST REGULATIONS § 7.9 (2003); 3 *Del. Admin. C.* § 402-3.2.

90

turns the requirement that we give deference to the Agencies in this context upside down.[295]

Invalidating the Regulations will also make it more difficult for Park and Forest officials to police hunting by use of improper weapons, as they will confront claims that the people they suspect were hunting were instead carrying the weapon for purposes of self-defense. And should the Parks and Forests have to have kid-free, education-free, sporting games-free, beer-free, or camping-free days in the Parks and Forests, when those who wish to carry weapons can have the Parks and Forests to themselves, without presenting a danger to those who wish to enjoy these core Park and Forest activities?[296]

Conjuring up a sensible, less-restrictive policy is not our function, and the appellants did not choose to make a focused challenge. They made a broad, facial challenge and have not come close to undermining the reasonableness of the longstanding policy judgment in the Regulations, the same one that characterized the national policy in 1987, when Section 20 was adopted. Consistent with our reasoning, federal courts have found that prohibiting

---

[295] Majority Op. 40 ("Although there certainly could be some 'sensitive' areas in State Parks and State Forests where the carrying of firearms may be restricted, as is done in certain areas of National Parks, there is no record here that the State has undertaken any effort to delineate such areas so as not to infringe on Section 20 rights.") (internal citations omitted).
[296] The Majority argues that the Agencies lack the authority to adopt the Regulations. But, they do not deny that the Agencies have the authority to regulate when visitors can enter the Parks and Forests, to limit activities such as the use of liquor, or to require visitors to pay entry and license fees. The Majority even admits that the Agencies can regulate firearm possession and use in the Parks and Forests, but just must do so more narrowly. In other words, all the Majority contends is that no agency may adopt a regulation that violates our Constitution. We agree with that, but do not agree that these Regulations run afoul of Section 20.

firearms on government property to ensure visitor safety advances an important policy objective and survives intermediate scrutiny.[297]

## XI.

Our tradition is to be restrained in overturning the settled determination of our Executive and Legislative Branches about important policy issues entrusted to them. For generations, a bipartisan array of governors and their duly confirmed cabinet secretaries has deemed it best for Delawareans that their Parks and Forests be places where the

---

[297] *See, e.g, Warden v. Nickels*, 697 F. Supp. 2d 1221, 1229 (W.D. Wash. 2010) (upholding a prohibition on firearms at certain parks and facilities, finding the prohibition was valid because parks "where children and youth recreate" were sensitive areas, and explaining that, just as the government does not want weapons in courthouses and government buildings, "the City does not want those with firearms entering certain parks where children and youth are likely present"); *United States v. Masciandaro*, 638 F.3d 458, 473 (4th Cir. 2011) (applying intermediate scrutiny, upholding a ban prohibiting loaded guns in vehicles within a national park area, finding that "the government has a substantial interest in providing for the safety of individuals who visit and make use of the national parks," and explaining that the national parks are an "area where large numbers of people, including children, congregate for recreation," which justified implementing "reasonable measures to secure public safety"); *GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers*, 212 F. Supp. 3d 1348, 1372–73 (N.D. Ga. 2016) (applying intermediate scrutiny and finding the "high density of visitors, use of recreational facilities, the various potential sources of conflict among visitors, and limitations on the Corps' ability to police its own properties, restricting visitors' authority to carry loaded firearms helps Defendant Army Corps maintain public safety and the security of infrastructure on those properties"); *Bonidy v. U.S. Postal Service*, 790 F.3d 1121, 1125–26 (10th Cir. 2015), *cert. denied*, 136 S. Ct. 1486 (2016) (explaining that "the fact that the government is acting in a proprietary capacity, analogous to that of a person managing a private business" was relevant because the government has "more flexibility to regulate when it is acting as a proprietor" and finding that the ban is was substantially "relevant to the USPS's business objectives, which include[d] providing a safe environment for its patrons and employees"); *Hall v. Garcia*, No. C 10-03799 RS, 2011 WL 995933, at *2 (N.D. Cal. Mar. 17, 2011) (upholding a prohibition on carrying weapons within one thousand feet of school property and finding that it was "beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling," and thus survived intermediate scrutiny"); *see also Embody v. Ward*, 695 F.3d 577, 581 (6th Cir. 2012) ("No court has held that the Second Amendment encompasses a right to bear arms within state parks.").

possession and use of deadly weapons is regulated. When Section 20 was adopted, no one in the General Assembly or the Executive Branch believed it upset these policies, and nor did anyone for the thirty years that followed. We regret that the authority to regulate our Parks and Forests has now been wrested from the control of the governors our citizens elect based on importing novel principles of federal constitutional law favored by gun rights advocates into a Delaware Constitution that does not embody them.

The appellants have failed to show that the Regulations do not advance the important objective of making our Parks and Forests safe, shared havens for the education, enjoyment, relaxation, and recreation of Delaware families, children, and adults. The outcome here does not solve a problem, it creates one, and puts our Executive Branch in the unnecessary predicament of trying to develop expensive, impractical, and suboptimal policies that segment open public spaces with no natural boundaries to contain deadly force into areas that are weapons-free and those that are not, or of choosing to open to firearms important areas that educate children, bring together families for picnics and camping, and provide a forum for sporting events.

Since our founding, Delawareans have entrusted the legislative and executive branches to regulate gun use. By judicial edict, this Court has denied its government the same rights as any other owner of property, to determine whether someone can enter its land and on what conditions. Instead the Majority has made its own policy determination that the interests of those who wish to carry arms on government property outweigh the interests of others in being in a place free of deadly weapons, and more important, in having

93

the governors and cabinet secretaries charged with running our Parks and Forests for the best interests of Delawareans decide how best to do so. And the Majority's decision, if good law, also has the regrettable consequence of overturning longstanding decisions of two of our state's counties to prohibit firearms in their county parks.

We respectfully dissent.[298]

_____

[298] Our colleagues in the Majority take issue with our dissent in several ways. We will not endeavor an extensive response to each, but suffice with this footnote. For example, the Majority argues that we focus on the state of English law only in 1977, not as of the time of Delaware's founding. But we show that, as of our founding, any English right to bear arms was subject to restriction and regulation by Parliament, the equivalent of our General Assembly, and we show how by 1977, Parliament had used that power to regulate the ownership and possession of firearms. *See supra* Part IV, Section F.

The Majority also suggests that our view that our government may create havens for recreation and family time that are weapons-free somehow portends its ability to restrict freedom of speech, and even engage in viewpoint discrimination. Nothing, of course, in our opinion suggests such a thing, and the reality is that even as to free speech, the government as a proprietor has the right to limit where and when speech may be exercised, and that government operates all kinds of properties (schools, courthouses and judicial chambers, museums, libraries, police stations) where no one has the right to come and just give a speech. When lethal force is present, an increased danger to others always exists, as recent events show. *See, e.g.*, Marwa Eltagouri, *Man Accidentally Shoots Himself and His Wife at a Church, Shortly After a Discussion on Shootings*, WASH. POST (Nov. 17, 2017), https://www.washingtonpost.com/news/acts-of-faith/wp/2017/11/17/a-man-accidentally-shot-himself-and-his-wife-at-a-church-shortly-after-a-discussion-on-shootings/; Marwa Eltagouri, *He Thought He Saw a Deer and Fired His Pistol. Now His Neighbor is Dead*, WASH. POST (Nov. 24, 2017), https://www.washingtonpost.com/news/animalia/wp/2017/11/24/he-thought-he-saw-a-deer-and-fired-his-pistol-now-his-neighbor-is-dead/?utm_term=.bd2afbb0af29. That is not true of an expression of an opinion. But, even in our Parks and Forests, you cannot just hold a rally on the softball field or in the trout stream. On this point, another reality exists. It was long understood that government could restrict gun possession on its property or even near it, *supra* note 56 (citing LOIS G. SCHWOERER, GUN CULTURE IN EARLY MODERN ENGLAND 59, 61 (2016) (identifying laws prohibiting the carrying of small handguns within the royal court or a three-mile radius of it)),

because of the obvious dangers lethal force presents, and as we show, Section 20 was adopted on the basis of accepting traditional restrictions on firearm possession and use, which included those that allowed the government to restrict firearm possession and use on its own lands. To this, even *McDonald* went out of it way to disclaim any "doomsday" reading of its reasoning, and to assure that it "does not imperil" all regulations of firearms, including longstanding regulations on the possession and ownership of guns, like the ones at issue here. *McDonald v. City of Chicago*, 561 U.S. 742, 787 (2010).